**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| The **UNITED STATES of AMERICA** and | ) | |
| The **STATE OF ILLINOIS**, *ex rel.* | ) | |
| **DONALD HELFER, M.D.** and | ) | |
| **DONALD HELFER, M.D.**, Individually, | ) | |
| | ) | No. 10-3076 |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Filed <u>In Camera</u> and |
| | ) | Under Seal |
| **ASSOCIATED ANESTHESIOLOGISTS OF** | ) | |
| **SPRINGFIELD, LTD.**, an Illinois Corporation, | ) | |
| **CBIZ MEDICAL MANAGEMENT PROFESSIONALS,** | ) | |
| **INC.**, an Ohio Corporation, and **ANESTHESIA** | ) | |
| **BUSINESS CONSULTANTS, LLC**, a | ) | |
| Michigan Limited Liability Corporation, **MEMORIAL** | ) | |
| **MEDICAL CENTER**, an Illinois Not-For-Profit | ) | |
| Corporation and **MEMORIAL HEALTH SYSTEM,** | ) | |
| an Illinois Not-For-Profit Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**AMENDED COMPLAINT**</u>

NOW COME the Plaintiffs, the United States of America and the State of Illinois, by

the Relator Donald Helfer, M.D., and Donald Helfer, M.D., Individually, through their

attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and for their

Amended Complaint against Associated Anesthesiologists of Springfield, Ltd., an Illinois

corporation, CBIZ Medical Management Professionals, Inc., an Ohio corporation,

Anesthesia Business Consultants, LLC, a Michigan Limited Liability Corporation, Memorial

Medical Center, an Illinois Not-for-Profit Corporation, and Memorial Health System, an

Illinois Not-for-Profit Corporation, allege as follows:

<u>Parties and Jurisdiction</u>

1.     This is an action for damages and civil penalties filed behalf on of:

A)     the United States of America arising from false statements and records made or caused to be made by Defendants to the United States in violation of the False Claims Act, 31 U.S.C. §3729, *et seq.*, as amended;

B)     the State of Illinois arising from false statements and records made or caused to be made by Defendants to the State of Illinois in violation of the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.*;

C)     the State of Illinois arising from violations of the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1, *et seq.*, by Defendants; and

D)     Donald Helfer, M.D. for wrongful discharge in violation of the False Claims Act, 31 U.S.C. §3730(h) and the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/4(g).

2.     Relator Donald Helfer, M.D. (hereafter "Relator") is a citizen of the United States and at all times relevant hereto was a resident of Springfield, Sangamon County, Illinois.

3.     Relator was employed by Defendant Associated Anesthesiologists of Springfield, Ltd. from August 1990 to October 2009 and provided professional medical services as a hospital-based anesthesiologist at Defendant Memorial Medical Center,

Springfield, Illinois.   Relator was also a shareholder of Defendant Associated Anesthesiologists of Springfield, Ltd. during the term of his employment.

4.      Defendant Associated Anesthesiologists of Springfield, Ltd. (hereafter "Associated Anesthesiologists") is a for-profit Illinois corporation, Charter No. 46079060, organized on December 29, 1965.  Its principal office is located at 701 N. 1st Street, Springfield, Illinois.

5.      Associated Anesthesiologists provides hospital-based anesthesiologists at Defendant Memorial Medical Center in Springfield, Illinois, for the provision of various types of anesthesia services to patients of Defendant Memorial Medical Center and its Ambulatory Surgery Center and the provision of medical direction services for Certified Registered Nurse Anesthetists ("CRNAs") employed by Defendant Memorial Medical Center to perform anesthesia services to patients.  Associated Anesthesiologists has an exclusive contract with Defendant Memorial Medical Center for these purposes.

6.      Associated Anesthesiologists submits bills to Medicare, Illinois Medicaid and private health insurance companies for anesthesia services performed by its anesthesiologists at Defendant Memorial Medical Center.

7.      Defendant CBIZ Medical Management Professionals (hereafter "MMP") is a for-profit Ohio Corporation, Charter #1038521, formed on October 13, 1998.  Its principal office is located at 5959 Shallowford Road, Suite 575, Chattanooga, TN. MMP provides billing, accounts receivable and practice management services to medical professionals, including anesthesiologists.

8.      MMP provided billing and accounts receivable services to Associated Anesthesiologists from at least 1997 to September 30, 2008, submitting claims to

Medicare, Illinois Medicaid and private insurance companies on Associated Anesthesiologists' behalf.

9.      Anesthesia Business Consultants, LLC (hereafter "ABC") is a for-profit Michigan limited liability company, Charter #B89226, formed on March 6, 2001.  Its principal office is located at 255 West Michigan Avenue, Jackson, MI.  ABC provides billing, accounts receivable and practice management services to hospital-based anesthesiologists.

10.     ABC has provided billing and accounts receivable services to Associated Anesthesiologists from October 1, 2008, to the present, submitting claims to Medicare, Illinois Medicaid and private insurance companies on Associated Anesthesiologists' behalf.

11.     Defendant Memorial Medical Center (hereafter "Memorial Medical Center") is an Illinois not-for-profit corporation, File # 07517572, formed on January 19, 1897. Memorial Medical Center operates as an acute care hospital offering comprehensive inpatient and outpatient care at 701 N. First Street, Springfield, Illinois.  Memorial Medical Center is an affiliate hospital of Defendant Memorial Health System.

12.     Defendant Memorial Health System (hereafter "Memorial Health System") is an Illinois not-for-profit corporation, File #52486173, formed on August 21, 1981. Memorial Health Systems operates as a healthcare organization governing three hospitals, one mental health center, one physician group and one home health services agency, which are referred to as their "affiliates".  Memorial Health Systems' principal office is located at 701 N. First Street, Springfield, Illinois.

4

13.     Subject matter jurisdiction for the underlying action alleged in Counts I – X of this Complaint arises under the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, and jurisdiction over the underlying matter is conferred on the Court by authority of 31 U.S.C. §§ 3732(a).

14.     As hereinafter more clearly appears, Counts XI - XXII of this Complaint  are so related to the claims alleged in Counts I-X that the claims in Counts XI – XXII form part of the same case or controversy under Article III of the United States Constitution.

15.     Counts XI – XXII of this Complaint neither raise a novel or complex issue of state law nor substantially predominate over the underlying False Claims Act matter alleged in Counts I - X of this Complaint.

16.     There are no compelling reasons for the court to decline subject matter jurisdiction over Counts XI-XXII of this Complaint.

17.     This Court has subject matter jurisdiction over Counts XI-XXII of this Complaint as supplemental jurisdiction in accordance with 28 U.S.C. §1367.

18.     This Court has personal jurisdiction over Defendants because they reside in, transact business in, and can be found in the Central District of Illinois and because the acts complained of herein occurred in the Central District of Illinois.

19.     Venue is proper in the Central District of Illinois pursuant to 31 U.S.C. §3732(a) because Defendants can be found in, reside in and transact business in the Central District of Illinois, and because the acts alleged herein to be in violation of 31 U.S.C. §3729 occurred in the Central District of Illinois.

20.     None of the allegations set forth in this complaint are based on a public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a

congressional, administrative, or General Accounting office report, hearing, audit, or investigation, or from the news media.

21.     Relator has direct and independent knowledge, within the meaning of 31 U.S.C. §3730(e)(4)(B) and 740 ILCS 175/4(e)(4)(B), of the information on which the allegations set forth in this complaint are based, derived through either employment or business or personal relationships with Associated Anesthesiologists, MMP, ABC, Memorial Medical Center and Memorial Health System.

22.     Relator is the original source of the allegations as defined in 31 U.S.C. §3730(e)(4)(B) and 740 ILCS 175/4(e)(4)(B).   Relator has knowledge of the false statements, records and claims that Associated Anesthesiologists, MMP, ABC, Memorial Medical Center and Memorial Health System knowingly submitted, or caused to be submitted, to the Government as alleged herein.

23.     To the extent, if any, that this case is deemed to be a related action and that facts set forth herein are deemed to be the same as facts underlying an existing *qui tam* False Claims Act or Illinois Whistleblower Reward and Protection Act action pending at the time of filing of this action, as prohibited in 31 U.S.C. §3730(e) and 740 ILCS 175/4(b)(5), said factual allegations in common with either pending action, which would cause this to be a related cause of action, are hereby expressly excluded from this action, but only to the limited extent necessary to exclude such preemption.

24.     Furthermore, to the extent that the allegations or transactions set forth herein are based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States and/or the State of Illinois is already a party, if any such proceedings exist, then the allegations or

transactions referred to herein that the Court deems are based upon allegations or transactions which are the subject of any such civil suit or administrative civil money penalty proceeding are expressly excluded herefrom, but only for the specific time periods, specific companies or persons, and specific allegations or transactions as necessary.

25.     Relator brings this action for: (1) violations of the False Claims Act on behalf of himself and the United States of America pursuant to 31 U.S.C. § 3730(b)(1); (2) violations of the Illinois Whistleblower Reward and Protection Act on behalf of himself and the State of Illinois pursuant to 740 ILCS 175/4(b); (3) violations of the Insurance Claims Fraud Prevention Act on behalf of himself and the State of Illinois pursuant to 740 ILCS 92/15(a); (4) violations of the False Claims Act on behalf of himself pursuant to 31 U.S.C. § 3730(h); and (5) violations of the Illinois Whistleblower Reward and Protection Act on behalf of himself pursuant to 740 ILCS 175/4(g).

Regulatory Scheme<br>Medicare Payment for Anesthesia Services

26.     The United States Medicare Healthcare Program (hereafter "Medicare") is a federal health insurance program for persons 65 or older, persons with permanent kidney failure, and persons receiving Social Security disability benefits. 42 U.S.C. §426; 42 U.S.C. §1395c.

27.     Overall responsibility for the administration of Medicare, as authorized by 42 U.S.C. §401, *et seq.*, (hereafter "Social Security Act"), resides with the Secretary of the Department of Health and Human Services (hereafter "HHS").  Within HHS, the responsibility for administration of the Medicare program has been delegated to the Center for Medicare and Medicaid Services (hereafter "CMS").

28.    Medicare provides two basic types of coverage - hospitalization insurance (commonly known as Medicare Part A) and medical insurance (commonly known as Medicare Part B).  Part A hospital insurance provides coverage for inpatient hospital charges, post-hospital extended care for 100 days following hospital discharge, and hospice care.  42 U.S.C. §1395d.  Part B medical insurance covers physician services, home health services, most skilled nursing home services, and other non-hospital related medical services.  42 U.S.C. §1395k.

29.    Inpatient hospital services covered by Part A include, but are not limited to, bed and board, nursing services, social services, medication, supplies, equipment, diagnostic services, therapeutic services, surgical services and transportation services.  42 CRF 409.10.

30.    Payment for inpatient hospital services under Part A is made by Medicare through an Inpatient Prospective Payment System ("Inpatient PPS").  42 CFR 412.  Under the Inpatient PPS, hospitals are paid a predetermined amount by Medicare for each inpatient discharge of a Medicare beneficiary.  42 CFR 412.2.  The predetermined amount paid for each inpatient discharge is based upon the diagnosis of the patient and the patient's assignment into a diagnosis related group ("DRG") by the hospital. www.cms.gov/AcuteInpatientPPS/01_overview.asp.   Each DRG has a predetermined payment amount based upon the average costs needed to treat Medicare patients with that diagnosis.  Id.

31.    The per discharge Inpatient PPS amount is payable for each inpatient stay where there is at least one Medicare payable day of care.  42 CFR 412.2(b)(2).

32.     Payments are made for each Medicare inpatient discharge in two ways:  (1) upon submission of a discharge bill for each patient; and (2) periodic interim payments cost payments made bi-weekly based upon the total estimated Medicare discharges for a specific reporting period.  42 CFR §412.116(a)(1), (b)(1), (b)(3).

33.     Medicare Part A claims are submitted to the Medicare Intermediary for payment electronically utilizing the CMS 1450/UB-04.   Medicare Claims Processing Manual, Chapter 1, §10.1.

34.     Hospitals are required to file an annual Cost Report ("Cost Report") utilizing HCFA forms such as 2540 or 2552.  42 CFR §413.20.  On the Cost Report, the provider lists information including but not limited to, all incurred costs, all routine and ancillary charges, the days of service provided to Medicare beneficiaries, the amount of Part B reimbursement received, and the amount of Part A Inpatient PPS payments received during that fiscal year.

35.     Upon receipt of the cost report, CMS determines the actual costs of the services provided to Medicare patients by the provider, compares it to the total payments made to the provider during the year and makes a final payment to the provider for reimbursement of its actual costs incurred in providing care to Medicare beneficiaries.  42 CFR §413.60.

36.     Medicare Part B provides coverage for anesthesia services "performed, medically directed or medically supervised by a physician" at the lesser of the actual charge or the anesthesia fee schedule amount.  42 CFR §414.46(b).  Medicare Part B also covers anesthesia services furnished by CRNAs or Anesthesiology Assistants who are legally authorized to perform the services in the state where they are furnished.  42 CFR

§410.69(a).  Illinois law allows CRNAs to perform anesthesia services when a physician participates in and agrees with the anesthesia plan to be delivered and the physician remains physically present and available on the premises where the anesthesia is being delivered.  68 Ill.Adm.Code 1305.45.

37.    Medicare's fee schedule amount for anesthesia services is hand calculated by multiplying an anesthesia specific conversion factor by the sum of the allowable base units for a particular anesthesia procedure and the anesthesia time units.  These three elements are determined as follows:

A)    The conversion factor is specific to locality. For the years 2008 – 2012, the anesthesia conversion factor for the Medicare payment locality in which Associated Anesthesiologists is located (Locality 99) was as follows:

| Year | CF |
|------|-------|
| 2008 | 20.01 |
| 2009 | 20.99 |
| 2010 | 20.73 |
| 2011 | 21.4 |
| 2012 | 21.76 |

*See* CMS website, Anesthesiologist Center, billing/payment data.

B)    "Base unit" is defined for Medicare purposes as:

the value for each anesthesia code that reflects all activities other than anesthesia time (i.e. pre-op and post op visits; incidental administration of fluids and blood; monitoring).

42 CFR §414.46(a)(1).  CMS provides the Medicare Carrier with the number of allowable base units for each CPT code for which anesthesia is or may be necessary.  42 CFR §414.6(b)(2).    The

allowable base units vary from 0 to 30 depending on the procedure type. *See* CMS website, Anesthesiologist Center, billing/payment data.

C)      "Anesthesia Time" is defined for Medicare purposes as:

> the time which an Anesthesia Practitioner is present with the patient, starting when the Anesthesia Practitioner begins to prepare the patient for anesthesia and ending when the patient is passed to post-op care.

42 CFR §414.46(a)(3).  The time units are calculated using the time units reported by the Anesthesia Practitioner.  42 CFR §414.6(b)(1).  One unit of anesthesia time is equal to 15 minutes. 42 CFR §414.46(c)(2).

38.      The specific amount allowed for payment for each particular anesthesia claim submitted is based upon the type of anesthesia practitioner and level of supervision of CRNAs involved in the anesthesia services.

39.      Medicare allows the full fee schedule amount for an anesthesia service when the service is personally performed by an anesthesiologist.  42 CFR §414.46(c)(2).  Medicare deems a procedure "personally performed" by an anesthesiologist when:

A)      The entire anesthesia service is performed solely by the physician;

B)      An attending physician relationship is established in one case involving an intern or resident (applies to all services rendered between 1/1/94 and 1/1/96 and to teaching physicians only for services after 1/1/96);

C)      It is medically necessary to involve both the physician and a CRNA or assistant in a single case;

D)      The physician is continuously involved in a single case handled by a student nurse anesthetist; or,

E)    The service was rendered prior to 1/1/98 and the physician was continuously involved in a case along with a CRNA or assistant.

42 CFR §414.46(c)(1).

40.    Payment for anesthesia services performed by an anesthesiologist while medically directing CRNAs is based upon a percentage of the payment amount for the service if performed personally by the physician.  For calendar year 1998 and thereafter, the percentage rate was 50%.  42 CFR §414.64(d)(3).  Medicare considers a service "medically directed" by the physician if the physician:

A)    performs the pre-anesthesia exam and evaluation;

B)    prescribes the anesthesia plan;

C)    participates in the most demanding aspects of the plan, including induction and emergence;

D)    ensures the anesthesia plan is performed by a qualified individual;

E)    frequently monitors the course of the administration of the anesthesia;

F)    is physically present and available for diagnosis and treatment if an emergency arises;

G)    provides post-anesthesia care as needed; and,

H)    directs no more than four concurrent[1] anesthesia services and does not perform any other services while directing these services.

42 CFR §414.64(d)(1); 42 CFR §415.110(a).  The physician is personally responsible for the inclusion of specific documentation in the patient's medical record indicating these items have been satisfied.  42 CFR §415.110(b); Medicare Carriers Manual ("MCM")

---

[1]  "Concurrent services" are defined as "the maximum number of procedures that the physician is medically directing with the context of a single procedure and whether these other procedures overlap each other." MCM §15018(C); MCPM, Chapter 12, §50(C).  A procedure does not have to involve a Medicare patient in order to be counted when determining the number of concurrent procedures a physician is engaged in for Medicare billing purposes.  Id.

§15018(C)/Medicare Claims Processing Manual ("MCPM"), Chapter 12, §50(C).[2]

41.     If a physician directs more than four concurrent services, it is deemed "medical supervision".   The payment amount for medical supervision is allowed at an amount equal to the anesthesia specific conversion factor multiplied by three base units for the physician's involvement in pre-surgery services.    42 CFR §414.64(f);  MCM §15081(D)/MCPM, Chapter 12, §50(D).   One additional time unit can be charged if the physician can document that he was present at the induction of the anesthesia.   MCM §15081(D)/MCPM, Chapter 12, §50(D).

42.     The payment issued by Medicare for an anesthesia service is an all-inclusive payment.   Pre-anesthesia exams, pre-op and post-op visits and monitoring functions are not separately reimbursable to the anesthesiologist.  42 CFR §414.46(h).

43.     In accordance with Title XVIII of the Social Security Act, as amended, 42 U.S.C. § 301, *et seq.*, CMS contracts with private insurers to process Medicare claims and to make benefit payments on behalf of the Government.    42 U.S.C. §1395u.   Private insurers that contract to handle Medicare Part B claims are known as Medicare Carriers. Since April, 1998, Wisconsin Physician Services (a/k/a "WPS") has served as the Medicare Carrier for all parts of Illinois other than the Chicago area.

44.     Claims submitted to the Medicare Carrier for Medicare reimbursement are to be paid in accordance with the Social Security Act, Code of Federal Regulations, and Medicare Rules and Regulations as promulgated by CMS.   The Medicare Rules and Regulations are distributed by CMS to the Medicare Carrier, who in turn distributes the

---

[2] Prior to 2003, the CMS manual applicable to handling of Medicare Part B claims was known as the Medical Carriers Manual.  The CMS manual system was transformed into an on-line manual system in 2003.  At this point, the Medicare Carrier Manual was retired and regulations regarding handling of Medicare Part B claims were moved into the Medicare Claims Processing Manual.

Rules and Regulations to the providers.  CMS periodically distributes Medicare Rules and Regulations to the providers through Program Memorandums and Program Transmittals. CMS also provides Medicare Rules and Regulations to providers via its internet website.

45.     Claims are submitted to the Medicare Carrier for payment utilizing the CMS-1500 or its electronic equivalent. WPS has issued specific instructions for the completion of the CMS-1500 for anesthesia services. Copies of the Medicare claim form and WPS instructions for completion of anesthesia services claims are attached hereto as Exhibits A and B respectively.

46.     CMS mandates that anesthesia providers utilize the Healthcare Common Procedure Coding System ("HCPCS") to indicate the medical services rendered when submitting claims to Carriers.  HCPCS are a uniform method for health care providers and medical suppliers to report professional services, procedures, and supplies.  The medical services codes of the HCPCS are known as "Common Procedure Terminology" Codes a/k/a "CPT Codes".

47.     During all relevant times hereto, anesthesia services performed and monitored by an anesthesiologist have been billed to Medicare utilizing HCPCS codes 00100 – 01999 (anesthesia service codes) and codes for Moderate Sedation from the 99000 Medicine codes series.

Regulatory Scheme
Illinois Medicaid Payment for Anesthesia Services

48.     Medicaid is a state-run program of medical care and rehabilitative services for persons receiving basic state maintenance grants and for other persons who are unable to meet their essential medical needs because of inadequate resources.  305 ILCS 5/5-1.

49.     Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program, in accordance with Title XIX of the Social Security Act, as amended, 42 U.S.C. §1396, *et seq*. The Federal Government grants funds to the individual states for Medical Assistance Programs to furnish medical assistance to families with dependent children and to aged, blind, or disabled individuals whose income and resources are insufficient to meet the costs of necessary medical services. The benefits paid by the individual state agencies contain a certain percentage of federal funds. Id.

50.     The State of Illinois participates in the Medicare program and provides medical insurance to eligible recipients.

51.     In Illinois, the percentage of federal funds involved in the Medicaid program during the relevant time period has been fifty percent (50%) of the total funding.

52.     Illinois Medicaid provides medical coverage for physician services essential for the diagnosis and treatment of disease or injury as outlined by the CPT Codes.  140 Ill.Adm.Code 140.411.   Anesthesia services and in-patient hospital services are such covered services.  Illinois Medicaid Handbook for Physicians ("HP"), Chapter 100, Section A-283.1; 89 Ill.Adm.Code 140.3.

53.     Illinois Medicaid provides coverage for anesthesia services provided by either an anesthesiologist or a CRNA.   HP A-238.1.   It will not pay for both an anesthesiologist and a CRNA on the same patient for the same procedure unless supporting documentation is submitted showing the medical necessity for both providers. Id.  An anesthesiologist who remains immediately available in the operating area during a surgical procedure can bill for his services if the hospital does not include the anesthesia

charges in its reimbursable costs and makes no charge for the services.  Id.  A claim may be submitted by the anesthesiologist for each anesthetized patient for which he is concurrently responsible for care. Id.

54.     An anesthesiologist cannot submit separate billing charges for pre-anesthesia evaluations as this service is included in the anesthesia code reimbursement. HP A-283.11.  Routine post-op care also cannot be submitted for separate reimbursement. HP  A-283.13.  Separate post-op care payment is only allowed for post-op pain management in cases of unstoppable pain from things like multiple trauma injuries or metastatic cancer.  Id.

55.     Illinois Medicaid will only make payment for covered anesthesiology services to Illinois Medicaid participating providers who are licensed by the State of Illinois to provide such services.  140 Ill.Adm.Code 140.2; 140 Ill.Adm.Code 140.410.

56.     Eligible Illinois Medicaid participating providers desiring payment for anesthesia services must submit claims to Illinois Medicaid for their services.    The charges for anesthesia services are submitted on the CMS-1500 in either paper form or through electronic means.

57.     As with Medicare claims, Illinois Medicaid hand-prices anesthesia services based upon a base charge, base units and time units.

58.     Illinois Medicare requires that anesthesiologists report time units as outlined by the American Medical Association in the CPT book.  HP A-283.12.  The CPT book provides that:

> Time for anesthesia procedures may be reported as is customary in the local area.  Anesthesia time begins when the anesthesiologist begins to prepare the patient for the induction of anesthesia in the operating room or in a equivalent area and ends when the anesthesiologist is no longer in personal

attendance, that is, when the patient may be safely placed under postoperative supervision.

CPT 2008, p. 37.  Time is to be reported in minutes on the anesthesia claim form.  HP A-283.12; HP Appendix A-1, p. 7, Field 24F.

59.    In regard to inpatient hospital services, Illinois Medicaid provides coverage for medically necessary inpatient and outpatient diagnostic treatment services for its beneficiaries.  Handbook for Provider of Hospital Services, Chapter H-200, Policy and Procedures for Hospital Services, §230; 89 Ill.Adm.Code 148.50(a).

60.    Payment for inpatient hospital services is made by Illinois Medicaid in one of two ways:  a per diem flat rate for each day of inpatient services or through a Diagnosis Related Group ("DRG") Prospective Payment System.  *See* http://www.hfs.illinois.gov/reimbursement/inpatient.html.  The Illinois hospitals paid on a per diem rate include University of Illinois at Chicago hospital, Cook County hospitals, rehabilitation hospitals, psychiatric hospitals, children's hospitals, long-term stay hospitals and certain rural hospitals.  Id.  All other Illinois hospitals, including Memorial Medical Center, are paid under the DRG Prospective Payment System.  Id.

61.    As with Medicare's Inpatient PPS, Illinois Medicaid's DRG Prospective Payment System ("DRG PPS") pays hospitals a predetermined amount for each inpatient discharge based upon the diagnosis of the patient and the patient's assignment into a diagnosis related group ("DRG") by the hospital.  89 Ill.Adm.Code 149.25(a), 149.100(a).  The DRG groups utilized by Illinois Medicaid are the same DRG groups utilized by Medicare.  Id.

62.     The per discharge DRG PPS payment becomes payable to the hospital upon submission of a claim to Illinois Medicaid for services provided to the beneficiary.  89 Ill.Adm.Code. 149.60(d)

63.     Hospital claims are submitted to Illinois Medicaid for payment electronically utilizing the CMS 1450/UB-04.

64.     The pre-determined payment amount for each DRG Group is individualized for each Illinois hospital paid under DRG PPS.  Handbook for Hospital Services, H-203.1. These payment amounts for each DRG Group are set by Illinois Medicaid for a specific hospital based upon the costs incurred by that specific hospital in providing services to patients falling within that DRG Group.  Id.

65.     A hospital's costs are reported to Illinois Medicaid via an annual cost report, due to be submitted by the hospital within 150 days after the close of each fiscal year.  89 Ill.Adm.Code 148.210; Handbook for Hospital Services, §H-203.1.  On the Cost Report, the hospital reports information regarding the number and type of inpatient services provided during the year and the amount of operating costs for routine services, ancillary services, special care unit costs, hospital-based physician costs and other costs.  *See* Illinois Medicaid form Hospital Statement of Cost and Healthcare and Family Services Instructions for Preparation of Hospital Statement of Cost.

66.     A hospital's submitted cost report is audited by the Illinois Department of Healthcare and Family Services, with cost analysis performed during that audit providing the information needed by Illinois Medicaid to establish the hospital's DRG PPS rates. Handbook for Hospital Services, H-203.1.

67.     In addition to the DRG PPS payments, Illinois Medicaid provides additional payments to hospitals for atypically long or extraordinarily costly cases, serving a disproportionately high share of low income patients, psychiatric services, physical rehabilitation services and other items.   89 Ill.Adm.Code 149.25(a)(5).   While each of the additional payment types have specific calculation methods, each one utilizes patient admissions and cost date in its calculations.

Regulatory Scheme<br>Private Insurance Company Payment for Anesthesia Services

68.     The Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1, *et seq.*, was passed with an effective date of January 1, 2002, specifically for the purpose of preventing fraud against private insurance companies.

69.     The Insurance Claims Fraud Prevention Act makes it illegal to knowingly submit false claims to private insurers in order to obtain insurance benefits.

## **BACKGROUND INFORMATION**

70.     Associated Anesthesiologists exclusively provide anesthesiologist services to patients of Memorial Medical Center, Springfield, Illinois.   Associated Anesthesiologists' anesthesiologists (hereafter "AAS Anesthesiologist") provide anesthesia services and medically direct CRNAs employed by Memorial Medical Center in Memorial Medical Center's 16 general operating rooms, 4 cardiac surgery rooms, 2 obstetrics surgical rooms, multiple obstetrics delivery rooms, Radiology Department, Gastrointestinal Lab, Heart Catheterization Lab, Orthopedic Surgery Center of Illinois (hereafter "OSCI") and 6 operating rooms at the hospital's Ambulatory Surgery Center located across the street from the hospital.

71.     The AAS Anesthesiologists work on shift assignments.   Each AAS Anesthesiologist calls Associated Anesthesiologists office each night to listen to a pre-recorded message to obtain his work schedule for the following day.

72.     The AAS Anesthesiologist arriving as the assigned third call person for the day is usually designated the "Charge Anesthesiologist".   In addition to providing anesthesia services, the Charge Anesthesiologist is responsible for obtaining the surgical schedule for the following day and assigning each particular anesthesia service to an AAS Anesthesiologist who will be on duty the following day.

73.     Each AAS Anesthesiologist working on a particular day is responsible for up to four anesthesia procedures at one time.

74.     The AAS Anesthesiologist performs medical direction of anesthesia services for up to four procedures approximately 95% percent of his work time.   As a patient presents to Memorial Medical Center for a procedure requiring anesthesia, the AAS Anesthesiologist meets with the patient for a pre-op consultation.   After the patient is taken into operating/procedure rooms, the AAS Anesthesiologist is called into the room to direct induction of anesthesia and after the procedure emergence from anesthesia.   As allowed by both Medicare and Medicaid regulations, as a general rule the AAS Anesthesiologist does not remain in the operating/procedure room throughout the procedure but rather turns the anesthesia monitoring over to a CRNA.   The AAS Anesthesiologist performs services for other patients while waiting to be called to the procedure room for services to be personally performed in the patient's procedure.

75.     During the period of 1997 through September 30, 2008, claims for services rendered by AAS Anesthesiologists were prepared and submitted to Medicare, Medicaid

and private insurance companies by MMP on behalf of Associated Anesthesiologists. From October 1, 2008, to the present, these claims were prepared and submitted by ABC on behalf of Associated Anesthesiologists.

76.     Both MMP and ABC maintained an employee on-site at Memorial Medical Center.  On a daily basis, this employee, whose name is Dianne Sommer, is responsible for obtaining the AAS Anesthesiologists' time records for the previous day from each surgical department as well as obtaining information from the hospital's Obstetrics Department regarding all epidurals provided to laboring mothers the previous day. Sommer is also responsible for inputting this information into Associated Anesthesiologists' system (as set up by MMP and ABC during their respective contract tenures) and transmitting the information to MMP/ABC for claim preparation and submission to Medicare, Medicaid and private insurance companies on behalf of Associated Anesthesiologists.

## COUNT I
### False Claims Act, 31 U.S.C. § 3729 (a)(1) & (2)
**(False Claims Submitted to Medicare by
Associated Anesthesiologists of Springfield, Ltd.)**

NOW COMES the Plaintiff, the United States of America, by the Relator, Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Associated Anesthesiologists of Springfield, Ltd. as follows:

77.     Medicare considers an anesthesia service "medically directed" by an anesthesiologist when the anesthesiologist directs no more than four concurrent anesthesia services and does not perform any other services while directing these services.  42 CFR §415.110(a)(2).   If the number of concurrent services being directed by

a physician goes over four at any time, all such concurrent services are deemed as being "medically supervised" rather than "medically directed."   42 CFR §414.64(f).

78.    If claiming a patient's services were "medically directed", the anesthesiologist is personally responsible for the inclusion of documentation in the patient medical chart to indicate requirements for "medical direction" have been met.  42 CFR §415.110(b); MCM §15018(C); MCPM, Chapter 12, §50(C).

79.    Services "medically directed" by an anesthesiologist are reimbursed to the anesthesiologist at 50% of the total allowed amount.  42 CFR §414.64(d)(3).

80.    Payment for "medically supervised" services is only allowed at an amount equal to the applicable conversion factor x 3 base units.   42 CFR §414.64(f); MCM §15081(D)/MCPM, Chapter 12, §50(D).  The three base units represent payment for the physician's involvement in pre-surgery services.   42 CFR §414.64(f); MCM §15081(D)/MCPM, Chapter 12, §50(D).  The base units can be increased to 4 units only if an anesthesiologist can document that he was present at the induction of the anesthesia. MCM §15081(D)/MCPM, Chapter 12, §50(D).

81.    Epidural anesthesia services for labor and delivery patients in the Obstetrics Department are not included on the daily hospital surgical schedule or the AAS Anesthesiologist anesthesia service assignment schedule.

82.    When a pregnant woman presents to Memorial Medical Center in labor and it has previously been determined that she will receive epidural anesthesia services during her labor, the Obstetrics Department pages the Charge Anesthesiologist.  The Charge Anesthesiologist then calls one of the AAS Anesthesiologists on duty to leave their

assigned procedure rooms or other departmental assignment to go to the Obstetrics Department to begin the epidural anesthesia service.

83.    The AAS Anesthesiologist starting epidural anesthesia for the obstetric patient does not stay with the patient throughout the use of the epidural anesthesia but rather returns to his assigned procedures rooms and continues his regular duties.  If the AAS Anesthesiologist happens to be at the end of his shift when he is called to begin an epidural, he is allowed to leave the hospital after beginning the epidural.  CRNAs are not utilized to stay with the patient during the use of the epidural anesthesia through labor and delivery.

84.    Medicare regulations allow for anesthesiologists to leave their immediate "medical direction" area to administer epidural anesthesia and perform periodic monitoring of an obstetrics patient without increasing the number of concurrent services for Medicare billing purposes.  MCM §15018(C); MCPM, Chapter 12, §50(C).  However, when an anesthesiologist leaves the immediate "medical direction" area to administer epidural anesthesia and perform continuous monitoring of an obstetrics patient, this allowance does not apply and the anesthesiologist's services are considered "medical supervision".  Id.

85.    Upon information and belief, since at least 1997, Associated Anesthesiologists has billed all epidural anesthesia services performed by AAS Anesthesiologists on Obstetrics Department patients as continuous services from the time the epidural anesthesia service is started until the delivery of the baby, meaning that the anesthesiologist is personally with or monitoring the anesthesia service during the entire labor and delivery period.

86.     Accordingly, the practice of the AAS Anesthesiologist leaving his "medical direction" procedure area to provide epidural anesthesia services in the Obstetrics Department and billing on a continuous basis prevents Associated Anesthesiologists from billing any of the ongoing concurrent procedures as "medical direction" and those surgical cases are to be billed as "medical supervision".   MCM §15018(C)/MCPM, Chapter 12, §50(C).

87.     From 1997 to the present, Associated Anesthesiologists have provided anesthesia services to patients who are covered and eligible for reimbursement of their medical expenses through Medicare and has submitted claims to Medicare for anesthesia services for Medicare patients as "medically directed" services to be paid at 50% of the full allowed payment amount when those services were actually "medically supervised" services which should only be paid at an amount equal to the conversion factor x 3 base units.

88.     For example, Relator was designated by the Charge Anesthesiologist on the following dates to begin labor epidural services on the following patients:

| Date | Patient |
|------|---------|
| 7/19/06 | Patient 1 |
| 10/18/06 | Patient 2 |
| 2/14/07 | Patient 3 |
| 3/2/07 | Patient 4 |
| 3/20/07 | Patient 5 |
| 9/19/07 | Patient 6 |
| 10/3/07 | Patient 7 |

| Date | Patient |
|------|---------|
| 11/5/07 | Patient 8 |

89.     Associated Anesthesiologists billed for the epidural anesthesia services performed by Relator for Patients 1 – 8 as continuous services from the time the epidural anesthesia service was started until the delivery of the baby, meaning that Relator was personally with or monitoring the anesthesia service during the entire labor and delivery period.

90.     At the same times as Associated Anesthesiologists billed continuous services to Patients 1 – 8 by Relator, it also billed Medicare and/or other third party payors for "medical direction" of other anesthesia services provided by Relator to patients in the Surgery Department, indicating that Relator was physically present in the Surgery Department.

91.     For example, on February 14, 2007, Relator provided epidural anesthesia services in the Labor & Delivery Department to Patient 3.  Associated Anesthesiologists billed these services to Patient 3 as continuous services, meaning that Relator stayed with Patient 3 in the Labor & Delivery Department and immediately available to her from the induction of the epidural services to the delivery of Patient 3's baby.  Associated Anesthesiologists also submitted claims to Medicare for "medical direction" of anesthesia services on the following patients being performed by Relator at the same time:

| Patient | Department |
|---------|------------|
| 9 | Surgery |
| 10 | Surgery |

The claims for Patients 9 and 10 should have been billed at the lower "medical supervision" rate as Associated Anesthesiologists' billing indicates Relator was in the Labor & Delivery Department with Patient 3 when anesthesia services were provided to Patients 9 and 10 and not in the Surgery Department.

92.     The claims listed above and other claims for "medically directed" anesthesia services to Medicare beneficiaries which should have been billed at the lower "medical supervision" rate were submitted by Associated Anesthesiologists on CMS-1500 forms, or the electronic equivalent thereof, to the Medicare Carrier for payment by Medicare.   In filing the CMS-1500 forms, Associated Anesthesiologists certified that:

> …the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

*See* Exhibit A.

93.     Said claims were submitted by Associated Anesthesiologists to Medicare with the knowledge by it that the claims were false as the "medically directed" services indicated on the claim forms were actually services that were "medically supervised" and therefore subject to a lower reimbursement rate.

94.     As a result of Associated Anesthesiologists' submission of the false CMS-1500s, Medicare reimbursed Associated Anesthesiologists for "medically directed" services when those services should have been paid at the lower "medically supervised" rate.

95.     By virtue of the acts described above, Associated Anesthesiologists defrauded the United States by getting false or fraudulent claims allowed and paid by Medicare in violation of 31 U.S.C. §3729(a)(1) & (2).

96.     By virtue of the acts described above, Associated Anesthesiologists knowingly submitted or caused to be submitted false or fraudulent claims to the United States for payment of benefits by Medicare in violation of 31 U.S.C. §3729(a)(1) & (2).

97.     By virtue of the acts described above, Associated Anesthesiologists knowingly made, used or caused to be made or used false statements to obtain government payment for false and fraudulent claims submitted to Medicare in violation of 31 U.S.C. §3729(a)(1) & (2).

98.     The United States, unaware of the falsity of the records, statements, or claims made or caused to be made by Associates Anesthesiologists paid for claims through the Medicare program that would otherwise have been paid at a lower amount.

99.     By reason of these payments, the United States has been damaged since at least 1997 and continues to be damaged in a substantial amount.

100.    Associated Anesthesiologists has not notified the United States of the violations of the False Claims Act alleged herein.

101.    Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 31 U.S.C. §3730(d)(1).

WHEREFORE, the United States of America, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Associated

Anesthesiologists of Springfield, Ltd. and issue orders in accordance with the False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically as follows:

A.    Order Defendant to cease and desist from violating the False Claims Act, 31 U.S.C. §3729 *et seq.*;

B.    Order Defendant to pay a compensatory amount equal to three times the amount of damages the United States of America has sustained for each false claim it submitted, plus a civil penalty of $10,000 for any false claims submitted prior to September 29, 1999, $11,000 for any false claim submitted on or after September 29, 1999, and the costs of this action pursuant to 31 U.S.C. §3729(a);

C.    Order Defendant to pay Relator's reasonable costs and expenses, including attorneys' fees, pursuant to 31 U.S.C. §3730(d)(1);

D.    Order that the Relator be awarded the statutory percentage of the amount received by the government pursuant to 31 U.S.C. §3730(d)(1); and,

E.    Order such other and further relief as this Court deems just and proper.

## **REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

 /s/ Ronald E. Osman
BY:    Ronald E. Osman
       Attorney for Relator,
       Donald Helfer, M.D.

## COUNT II
### False Claims Act, 31 U.S.C. § 3729 (a)(2)
### (False Records Made or Caused to be Made by
### CBIZ Medical Management Professionals, Inc.)

NOW COMES the Plaintiff, the United States of America, by the Relator, Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against CBIZ Medical Management Professionals, Inc. as follows:

102.    Medicare considers an anesthesia service "medically directed" by an anesthesiologist when the anesthesiologist directs no more than four concurrent anesthesia services and does not perform any other services while directing these services.  42 CFR §415.110(a)(2).   If the number of concurrent services being directed by a physician goes over four at any time, all such concurrent services are deemed as being "medically supervised" rather than "medically directed."  42 CFR §414.64(f).

103.    If claiming a patient's services were "medically directed", the anesthesiologist is personally responsible for the inclusion of documentation in the patient medical chart to indicate requirements for "medical direction" have been met.  42 CFR §415.110(b); MCM §15018(C); MCPM, Chapter 12, §50(C).

104.    Services "medically directed" by an anesthesiologist are reimbursed to the anesthesiologist at 50% of the total allowed payment amount.  42 CFR §414.64(d)(3).

105.    Payment for "medically supervised" services is only allowed at an amount equal to the applicable conversion factor x 3 base units.  42 CFR §414.64(f); MCM §15081(D)/MCPM, Chapter 12, §50(D).  The three base units represent payment for the physician's involvement in pre-surgery services. 42 CFR §414.64(f); MCM §15081(D)/MCPM, Chapter 12, §50(D).  The base units can be increased to 4 units only if

an anesthesiologist can documents that he was present at the induction of the anesthesia. MCM §15081(D)/MCPM, Chapter 12, §50(D).

106.    Epidural anesthesia services for labor and delivery patients in the Obstetrics Department are not included on the daily hospital surgical schedule or the AAS Anesthesiologist anesthesia service assignment schedule.

107.    When a pregnant woman presents to Memorial Medical Center in labor and it has previously been determined that she will receive epidural anesthesia services during her labor, the Obstetrics Department pages the Charge Anesthesiologist.  The Charge Anesthesiologist then calls one of the AAS Anesthesiologists on duty to leave their assigned procedure rooms or other departmental assignment to go to the Obstetrics Department to begin the epidural anesthesia service.

108.    The AAS Anesthesiologist starting epidural anesthesia for patient does not stay with the patient throughout the use of the epidural anesthesia but rather returns to his assigned procedures rooms and continues his regular duties.  If the AAS Anesthesiologist happens to be at the end of his shift when he is called to begin an epidural, he is allowed to leave the hospital after beginning the epidural.  CRNAs are not utilized to stay with the patient during the use of the epidural anesthesia through labor and delivery.

109.    Medicare regulations allow for anesthesiologists to leave their immediate "medical direction" area to administer epidural anesthesia and perform periodic monitoring of an obstetrics patient without increasing the number of concurrent services for Medicare billing purposes.  MCM §15018(C); MCPM, Chapter 12, §50(C).  However, when an anesthesiologist leaves the immediate "medical direction" area to administer epidural anesthesia and perform continuous monitoring of an obstetrics patient, this allowance

does not apply and the anesthesiologist's services are considered "medical supervision".
Id.

110.   During the period of 1997 to September 30, 2008, Medicare claim preparation and submission for Associated Anesthesiologists was handled by MMP.  After January 1, 2001, MMP maintained an employee on-site at Memorial Medical Center, Dianne Sommer, whose responsibilities were to: (1) obtain the AAS Anesthesiologists' time records for the previous day from each surgical department; (2) obtain a listing from Obstetrics Department of each patient to whom an epidural was given by an AAS Anesthesiologist, which showed the time of the epidural induction and the delivery time of the baby; (3) input this information into a system for Associated Anesthesiologists set up and maintained by MMP; and (4) transmit the information to MMP for processing and submission to Medicare, Medicaid and private insurance companies.

111.   Upon information and belief, MMP inputted billing time for all epidural services given by AAS Anesthesiologists as being the time from the induction of the epidural to the delivery of the baby.

112.   Upon information and belief, MMP did not count these continuous epidural services as a personally provided service and reduce "medically directed" services to "medical supervision" services as appropriate on Medicare patients.

113.   Accordingly, the practice of the AAS Anesthesiologist leaving his "medical direction" procedure area to provide epidural anesthesia services in the Obstetrics Department and billing for continuous services resulted in any procedure performed concurrently being "medical supervised" instead of "medically directed".   MCM §15018(C)/MCPM, Chapter 12, §50(C).

114.    From 1997 to September 30, 2008, Associated Anesthesiologists provided anesthesia services to patients who were covered and eligible for reimbursement of their medical expenses through Medicare and submitted claims to Medicare for anesthesia services for Medicare patients as "medically directed" services to be paid at 50% of the full allowed payment amount when those services were actually "medically supervised" services which should only be paid at an amount equal to the conversion factor x 3 base units.

115.    For example, Relator was designated by the Charge Anesthesiologist on the following dates to begin labor epidural services on the following patients:

| Date | Patient |
|------|---------|
| 7/19/06 | Patient 1 |
| 10/18/06 | Patient 2 |
| 2/14/07 | Patient 3 |
| 3/2/07 | Patient 4 |
| 3/20/07 | Patient 5 |
| 9/19/07 | Patient 6 |
| 10/3/07 | Patient 7 |
| 11/5/07 | Patient 8 |

116.    MMP prepared the billing information from each patient's medical records and Associated Anesthesiologists billed for the epidural anesthesia services performed by Relator Patients 1 – 8 as continuous services from the time the epidural anesthesia

service is started until the delivery of the baby, meaning that Relator was personally with or monitoring the anesthesia service during the entire labor and delivery period.

117.    At the same time as Associated Anesthesiologists billed continuous services to Patients 1 – 8 by Relator, it also billed Medicare and/or other third party payors for "medical direction" of other anesthesia services provided by Relator to patients in the Surgery Department, indicating that Relator was physically present in the Surgery Department.  MMP was aware of the billing practice of Associated Anesthesiologists as it was responsible for and did review the patient medical records and prepared the Associated Anesthesiologists' patient billing information.

118.    For example, on February 14, 2007, Relator provided epidural anesthesia services in the Labor & Delivery Department to Patient 3.  Associated Anesthesiologists billed these services to Patient 3 as continuous services, meaning that Relator stayed with Patient 3 in the Labor & Delivery Department from the induction of the epidural services to the delivery of Patient 3's baby.  Associated Anesthesiologists also submitted claims to Medicare for "medical direction" of anesthesia services on the following patients being performed by Relator at the same time:

| Patient | Department |
|---------|------------|
| 9 | Surgery |
| 10 | Surgery |

The claims for Patients 9 and 10 should have been billed at the lower "medical supervision" rate as Associated Anesthesiologists' billing indicates Relator was in the

Labor & Delivery Department with Patient 3 when anesthesia services were provided to Patients 9 and 10 and not in the Surgery Department.

119.    The claims listed above and other claims for "medically directed" anesthesia services to Medicare beneficiaries which should have been billed at the lower "medical supervision" rate were prepared by MMP and were submitted by Associated Anesthesiologists on CMS-1500 forms, or the electronic equivalent thereof, to the Medicare Carrier for payment by Medicare.   In filing the CMS-1500 forms, Associated Anesthesiologists certified that:

> …the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

*See* Exhibit A.

120.    The billing records created for Associated Anesthesiologists by MMP for Medicare patients falsely indicated services were "medically directed" when those services were actually "medically supervised" because at the time of such claimed "medical direction", the AAS Anesthesiologist were being billed as providing continuous services for epidural anesthesia.

121.    As a result of MMP's creation of these false billing records upon which Associated Anesthesiologists' CMS-1500s were based, Medicare reimbursed Associated Anesthesiologists for "medically directed" services when those services should have been paid at the lower "medically supervised" rate.

122.    By virtue of the acts described above, MMP defrauded the United States by creating false records or causing false records to be made to support false claims allowed and paid by Medicare in violation of 31 U.S.C. 3729(a)(2).

123.    By virtue of the acts described above, MMP knowingly created or caused to be created false records to support submitted false or fraudulent claims to the United States for payment of benefits by Medicare in violation of 31 U.S.C. 3729(a)(2).

124.    By virtue of the acts described above, MMP knowingly created or caused to be created false records to allow Associated Anesthesiologists to obtain government payment for false and fraudulent claims submitted to Medicare in violation of 31 U.S.C. 3729(a)(2).

125.    The United States, unaware of the falsity of the records made or caused to be made by MMP, paid for Associated Anesthesiologists' claims through the Medicare program that would otherwise have been paid at a lower amount.

126.    By reason of these payments, the United States was damaged from 1997 to September 30, 2008.

127.    MMP has not notified the United States of the violations of the False Claims Act alleged herein.

128.    Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 31 U.S.C. §3730(d)(1).

WHEREFORE, the United States of America, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant CBIZ Medical

Management Professionals, Inc. and issue orders in accordance with the False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically as follows:

A.      Order Defendant to cease and desist from violating the False Claims Act, 31 U.S.C. §3729 *et seq.*;

B.      Order Defendant to pay a compensatory amount equal to three times the amount of damages the United States of America has sustained for each false record it made or caused to be made, plus a civil penalty of $10,000 for any false claims submitted prior to September 29, 1999, $11,000 for any false claim submitted on or after September 29, 1999, and the costs of this action pursuant to 31 U.S.C. § 3729(a);

C.      Order Defendant to pay Relator's reasonable costs and expenses, including attorneys' fees, pursuant to 31 U.S.C. §3730(d)(1);

D.      Order that the Relator be awarded the statutory percentage of the amount received by the government pursuant to 31 U.S.C. § 3730 (d)(1); and,

E.      Order such other and further relief as this Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

 /s/ Ronald E. Osman
BY:    Ronald E. Osman
        Attorney for Relator,
        Donald Helfer, M.D.

**COUNT III**
**False Claims Act, 31 U.S.C. § 3729 (a)(2)**
**(False Records Made or Caused to be Made by**
**Anesthesia Business Consultants, LLC)**

NOW COMES the Plaintiff, the United States of America, by the Relator, Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Anesthesia Business Consultants, LLC as follows:

129.   Medicare considers an anesthesia service "medically directed" by an anesthesiologist when the anesthesiologist directs no more than four concurrent anesthesia services and does not perform any other services while directing these services.  42 CFR §415.110(a)(2).   If the number of concurrent services being directed by a physician goes over four at any time, all such concurrent services are deemed as being "medically supervised" rather than "medically directed."   42 CFR §414.64(f).

130.   If claiming a patient's services were "medically directed", the anesthesiologist is personally responsible for the inclusion of documentation in the patient medical chart to indicate requirements for "medical direction" have been met.  42 CFR §415.110(b); MCM §15018(C); MCPM, Chapter 12, §50(C).

131.   Services "medically directed" by an anesthesiologist are reimbursed to the anesthesiologist at 50% of the total allowed payment amount.  42 CFR §414.64(d)(3).

132.   Payment for "medically supervised" services is only allowed at an amount equal to the applicable conversion factor x 3 base units.   42 CFR §414.64(f); MCM §15081(D)/MCPM, Chapter 12, §50(D).  The three base units represent payment for the physician's involvement in pre-surgery services.   42 CFR §414.64(f); MCM §15081(D)/MCPM, Chapter 12, §50(D).  The base units can be increased to 4 units only if

an anesthesiologist can documents that he was present at the induction of the anesthesia. MCM §15081(D)/MCPM, Chapter 12, §50(D).

133.    Epidural anesthesia services for labor and delivery patients in the Obstetrics Department are not included on the daily hospital surgical schedule or the AAS Anesthesiologist anesthesia service assignment schedule.

134.    When a pregnant woman presents to Memorial Medical Center in labor and it has previously been determined that she will receive epidural anesthesia services during her labor, the Obstetrics Department pages the Charge Anesthesiologist.  The Charge Anesthesiologist then calls one of the AAS Anesthesiologists on duty to leave his assigned procedure rooms or other departmental assignment to go to the Obstetrics Department to begin the epidural anesthesia service.

135.    The AAS Anesthesiologist starting epidural anesthesia for patient does not stay with the patient throughout the use of the epidural anesthesia but rather returns to his assigned procedures rooms and continues his regular duties.  If the AAS Anesthesiologist happens to be at the end of his shift when he is called to begin an epidural, he is allowed to leave the hospital after beginning the epidural.  CRNAs are not utilized to stay with the patient during the use of the epidural anesthesia through labor and delivery.

136.    Medicare regulations allow for anesthesiologists to leave their immediate "medical direction" area to administer epidural anesthesia and perform periodic monitoring of an obstetrics patient without increasing the number of concurrent services for Medicare billing purposes.  MCM §15018(C); MCPM, Chapter 12, §50(C).  However, when an anesthesiologist leaves the immediate "medical direction" area to administer epidural anesthesia and perform continuous monitoring of an obstetrics patient, this allowance

does not apply and the anesthesiologist's services are considered "medical supervision".
Id.

137.   From October 1, 2008, to the present, Medicare claim preparation and submission for Associated Anesthesiologists has been handled by ABC.   ABC has maintained an employee on-site at Memorial Medical Center, Dianne Sommer, whose responsibilities are to: (1) obtain the AAS Anesthesiologists' time records for the previous day from each surgical department; (2) obtain a listing from Obstetrics Department of each patient to whom an epidural was given by an AAS Anesthesiologist, which showed the time of the epidural induction and the delivery time of the baby; (3) input this information into a billing system for Associated Anesthesiologists set up and maintained by ABC; and (4) transmit the information to ABC for processing and submission to Medicare, Medicaid and private insurance companies.

138.   Upon information and belief, ABC inputted billing time for all epidural services given by AAS Anesthesiologists as being the time from the induction of the epidural to the delivery of the baby.

139.   Upon information and belief, ABC did not count these continuous epidural services as a personal service and reduce "medically directed" services to "medical supervision" services as appropriate on Medicare patients.

140.   Accordingly, the practice of the AAS Anesthesiologist leaving his "medical direction" procedure area to provide epidural anesthesia services in the Obstetrics Department and billing for continuous services resulted in any procedure performed concurrently being "medical supervised" instead of "medically directed".   MCM §15018(C)/MCPM, Chapter 12, §50(C).

141.   From October 1, 2008, to the present, Associated Anesthesiologists has provided anesthesia services to patients who are covered and eligible for reimbursement of their medical expenses through Medicare and has submitted claims to Medicare for anesthesia services for Medicare patients as "medically directed" services to be paid at 50% of the full allowed payment amount when those services were actually "medically supervised" services which should only be paid at an amount equal to the conversion factor x 3 base units.

142.   The claims were submitted by Associated Anesthesiologists on CMS-1500 forms, or the electronic equivalent thereof, to the Medicare Carrier for payment by Medicare.  In filing the CMS-1500 forms, Associated Anesthesiologists certified that:

> …the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

*See* Exhibit A.

143.   The billing records created for Associated Anesthesiologists by ABC for Medicare patients falsely indicated services were "medically directed" when those services were actually "medically supervised" because at the time of such claimed "medical direction", the AAS Anesthesiologists were being billed as providing continuous services for epidural anesthetic.

144.   As a result of ABC's creation of these false billing records upon which Associated Anesthesiologists' CMS-1500s were based, Medicare reimbursed Associated Anesthesiologists for "medically directed" services when those services should have been paid at the lower "medically supervised" rate.

145.   By virtue of the acts described above, ABC defrauded the United States by creating false records or causing false records to be made to support false claims allowed and paid by Medicare in violation of 31 U.S.C. 3729(a)(2).

146.   By virtue of the acts described above, ABC knowingly created or caused to be created false records to support submitted false or fraudulent claims to the United States for payment of benefits by Medicare in violation of 31 U.S.C. 3729(a)(2).

147.   By virtue of the acts described above, ABC knowingly created or caused to be created false records to allow Associated Anesthesiologists to obtain government payment for false and fraudulent claims submitted to Medicare in violation of 31 U.S.C. 3729(a)(2).

148.   The United States, unaware of the falsity of the records made or caused to be made by ABC paid for Associated Anesthesiologists' claims through the Medicare program that would otherwise have been paid at a lower amount.

149.   By reason of these payments, the United States has been damaged since at least October 1, 2008, and continues to be damaged in a substantial amount.

150.   ABC has not notified the United States of the violations of the False Claims Act alleged herein.

151.   Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 31 U.S.C. §3730(d)(1).

WHEREFORE, the United States of America, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Anesthesia Business

Consultants, LLC, and issue orders in accordance with the False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically as follows:

A.      Order Defendant to cease and desist from violating the False Claims Act, 31 U.S.C. §3729 *et seq.*;

B.      Order Defendant to pay a compensatory amount equal to three times the amount of damages the United States of America has sustained for each false record it made or caused to be made, plus a civil penalty of $10,000 for any false claims submitted prior to September 29, 1999, $11,000 for any false claim submitted on or after September 29, 1999, and the costs of this action pursuant to 31 U.S.C. § 3729(a);

C.      Order Defendant to pay Relator's reasonable costs and expenses, including attorneys' fees, pursuant to 31 U.S.C. §3730(d)(1);

D.      Order that the Relator be awarded the statutory percentage of the amount received by the government pursuant to 31 U.S.C. §3730 (d)(1); and,

E.      Order such other and further relief as this Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

 /s/ Ronald E. Osman
BY:     Ronald E. Osman
        Attorney for Relator,
        Donald Helfer, M.D.

**COUNT IV**
**False Claims Act, 31 U.S.C. § 3729 (a)(1) & (2)**
**(False Claims, Records and Statements Made or Caused to be Made by**
**Associated Anesthesiologists of Springfield, Ltd. as a result of**
**Stark Law and Anti-Kickback Statute violations – False Medicare Claims**
**Submitted by Associated Anesthesiologists of Springfield, Ltd.)**

NOW COMES the Plaintiff, the United States of America, by the Relator, Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Associated Anesthesiologists of Springfield, Ltd. as follows:

152.    From at least 1997 to the present, Associated Anesthesiologists has exclusively served as the provider of anesthesia services to Memorial Medical Center.

153.    From at least 1997 to the present, Memorial Medical Center has provided the following to Associated Anesthesiologists in exchange for this exclusive relationship:

A)        office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)        anesthesia equipment for use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)        anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)        Memorial Medical Center employed CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists at no charge to Associated Anesthesiologists for all anesthesia services rendered other than those needed for cardiac procedures ("MMC CRNAs").

154.    Despite the employer of the MMC CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by

43

Associated Anesthesiologists through assignment of the MMC CRNAs' benefits to Associated Anesthesiologists and payment for said MMC CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

155.    Associated Anesthesiologists agreement with Memorial Medical Center to receive free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was knowingly and willfully entered into by Associated Anesthesiologists as compensation for its services to Memorial Medical Center as its exclusive anesthesia services provider.

156.    Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

157.    Prior to 2004, Associated Anesthesiologists itself employed CRNAs to assist with its anesthesia work for cardiac procedures at Memorial Medical Center ("Cardiac CRNAs").   Associated Anesthesiologists billed patients, Medicare, Medicaid and other third-party payors for services performed by both its anesthesiologists and its Cardiac CRNAs.

158.    In 2004, Associated Anesthesiologists began having difficulty retaining Cardiac CRNAs in their employ due to various issues, including the cost of employing the

Cardiac CRNAs.  As a result of the decrease in Associated Anesthesiologists' Cardiac CRNAs, the number of anesthesia services Associated Anesthesiologists had the ability to provide to Memorial Medical Center for cardiac procedures on a daily basis declined.

159.    At that point, Memorial Medical Center hired the five Cardiac CRNAs then employed by Associated Anesthesiologists to continue assisting Associated Anesthesiologists with cardiac anesthesia services provided at Memorial Medical Center ("MMC Cardiac CRNAs").  Associated Anesthesiologists ceased employment of Cardiac CRNAs at that time.

160.    Despite the employer of the MMC Cardiac CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC Cardiac CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC Cardiac CRNA's benefit to Associated Anesthesiologists and payment for said MMC Cardiac CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

161.    Approximately $185,000 of costs per MMC Cardiac CRNA per year has been diverted to Memorial Medical Center from Associated Anesthesiologists and the total costs have been reported on Memorial Medical Center's annual Medicare and Medicaid cost reports.

162.    Prior to 2008, the exclusive anesthesia provider agreement between Associated Anesthesiologists and Memorial Medical Center was an oral agreement.  In 2008, the entities executed a Professional Services Agreement for Anesthesia Services

memorializing their agreement.  A copy of an October 22, 2007 draft of the Professional

Services Agreement is attached hereto as Exhibit C.

163.    Section 3.1 of the Professional Services Agreement provides that:

> MMC [Memorial Medical Center] shall provide to the Group
> [Associated Anesthesiologists] **at no cost to the group** the facilities,
> equipment, supplies, services and non-physician personnel (the
> "MMC Personnel") which MMC determines are reasonably necessary
> and appropriate for the Group's delivery of Anesthesia Services and
> Administrative Services hereunder, subject to and consistent with the
> financial condition and constraints of MMC.  MMC Personnel shall be
> MMC employees or independent contractors, shall be subject to
> MMC policies and procedures, and rules and regulations, shall be
> under the control and supervision of MMC, and shall report to their
> respective departments.

See Exhibit C, p. 10, line 4-11 (emphasis added).

164.    After the execution of said agreement, Memorial Medical Center has

continued to date to provide to Associated Anesthesiologists the following:

A)          office space at Memorial Medical Center at no charge to Associated
            Anesthesiologists;

B)          anesthesia equipment for use at Memorial Medical Center at no
            charge to Associated Anesthesiologists;

C)          anesthesia supplies for use at Memorial Medical Center at no charge
            to Associated Anesthesiologists; and

D)          MMC CRNAs to perform anesthesia services on behalf of Associated
            Anesthesiologists' patients at no charge to Associated
            Anesthesiologists.

Associated Anesthesiologists has continued to bill for services performed by the MMC

CRNAs since the execution of said agreement and collect all amounts due for said MMC

CRNA services rendered at Memorial Medical Center.

165.    Associated Anesthesiologists agreement with Memorial Medical Center to

receive free office space, supplies and equipment, use of MMC CRNAs and collection of

Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was knowingly and willfully entered into by Associated Anesthesiologists as compensation for its services to Memorial Medical Center as its exclusive anesthesia services provider.

166.    Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

167.    At all times relevant hereto, 42 U.S.C. §1302a-7b(b)(2) provided that it was illegal to knowingly and willing to offer or pay any remuneration to induce referrals for healthcare services to be paid for by a Federal health care program (hereafter "Stark Law).

168.    At all times relevant hereto, 42 U.S.C. §1395nn(a) prohibited referrals by a physician to an entity in which he held a financial interest and prohibited claims be made to Medicare when the services were rendered as a result of such a prohibited relationship (hereafter "Anti-Kickback Law").

169.    The agreement between Memorial Medical Center and Associated Anesthesiologists in which Memorial Medical Center provided financial benefits to Associated Anesthesiologists in order to induce referrals of patients to Memorial Medical Center constitutes an indirect kick-back in violation of both the Stark Law and the Anti-Kickback Law.

170.   Claims for services rendered by MMC CRNAs were submitted by Associated Anesthesiologists on CMS-1500 forms, or the electronic equivalent thereof, to Medicare for payment.   In filing the CMS-1500 forms, Associated Anesthesiologists certified that:

> …the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

*See* Exhibit A.  Said claims were false as Associated Anesthesiologists did not employ the MMC CRNAs at the time the claimed services were rendered but rather received the benefit of the MMC CRNAs as an indirect kickback from Memorial Medical Center.

171.   As a result of Associated Anesthesiologists filings of these false CMS-1500s, Medicare reimbursed Associated Anesthesiologists for services by MMC CRNAs when Associated Anesthesiologists was not entitled to receive said Medicare payments.

172.   By virtue of the acts described above, Associated Anesthesiologists defrauded the United States by getting false or fraudulent claims allowed and paid by Medicare in violation of 31 U.S.C. §3729(a)(1).

173.   By virtue of the acts described above, Associated Anesthesiologists knowingly submitted or caused to be submitted false or fraudulent claims to the United States for payment of benefits by Medicare in violation of 31 U.S.C. §3729(a)(1).

174.   By virtue of the acts described above, Associated Anesthesiologists defrauded the United States by creating false records and making false statements or causing false records and statements to be made to support false claims allowed and paid by Medicare in violation of 31 U.S.C. 3729(a)(2).

175.   By virtue of the acts described above, Associated Anesthesiologists knowingly created or caused to be created false records to allow it to obtain government payment for false and fraudulent claims submitted to Medicare in violation of 31 U.S.C. 3729(a)(2).

176.   By virtue of the acts described above, Associated Anesthesiologists knowingly made, used or caused to be made or used false statements to obtain government payment for false and fraudulent claims submitted to Medicare in violation of 31 U.S.C. §3729(a)(2).

177.   The United States, unaware of the falsity of the claims made or caused to be made by Associated Anesthesiologists paid Associated Anesthesiologists for claims through the Medicare program for MMC CRNAs that would otherwise have not been paid to Associated Anesthesiologists.

178.   By reason of these payments, the United States has been damaged since at least 1997 to the present, and continues to be damaged in a substantial amount.

179.   Associated Anesthesiologists has not notified the United States of the violations of the False Claims Act alleged herein.

180.   Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 31 U.S.C. §3730(d)(1).

WHEREFORE, the United States of America, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Associated Anesthesiologists of Springfield, Ltd., and issue orders in accordance with the False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically as follows:

A.      Order Defendant to cease and desist from violating the False Claims Act, 31 U.S.C. §3729 *et seq.*;

B.      Order Defendant to pay a compensatory amount equal to three times the amount of damages the United States of America has sustained for each false record it made or caused to be made, plus a civil penalty of $10,000 for any false claims submitted prior to September 29, 1999, $11,000 for any false claim submitted on or after September 29, 1999, and the costs of this action pursuant to 31 U.S.C. § 3729(a);

C.      Order Defendant to pay Relator's reasonable costs and expenses, including attorneys' fees, pursuant to 31 U.S.C. §3730(d)(1);

D.      Order that the Relator be awarded the statutory percentage of the amount received by the government pursuant to 31 U.S.C. §3730 (d)(1); and,

E.      Order such other and further relief as this Court deems just and proper.

## **REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

 /s/ Ronald E. Osman
BY:    Ronald E. Osman
       Attorney for Relator,
       Donald Helfer, M.D.

**COUNT V**
**False Claims Act, 31 U.S.C. § 3729 (a)(1) & (2)**
**(False Claims, Records & Statements Caused to be made by**
**Memorial Medical Center as a result of Stark Law and**
**Anti-Kickback Statute violations - False Medicare Claims**
**Submitted by Associated Anesthesiologists of Springfield, Ltd.**

NOW COMES the Plaintiff, the United States of America, by the Relator, Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Memorial Medical Center as follows:

181.   From at least 1997 to the present, Associated Anesthesiologists has exclusively served as the provider of anesthesia services to Memorial Medical Center.

182.   From at least 1997 to the present, Memorial Medical Center has provided the following to Associated Anesthesiologists in exchange for this exclusive relationship:

A)      office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)      anesthesia equipment for use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)      anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)      Memorial Medical Center employed CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists at no charge to Associated Anesthesiologists for all anesthesia services rendered other than those needed for cardiac procedures ("MMC CRNAs").

183.   Despite the employer of the MMC CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by

Associated Anesthesiologists through assignment of the MMC CRNAs benefits to Associated Anesthesiologists and payment for said MMC CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

184.   Memorial Medical Centers' agreement with Associated Anesthesiologists to provide free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was knowingly and willfully entered into by Memorial Medical Center to serve as compensation for Associates Anesthesiologists' services to Memorial Medical Center as its exclusive anesthesia services provider.

185.   Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

186.   Prior to 2004, Associated Anesthesiologists itself employed CRNAs to assist with its anesthesia work for cardiac procedures at Memorial Medical Center ("Cardiac CRNAs").   Associated Anesthesiologists billed patients, Medicare, Medicaid and other third-party payors for services performed by both its anesthesiologists and its Cardiac CRNAs.

187.   In 2004, Associated Anesthesiologists began having difficulty retaining Cardiac CRNAs in their employ due to various issues, including the cost of employing the

Cardiac CRNAs. As a result of the decrease in Associated Anesthesiologists' Cardiac CRNAs, the number of anesthesia services Associated Anesthesiologists had the ability to provide to Memorial Medical Center for cardiac procedures on a daily basis declined.

188. At that point, Memorial Medical Center hired the five Cardiac CRNAs then employed by Associated Anesthesiologists to continue assisting Associated Anesthesiologists with cardiac anesthesia services provided at Memorial Medical Center ("MMC Cardiac CRNAs"). Associated Anesthesiologists ceased employment of Cardiac CRNAs at that time.

189. Despite the employer of the MMC Cardiac CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC Cardiac CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC Cardiac CRNA's benefit to Associated Anesthesiologists and payment for said MMC Cardiac CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

190. Approximately $185,000 of costs per MMC Cardiac CRNA per year has been diverted to Memorial Medical Center from Associated Anesthesiologists and the total costs have been reported on Memorial Medical Center's annual Medicare and Medicaid cost reports.

191. Prior to 2008, the exclusive anesthesia provider agreement between Associated Anesthesiologists and Memorial Medical Center was an oral agreement. In 2008, the entities executed a Professional Services Agreement for Anesthesia Services

memorializing their agreement.  A copy of an October 22, 2007 draft of the Professional

Services Agreement is attached hereto as Exhibit C.

192.   Section 3.1 of the Professional Services Agreement provides that:

MMC [Memorial Medical Center] shall provide to the Group [Associated Anesthesiologists] **at no cost to the group** the facilities, equipment, supplies, services and non-physician personnel (the "MMC Personnel") which MMC determines are reasonably necessary and appropriate for the Group's delivery of Anesthesia Services and Administrative Services hereunder, subject to and consistent with the financial condition and constraints of MMC.  MMC Personnel shall be MMC employees or independent contractors, shall be subject to MMC policies and procedures, and rules and regulations, shall be under the control and supervision of MMC, and shall report to their respective departments.

See Exhibit C, p. 10, line 4-11 (emphasis added).

193.   After the execution of said agreement, Memorial Medical Center has

continued to date to provide to Associated Anesthesiologists the following:

A)      office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)      anesthesia equipment for its use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)      anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)      MMC CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists' patients at no charge to Associated Anesthesiologists.

Associated Anesthesiologists has continued to bill for services performed by the MMC

CRNAs since the execution of said agreement and collect all amounts due for said MMC

CRNA services rendered at Memorial Medical Center.

194.   Memorial Medical Centers' agreement with Associated Anesthesiologists to

provide free office space, supplies and equipment, use of MMC CRNAs and collection of

Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was knowingly and willfully entered into by Memorial Medical Center to serve as compensation for Associates Anesthesiologists' services to Memorial Medical Center as its exclusive anesthesia services provider.

195.   Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

196.   At all times relevant hereto, 42 U.S.C. §1302a-7b(b)(2) provided that it was illegal to knowingly and willing to offer or pay any remuneration to induce referrals for healthcare services to be paid for by a Federal health care program (hereafter "Stark Law).

197.   At all times relevant hereto, 42 U.S.C. §1395nn(a) prohibited referrals by a physician to an entity in which he held a financial interest and prohibited claims be made to Medicare when the services were rendered as a result of such a prohibited relationship (hereafter "Anti-Kickback Law").

198.   The agreement between Memorial Medical Center and Associated Anesthesiologists in which Memorial Medical Center provided financial benefits to Associated Anesthesiologists in order to induce referrals of patients to Memorial Medical Center constitutes an indirect kick-back in violation of both the Stark Law and the Anti-Kickback Law.

199.    At all times relevant hereto, Memorial Medical Center was enrolled as a participating provider in the Medicare program. In order to enroll in the Medicare Program, Memorial Medical Center had specifically agreed to be bound by statutes, rules and regulations of Medicare, including the Stark Law and Anti-Kickback Law, by  submitting a Medicare Enrollment Application, Institutional Providers, CMS 855A, in which it certified that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier.   The Medicare laws, regulations, and program instructions are available through the Medicare contractor.   I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

200.    The agreement between Memorial Medical Center and Associated Anesthesiologists for Memorial Medical Center to employ the MMC CRNAs while Associated Anesthesiologists billed Medicare for the MMC CRNA's services caused the submission of false CMS-1500 forms, or the electronic equivalent thereof, to Medicare by Associated Anesthesiologists and in filing each CMS-1500 form for MMC CRNA services, Associated Anesthesiologists falsely certified that:

> …the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

*See* Exhibit A.

201.   Said claims were false as Associated Anesthesiologists did not employ the MMC CRNAs at the time the claimed services were rendered but rather received the benefit of the MMC CRNAs as an indirect kickback from Memorial Medical Center.

202.   As a result of Memorial Medical Center's causing of these false claims to be submitted by Associated Anesthesiologists, Medicare reimbursed Associated Anesthesiologists for services by MMC CRNAs when Associated Anesthesiologists was not entitled to receive said Medicare payments.

203.   By virtue of the acts described above, Memorial Medical Center defrauded the United States by causing false or fraudulent claims to allowed and paid by Medicare in violation of 31 U.S.C. §3729(a)(1).

204.   By virtue of the acts described above, Memorial Medical Center knowingly caused to be submitted false or fraudulent claims to the United States for payment of benefits by Medicare in violation of 31 U.S.C. §3729(a)(1).

205.   By virtue of the acts described above, Memorial Medical Center defrauded the United States by causing false records and statements to be made to support false claims allowed and paid by Medicare in violation of 31 U.S.C. 3729(a)(2).

206.   By virtue of the acts described above, Memorial Medical Center knowingly caused to be made or used false statements to obtain government payment for false and fraudulent claims submitted to Medicare in violation of 31 U.S.C. §3729(a)(2).

207.   By virtue of the acts described above, Memorial Medical Center defrauded the United States by causing false records to be made to support false claims allowed and paid by Medicare in violation of 31 U.S.C. 3729(a)(2).

208.    The United States, unaware of the falsity of the claims, records and statements caused to be made by Memorial Medical Center paid Associated Anesthesiologists for claims through the Medicare program for MMC CRNAs that would otherwise have not been paid to Associated Anesthesiologists.

209.    By reason of these payments, the United States has been damaged since at least 1997 to the present, and continues to be damaged in a substantial amount.

210.    Memorial Medical Center has not notified the United States of the violations of the False Claims Act alleged herein.

211.    Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 31 U.S.C. §3730(d)(1).

WHEREFORE, the United States of America, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Memorial Medical Center, and issue orders in accordance with the False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically as follows:

A.    Order Defendant to cease and desist from violating the False Claims Act, 31 U.S.C. §3729 *et seq.*;

B.    Order Defendant to pay a compensatory amount equal to three times the amount of damages the United States of America has sustained for each false record it made or caused to be made, plus a civil penalty of $10,000 for any false claims submitted prior to September 29, 1999, $11,000 for any false claim submitted on or after September 29, 1999, and the costs of this action pursuant to 31 U.S.C. § 3729(a);

C.  Order Defendant to pay Relator's reasonable costs and expenses, including attorneys' fees, pursuant to 31 U.S.C. §3730(d)(1);

D.  Order that the Relator be awarded the statutory percentage of the amount received by the government pursuant to 31 U.S.C. §3730 (d)(1); and,

E.  Order such other and further relief as this Court deems just and proper.

### REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

 /s/ Ronald E. Osman_____
BY:   Ronald E. Osman
        Attorney for Relator,
        Donald Helfer, M.D.


### COUNT VI
### False Claims Act, 31 U.S.C. § 3729 (a)(1) & (2)
**(False Claims, Records & Statements Caused to be made by
Memorial Health System as a result of Stark Law and
Anti-Kickback Statute violations - False Medicare Claims
Submitted by Associated Anesthesiologists of Springfield, Ltd.)**

NOW COMES the Plaintiff, the United States of America, by the Relator, Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Memorial Health System as follows:

212.   At all times relevant hereto, Defendant Memorial Health System was the parent company of Memorial Medical Center and directed the daily operations of Memorial Medical Center.

213.   From at least 1997 to the present, Associated Anesthesiologists has exclusively served as the provider of anesthesia services to Memorial Medical Center.

214.    From at least 1997 to the present, Memorial Medical Center has provided the following to Associated Anesthesiologists in exchange for this exclusive relationship:

A)          office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)          anesthesia equipment for use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)          anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)          Memorial Medical Center employed CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists at no charge to Associated Anesthesiologists for all anesthesia services rendered other than those needed for cardiac procedures ("MMC CRNAs").

215.    Despite the employer of the MMC CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC CRNAs' benefits to Associated Anesthesiologists and payment for said MMC CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

216.    Memorial Medical Centers' agreement with Associated Anesthesiologists to provide free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was entered into by Memorial Medical Center with the knowledge of Memorial

Health Systems and the intent by Memorial Health Systems for these items to serve as compensation to Associated Anesthesiologists for its services to Memorial Medical Center as its exclusive anesthesia services provider.

217.    Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

218.    Prior to 2004, Associated Anesthesiologists itself employed CRNAs to assist with its anesthesia work for cardiac procedures at Memorial Medical Center ("Cardiac CRNAs").    Associated Anesthesiologists billed patients, Medicare, Medicaid and other third-party payors for services performed by both its anesthesiologists and its Cardiac CRNAs.

219.    In 2004, Associated Anesthesiologists began having difficulty retaining Cardiac CRNAs in their employ due to various issues, including the cost of employing the Cardiac CRNAs.    As a result of the decrease in Associated Anesthesiologists' Cardiac CRNAs, the number of anesthesia services Associated Anesthesiologists had the ability to provide to Memorial Medical Center for cardiac procedures on a daily basis declined.

220.    At that point, Memorial Medical Center hired the five Cardiac CRNAs then employed by Associated Anesthesiologists to continue assisting Associated Anesthesiologists with cardiac anesthesia services provided at Memorial Medical Center

("MMC Cardiac CRNAs"). Associated Anesthesiologists ceased employment of Cardiac CRNAs at that time.

221. Despite the employer of the MMC Cardiac CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC Cardiac CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC Cardiac CRNA's benefit to Associated Anesthesiologists and payment for said MMC Cardiac CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

222. Approximately $185,000 of costs per MMC Cardiac CRNA per year has been diverted to Memorial Medical Center from Associated Anesthesiologists and the total costs have been reported on Memorial Medical Center's annual Medicare and Medicaid cost reports.

223. Prior to 2008, the exclusive anesthesia provider agreement between Associated Anesthesiologists and Memorial Medical Center was an oral agreement. In 2008, the entities executed a Professional Services Agreement for Anesthesia Services memorializing their agreement. A copy of an October 22, 2007 draft of the Professional Services Agreement is attached hereto as Exhibit C.

224. Edgar J. Curtis, President and CEO of Memorial Health System was the Memorial Medical Center signor on the 2008 Professional Services Agreement for Anesthesia Services by and between Memorial Medical Center and Associated Anesthesiologists.

225.    Section 3.1 of the Professional Services Agreement provides that:

> MMC [Memorial Medical Center] shall provide to the Group [Associated Anesthesiologists] **at no cost to the group** the facilities, equipment, supplies, services and non-physician personnel (the "MMC Personnel") which MMC determines are reasonably necessary and appropriate for the Group's delivery of Anesthesia Services and Administrative Services hereunder, subject to and consistent with the financial condition and constraints of MMC.  MMC Personnel shall be MMC employees or independent contractors, shall be subject to MMC policies and procedures, and rules and regulations, shall be under the control and supervision of MMC, and shall report to their respective departments.

See Exhibit C, p. 10, line 4-11 (emphasis added).

226.    After the execution of said agreement, Memorial Medical Center has continued to date to provide to Associated Anesthesiologists the following:

A)     office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)     anesthesia equipment for use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)     anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)     MMC CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists' patients at no charge to Associated Anesthesiologists.

Associated Anesthesiologists has continued to bill for services performed by the MMC CRNAs since the execution of said agreement and collect all amounts due for said MMC CRNA services rendered at Memorial Medical Center.

227.    Memorial Medical Centers' agreement with Associated Anesthesiologists to provide free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was entered into by Memorial Medical Center with the knowledge of Memorial

Health Systems and the intent by Memorial Health Systems for these items to serve as compensation to Associated Anesthesiologists for its services to Memorial Medical Center as its exclusive anesthesia services provider.

228.   Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

229.   At all times relevant hereto, 42 U.S.C. §1302a-7b(b)(2) provided that it was illegal to knowingly and willing to offer or pay any remuneration to induce referrals for healthcare services to be paid for by a Federal health care program (hereafter "Stark Law).

230.   At all times relevant hereto, 42 U.S.C. §1395nn(a) prohibited referrals by a physician to an entity in which he held a financial interest and prohibited claims be made to Medicare when the services were rendered as a result of such a prohibited relationship (hereafter "Anti-Kickback Law").

231.   The agreement between Memorial Medical Center and Associated Anesthesiologists in which Memorial Medical Center provided financial benefits to Associated Anesthesiologists in order to induce referrals of patients to Memorial Medical Center constitutes an indirect kick-back in violation of both the Stark Law and the Anti-Kickback Law.

232.   At all times relevant hereto, Memorial Medical Center was enrolled as a participating provider in the Medicare program. In order to enroll in the Medicare Program,

Memorial Medical Center had specifically agreed to be bound by statutes, rules and regulations of Medicare, including the Stark Law and Anti-Kickback Law, by submitting a Medicare Enrollment Application, Institutional Providers, CMS 855A, in which it certified that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

233. The agreement between Memorial Medical Center and Associated Anesthesiologists, made with the knowledge of Memorial Health Systems, for Memorial Medical Center to employ the MMC CRNAs while Associated Anesthesiologists billed Medicare for the MMC CRNA's services caused the submission of false CMS-1500 forms, or the electronic equivalent thereof, to Medicare by Associated Anesthesiologists and in filing each CMS-1500 form for MMC CRNA services, Associated Anesthesiologists falsely certified that:

> …the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

*See* Exhibit A.

3:10-cv-03076-SEM-JEH   # 13   Page 66 of 202

234.    Said claims were false as Associated Anesthesiologists did not employ the MMC CRNAs at the time the claimed services were rendered but rather received the benefit of the MMC CRNAs as an indirect kickback from Memorial Health System.

235.    As a result of Memorial Health System's causing of these false claims to be submitted by Associated Anesthesiologists' CMS-1500s were based, Medicare reimbursed Associated Anesthesiologists for services by MMC CRNAs when Associated Anesthesiologists was not entitled to receive said Medicare payments.

236.    By virtue of the acts described above, Memorial Health Systems defrauded the United States by causing false or fraudulent claims to allowed and paid by Medicare in violation of 31 U.S.C. §3729(a)(1).

237.    By virtue of the acts described above, Memorial Health System knowingly caused to be submitted false or fraudulent claims to the United States for payment of benefits by Medicare in violation of 31 U.S.C. §3729(a)(1).

238.    By virtue of the acts described above, Memorial Health Systems defrauded the United States by causing false records and statements to be made to support false claims allowed and paid by Medicare in violation of 31 U.S.C. 3729(a)(2).

239.    By virtue of the acts described above, Memorial Health System knowingly caused to be made or used false statements to obtain government payment for false and fraudulent claims submitted to Medicare in violation of 31 U.S.C. §3729(a)(2).

240.    By virtue of the acts described above, Memorial Health System defrauded the United States by causing false records to be made to support false claims allowed and paid by Medicare in violation of 31 U.S.C. 3729(a)(2).

241.    The United States, unaware of the falsity of the claims caused to be made by Memorial Health System paid Associated Anesthesiologists for claims through the Medicare program for MMC CRNAs that would otherwise have not been paid to Associated Anesthesiologists.

242.    By reason of these payments, the United States has been damaged since at least 1997 to the present, and continues to be damaged in a substantial amount.

243.    Memorial Health System has not notified the United States of the violations of the False Claims Act alleged herein.

244.    Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 31 U.S.C. §3730(d)(1).

WHEREFORE, the United States of America, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Memorial Health System, and issue orders in accordance with the False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically as follows:

A.    Order Defendant to cease and desist from violating the False Claims Act, 31 U.S.C. §3729 *et seq.*;

B.    Order Defendant to pay a compensatory amount equal to three times the amount of damages the United States of America has sustained for each false record it made or caused to be made, plus a civil penalty of $10,000 for any false claims submitted prior to September 29, 1999, $11,000 for any false claim submitted on or after September 29, 1999, and the costs of this action pursuant to 31 U.S.C. § 3729(a);

C.      Order Defendant to pay Relator's reasonable costs and expenses, including attorneys' fees, pursuant to 31 U.S.C. §3730(d)(1);

D.      Order that the Relator be awarded the statutory percentage of the amount received by the government pursuant to 31 U.S.C. §3730 (d)(1); and,

E.      Order such other and further relief as this Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

  /s/ Ronald E. Osman

BY:     Ronald E. Osman
        Attorney for Relator,
        Donald Helfer, M.D.

## COUNT VII
## False Claims Act, 31 U.S.C. § 3729 (a)(1) & (2)
**(False Claims, Records & Statements Caused to be made by
Associated Anesthesiologists of Springfield, Ltd. as a result of
Stark Law and Anti-Kickback Statute violations – False Cost Reports
Filed by Memorial Medical Center)**

NOW COMES the Plaintiff, the United States of America, by the Relator, Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Associated Anesthesiologists of Springfield, Ltd. as follows:

245.    From at least 1997 to the present, Associated Anesthesiologists has exclusively served as the provider of anesthesia services to Memorial Medical Center.

246.    From at least 1997 to the present, Memorial Medical Center has provided the following to Associated Anesthesiologists in exchange for this exclusive relationship:

A)      office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)      anesthesia equipment for use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)      anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)      Memorial Medical Center employed CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists at no charge to Associated Anesthesiologists for all anesthesia services rendered other than those needed for cardiac procedures ("MMC CRNAs").

247.   Despite the employer of the MMC CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC CRNAs' benefits to Associated Anesthesiologists and payment for said MMC CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

248.   Associated Anesthesiologists agreement with Memorial Medical Center to receive free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was knowingly and willfully entered into by Associated Anesthesiologists as compensation for its services to Memorial Medical Center as its exclusive anesthesia services provider.

249.    Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

250.    Prior to 2004, Associated Anesthesiologists itself employed CRNAs to assist with its anesthesia work for cardiac procedures at Memorial Medical Center ("Cardiac CRNAs").  Associated Anesthesiologists billed patients, Medicare, Medicaid and other third-party payors for services performed by both its anesthesiologists and its Cardiac CRNAs.

251.    In 2004, Associated Anesthesiologists began having difficulty retaining Cardiac CRNAs in their employ due to various issues, including the cost of employing the Cardiac CRNAs.  As a result of the decrease in Associated Anesthesiologists' Cardiac CRNAs, the number of anesthesia services Associated Anesthesiologists had the ability to provide to Memorial Medical Center for cardiac procedures on a daily basis declined.

252.    At that point, Memorial Medical Center hired the five Cardiac CRNAs then employed by Associated Anesthesiologists to continue assisting Associated Anesthesiologists with cardiac anesthesia services provided at Memorial Medical Center ("MMC Cardiac CRNAs").  Associated Anesthesiologists ceased employment of Cardiac CRNAs at that time.

253.    Despite the employer of the MMC Cardiac CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC Cardiac

CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC Cardiac CRNA's benefit to Associated Anesthesiologists and payment for said MMC Cardiac CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

254.   Approximately $185,000 of costs per MMC Cardiac CRNA per year has been diverted to Memorial Medical Center from Associated Anesthesiologists and the total costs have been reported on Memorial Medical Center's annual Medicare and Medicaid cost reports.

255.   Prior to 2008, the exclusive anesthesia provider agreement between Associated Anesthesiologists and Memorial Medical Center was an oral agreement.   In 2008, the entities executed a Professional Services Agreement for Anesthesia Services memorializing their agreement.   A copy of an October 22, 2007 draft of the Professional Services Agreement is attached hereto as Exhibit C.

256.   Section 3.1 of the Professional Services Agreement provides that:

> MMC [Memorial Medical Center] shall provide to the Group [Associated Anesthesiologists] **at no cost to the group** the facilities, equipment, supplies, services and non-physician personnel (the "MMC Personnel") which MMC determines are reasonably necessary and appropriate for the Group's delivery of Anesthesia Services and Administrative Services hereunder, subject to and consistent with the financial condition and constraints of MMC.   MMC Personnel shall be MMC employees or independent contractors, shall be subject to MMC policies and procedures, and rules and regulations, shall be under the control and supervision of MMC, and shall report to their respective departments.

See Exhibit C, p. 10, line 4-11 (emphasis added).

257.   After the execution of said agreement, Memorial Medical Center has continued to date to provide to Associated Anesthesiologists the following:

A)        office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)        anesthesia equipment for its use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)        anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)        MMC CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists' patients at no charge to Associated Anesthesiologists.

Associated Anesthesiologists has continued to bill for services performed by the MMC CRNAs since the execution of said agreement and collect all amounts due for said MMC CRNA services rendered at Memorial Medical Center.

258.   Associated Anesthesiologists agreement with Memorial Medical Center to receive free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was knowingly and willfully entered into by Associated Anesthesiologists as compensation for its services to Memorial Medical Center as its exclusive anesthesia services provider.

259.   Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

260.   At all times relevant hereto, 42 U.S.C. §1302a-7b(b)(2) provided that it was illegal to knowingly and willingly offer or pay any remuneration to induce referrals for healthcare services to be paid for by a Federal health care program (hereafter "Stark Law).

261.   At all times relevant hereto, 42 U.S.C. §1395nn(a) prohibited referrals by a physician to an entity in which he held a financial interest and prohibited claims be made to Medicare when the services were rendered as a result of such a prohibited relationship (hereafter "Anti-Kickback Law").

262.   The agreement between Memorial Medical Center and Associated Anesthesiologists in which Memorial Medical Center provided financial benefits to Associated Anesthesiologists in order to induce referrals of patients to Memorial Medical Center constitutes an indirect kick-back in violation of both the Stark Law and the Anti-Kickback Law.

263.   At all times relevant hereto, Memorial Medical Center was enrolled as a participating provider in the Medicare program. In order to enroll in the Medicare Program, Memorial Medical Center had specifically agreed to be bound by statutes, rules and regulations of Medicare, including the Stark Law and Anti-Kickback Law, by submitting a Medicare Enrollment Application, Institutional Providers, CMS 855A, in which it certified that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier.   The Medicare laws, regulations, and program instructions are available through the Medicare contractor.   I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

264.   As an acute care medical center, Memorial Medical Center received Medicare payment for its services under the Inpatient PPS, as discussed above, during the period of at least 1997 to the present.  The payments received by Memorial Medical Center consisted of interim cost payments based upon the DRG assignment given to Medicare patients discharged from Memorial Medical Center as well as a final settlement payment  each year based upon Memorial Medical Center's actual costs incurred in performing those services.

265.   The agreement between Memorial Medical Center and Associated Anesthesiologists for Memorial Medical Center to employ the MMC CRNAs while Associated Anesthesiologists billed Medicare for the MMC CRNA's services allowed Memorial Medical Center to include wages and other employment benefits for the MMC CRNAs in its annual cost reports, potentially resulting in additional reimbursements from Medicare for services rendered to Medicare beneficiaries.  Said cost reports are false as said costs were incurred in direct violation of the Stark Law and Anti-Kickback Law.

266.   Each cost report submitted to Medicare by Memorial Medical Center included a certification by Memorial Medical Center stating as follows:

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

I HEREBY CERTIFY THAT I HAVE READ THE ABOVE STATEMENT AND THAT I HAVE EXAMINED THE ACCOMPANYING ELECTRONICALLY FILED OR MANUALLY SUBMITTED COST REPORT AND THE BALANCE SHEET AND STATEMENT OF REVENUE AND EXPENSES PREPARED BY (PROVIDER NAME(S) AND NUMBER(S)) FOR THE COST REPORTING PERIOD BEGINNING [DATE] AND ENDING [DATE], AND THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS A TRUE, CORRECT AND COMPLETE STATEMENT PREPARED FROM THE BOOKS AND RECORDS OF THE

PROVIDER IN ACCORDANCE WITH APPLICABLE INSTRUCTIONS, EXCEPT AS NOTED. I FURTHER CERTIFY THAT I AM FAMILIAR WITH THE LAWS AND REGULATIONS REGARDING THE PROVISION OF HEALTH CARE SERVICES AND THAT THE SERVICES IDENTIFIED IN THIS COST REPORT WERE PROVIDED IN COMPLIANCE WITH SUCH LAWS AND REGULATIONS.

Said certifications were false as said costs reported by Memorial Medical Center on its cost reports were incurred in direct violation of the Stark Law and Anti-Kickback Law.

267. As a result of Associated Anesthesiologists causing Memorial Medical Center to submit false cost reports to Medicare, Memorial Medical Center received cost reimbursements from Medicare to which it was not entitled.

268. By virtue of the acts described above, Associated Anesthesiologists defrauded the United States by causing false or fraudulent claims to allowed and paid by Medicare in violation of 31 U.S.C. §3729(a)(1).

269. By virtue of the acts described above, Associated Anesthesiologists knowingly caused to be submitted false or fraudulent claims to the United States for payment of benefits by Medicare in violation of 31 U.S.C. §3729(a)(1).

270. By virtue of the acts described above, Associated Anesthesiologists defrauded the United States by causing false records and statements to be made to support false claims allowed and paid by Medicare in violation of 31 U.S.C. 3729(a)(2).

271. By virtue of the acts described above, Associated Anesthesiologists defrauded the United States by causing false records to be made to support false claims allowed and paid by Medicare in violation of 31 U.S.C. 3729(a)(2).

272. By virtue of the acts described above, Associated Anesthesiologists knowingly caused to be made or used false statements to obtain government payment for false and fraudulent claims submitted to Medicare in violation of 31 U.S.C. §3729(a)(2).

273.    The United States, unaware of the falsity of the claims, records and statements caused to be made by Associated Anesthesiologists paid cost reimbursements to Memorial Medical Center that would otherwise not been paid.

274.    By reason of these payments, the United States has been damaged since at least 1997 to the present, and continues to be damaged in a substantial amount.

275.    Associated Anesthesiologists has not notified the United States of the violations of the False Claims Act alleged herein.

276.    Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 31 U.S.C. §3730(d)(1).

WHEREFORE, the United States of America, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Associated Anesthesiologists of Springfield, Ltd, and issue orders in accordance with the False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically as follows:

A.      Order Defendant to cease and desist from violating the False Claims Act, 31 U.S.C. §3729 *et seq.*;

B.      Order Defendant to pay a compensatory amount equal to three times the amount of damages the United States of America has sustained for each false record it made or caused to be made, plus a civil penalty of $10,000 for any false claims submitted prior to September 29, 1999, $11,000 for any false claim submitted on or after September 29, 1999, and the costs of this action pursuant to 31 U.S.C. § 3729(a);

C.      Order Defendant to pay Relator's reasonable costs and expenses, including attorneys' fees, pursuant to 31 U.S.C. §3730(d)(1);

D.      Order that the Relator be awarded the statutory percentage of the amount received by the government pursuant to 31 U.S.C. §3730 (d)(1); and,

E.      Order such other and further relief as this Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

 /s/ Ronald E. Osman
BY:    Ronald E. Osman
       Attorney for Relator,
       Donald Helfer, M.D.

## COUNT VIII
## False Claims Act, 31 U.S.C. § 3729 (a)(1) & (2)
**(False Claims, Records and Statements Made or Caused to be made by
Memorial Medical Center as a result of Stark Law and
Anti-Kickback Statute violations - False Cost Reports
Filed by Memorial Medical Center)**

NOW COMES the Plaintiff, the United States of America, by the Relator, Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Memorial Medical Center as follows:

277.    From at least 1997 to the present, Associated Anesthesiologists has exclusively served as the provider of anesthesia services to Memorial Medical Center.

278.    From at least 1997 to the present, Memorial Medical Center has provided the following to Associated Anesthesiologists in exchange for this exclusive relationship:

A)      office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)      anesthesia equipment for use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)      anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)      Memorial Medical Center employed CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists at no charge to Associated Anesthesiologists for all anesthesia services rendered other than those needed for cardiac procedures ("MMC CRNAs").

279.   Despite the employer of the MMC CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC CRNAs' benefits to Associated Anesthesiologists and payment for said MMC CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

280.   Memorial Medical Centers' agreement with Associated Anesthesiologists to provide free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was knowingly and willfully entered into by Memorial Medical Center to serve as compensation for Associates Anesthesiologists' services to Memorial Medical Center as its exclusive anesthesia services provider.

281.   Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

282.   Prior to 2004, Associated Anesthesiologists itself employed CRNAs to assist with its anesthesia work for cardiac procedures at Memorial Medical Center ("Cardiac CRNAs").   Associated Anesthesiologists billed patients, Medicare, Medicaid and other third-party payors for services performed by both its anesthesiologists and its Cardiac CRNAs.

283.   In 2004, Associated Anesthesiologists began having difficulty retaining Cardiac CRNAs in their employ due to various issues, including the cost of employing the Cardiac CRNAs.   As a result of the decrease in Associated Anesthesiologists' Cardiac CRNAs, the number of anesthesia services Associated Anesthesiologists had the ability to provide to Memorial Medical Center for cardiac procedures on a daily basis declined.

284.   At that point, Memorial Medical Center hired the five Cardiac CRNAs then employed by Associated Anesthesiologists to continue assisting Associated Anesthesiologists with cardiac anesthesia services provided at Memorial Medical Center ("MMC Cardiac CRNAs").   Associated Anesthesiologists ceased employment of Cardiac CRNAs at that time.

285.   Despite the employer of the MMC Cardiac CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC Cardiac

CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC Cardiac CRNA's benefit to Associated Anesthesiologists and payment for said MMC Cardiac CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

286.    Approximately $185,000 of costs per MMC Cardiac CRNA per year has been diverted to Memorial Medical Center from Associated Anesthesiologists and the total costs have been reported on Memorial Medical Center's annual Medicare and Medicaid cost reports.

287.    Prior to 2008, the exclusive anesthesia provider agreement between Associated Anesthesiologists and Memorial Medical Center was an oral agreement.  In 2008, the entities executed a Professional Services Agreement for Anesthesia Services memorializing their agreement.  A copy of an October 22, 2007 draft of the Professional Services Agreement is attached hereto as Exhibit C.

288.    Section 3.1 of the Professional Services Agreement provides that:

MMC [Memorial Medical Center] shall provide to the Group [Associated Anesthesiologists] **at no cost to the group** the facilities, equipment, supplies, services and non-physician personnel (the "MMC Personnel") which MMC determines are reasonably necessary and appropriate for the Group's delivery of Anesthesia Services and Administrative Services hereunder, subject to and consistent with the financial condition and constraints of MMC.  MMC Personnel shall be MMC employees or independent contractors, shall be subject to MMC policies and procedures, and rules and regulations, shall be under the control and supervision of MMC, and shall report to their respective departments.

See Exhibit C, p. 10, line 4-11 (emphasis added).

289.  After the execution of said agreement, Memorial Medical Center has continued to date to provide to Associated Anesthesiologists the following:

A)        office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)        anesthesia equipment for its use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)        anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)        MMC CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists at no charge to Associated Anesthesiologists.

Associated Anesthesiologists has continued to bill for services performed by the MMC CRNAs since the execution of said agreement and collect all amounts due for said MMC CRNA services rendered at Memorial Medical Center.

290.  Memorial Medical Centers' agreement with Associated Anesthesiologists to provide free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was knowingly and willfully entered into by Memorial Medical Center to serve as compensation for Associates Anesthesiologists' services to Memorial Medical Center as its exclusive anesthesia services provider.

291.  Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

81

292.    At all times relevant hereto, 42 U.S.C. §1302a-7b(b)(2) provided that it was illegal to knowingly and willingly offer or pay any remuneration to induce referrals for healthcare services to be paid for by a Federal health care program (hereafter "Stark Law).

293.    At all times relevant hereto, 42 U.S.C. §1395nn(a) prohibited referrals by a physician to an entity in which he held a financial interest and prohibited claims be made to Medicare when the services were rendered as a result of such a prohibited relationship (hereafter "Anti-Kickback Law").

294.    The agreement between Memorial Medical Center and Associated Anesthesiologists in which Memorial Medical Center provided financial benefits to Associated Anesthesiologists in order to induce referrals of patients to Memorial Medical Center constitutes an indirect kick-back in violation of both the Stark Law and the Anti-Kickback Law.

295.    At all times relevant hereto, Memorial Medical Center was enrolled as a participating provider in the Medicare program. In order to enroll in the Medicare Program, Memorial Medical Center had specifically agreed to be bound by statutes, rules and regulations of Medicare, including the Stark Law and Anti-Kickback Law, by  submitting a Medicare Enrollment Application, Institutional Providers, CMS 855A, in which it certified that:

>   I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

296.   As an acute care medical center, Memorial Medical Center received Medicare payment for its services under the Inpatient PPS, as discussed above, during the period of at least 1997 to the present.  The payments received by Memorial Medical Center consisted of interim cost payments based upon the DRG assignment given to Medicare patients discharged from Memorial Medical Center as well as a final settlement payment  each year based upon Memorial Medical Center's actual costs incurred in performing those services.

297.   The agreement between Memorial Medical Center and Associated Anesthesiologists for Memorial Medical Center to employ the MMC CRNAs while Associated Anesthesiologists billed Medicare for the MMC CRNA's services allowed Memorial Medical Center to include wages and other employment benefits for the MMC CRNAs in its annual cost reports, potentially resulting in additional reimbursements from Medicare for services rendered to Medicare beneficiaries.  Said cost reports are false as said costs were incurred in direct violation of the Stark Law and Anti-Kickback Law.

298.   Each cost report submitted to Medicare by Memorial Medical Center included a certification by Memorial Medical Center stating as follows:

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

I HEREBY CERTIFY THAT I HAVE READ THE ABOVE STATEMENT AND THAT I HAVE EXAMINED THE ACCOMPANYING ELECTRONICALLY FILED OR MANUALLY SUBMITTED COST REPORT AND THE BALANCE SHEET AND STATEMENT OF REVENUE AND EXPENSES PREPARED BY (PROVIDER NAME(S) AND NUMBER(S)) FOR THE COST REPORTING PERIOD BEGINNING [DATE] AND ENDING [DATE], AND THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS A TRUE, CORRECT AND COMPLETE STATEMENT PREPARED FROM THE BOOKS AND RECORDS OF THE

PROVIDER IN ACCORDANCE WITH APPLICABLE INSTRUCTIONS, EXCEPT AS NOTED. I FURTHER CERTIFY THAT I AM FAMILIAR WITH THE LAWS AND REGULATIONS REGARDING THE PROVISION OF HEALTH CARE SERVICES AND THAT THE SERVICES IDENTIFIED IN THIS COST REPORT WERE PROVIDED IN COMPLIANCE WITH SUCH LAWS AND REGULATIONS.

Said certifications were false as said costs reported by Memorial Medical Center on its cost reports were incurred in direct violation of the Stark Law and Anti-Kickback Law.

299.   By virtue of the acts described above, Memorial Medical Center defrauded the United States by getting false or fraudulent claims allowed and paid by Medicare in violation of 31 U.S.C. §3729(a)(1) & (2).

300.   By virtue of the acts described above, Memorial Medical Center knowingly submitted or caused to be submitted false or fraudulent claims to the United States for payment of benefits by Medicare in violation of 31 U.S.C. §3729(a)(1).

301.   By virtue of the acts described above, Memorial Medical Center defrauded the United States by creating false records and making false statements or causing false records and statements to be made to support false claims allowed and paid by Medicare in violation of 31 U.S.C. 3729(a)(2).

302.   By virtue of the acts described above, Memorial Medical Center knowingly created or caused to be created false records to support submitted false or fraudulent claims to the United States for payment of benefits by Medicare in violation of 31 U.S.C. 3729(a)(2).

303.   By virtue of the acts described above, Memorial Medical Center knowingly made, used or caused to be made or used false statements to obtain government payment for false and fraudulent claims submitted to Medicare in violation of 31 U.S.C. §3729(a)(2).

304.    The United States, unaware of the falsity of the claims made or caused to be made by Memorial Medical Center paid cost reimbursements to Memorial Medical Center that would otherwise not been paid.

305.    By reason of these payments, the United States has been damaged since at least 1997 to the present, and continues to be damaged in a substantial amount.

306.    Memorial Medical Center has not notified the United States of the violations of the False Claims Act alleged herein.

307.    Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 31 U.S.C. §3730(d)(1).

WHEREFORE, the United States of America, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Memorial Medical Center, and issue orders in accordance with the False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically as follows:

A.      Order Defendant to cease and desist from violating the False Claims Act, 31 U.S.C. §3729 *et seq.*;

B.      Order Defendant to pay a compensatory amount equal to three times the amount of damages the United States of America has sustained for each false record it made or caused to be made, plus a civil penalty of $10,000 for any false claims submitted prior to September 29, 1999, $11,000 for any false claim submitted on or after September 29, 1999, and the costs of this action pursuant to 31 U.S.C. § 3729(a);

C.    Order Defendant to pay Relator's reasonable costs and expenses, including attorneys' fees, pursuant to 31 U.S.C. §3730(d)(1);

D.    Order that the Relator be awarded the statutory percentage of the amount received by the government pursuant to 31 U.S.C. §3730 (d)(1); and,

E.    Order such other and further relief as this Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

/s/ Ronald E. Osman
BY:    Ronald E. Osman
       Attorney for Relator,
       Donald Helfer, M.D.

## COUNT IX
## False Claims Act, 31 U.S.C. § 3729 (a)(1) & (2)
**(False Claims Made or Caused to be made by
Memorial Health System as a result of Stark Law and
Anti-Kickback Statute violations - False Cost Reports
Filed by Memorial Medical Center)**

NOW COMES the Plaintiff, the United States of America, by the Relator, Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Memorial Health System as follows:

308.    At all times relevant hereto, Defendant Memorial Health System was the parent company of Memorial Medical Center and directed the daily operations of Memorial Medical Center.

309.    From at least 1997 to the present, Memorial Medical Center has provided the following to Associated Anesthesiologists in exchange for this exclusive relationship:

A)      office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)      anesthesia equipment for use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)      anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)      Memorial Medical Center employed CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists at no charge to Associated Anesthesiologists for all anesthesia services rendered other than those needed for cardiac procedures ("MMC CRNAs").

310.   Despite the employer of the MMC CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC CRNAs' benefits to Associated Anesthesiologists and payment for said MMC CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

311.   Memorial Medical Centers' agreement with Associated Anesthesiologists to provide free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was entered into by Memorial Medical Center with the knowledge of Memorial Health Systems and the intent by Memorial Health Systems for these items to serve as

compensation to Associated Anesthesiologists for its services to Memorial Medical Center as its exclusive anesthesia services provider.

312.    Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

313.    Prior to 2004, Associated Anesthesiologists itself employed CRNAs to assist with its anesthesia work for cardiac procedures at Memorial Medical Center ("Cardiac CRNAs").   Associated Anesthesiologists billed patients, Medicare, Medicaid and other third-party payors for services performed by both its anesthesiologists and its Cardiac CRNAs.

314.    In 2004, Associated Anesthesiologists began having difficulty retaining Cardiac CRNAs in their employ due to various issues, including the cost of employing the Cardiac CRNAs.   As a result of the decrease in Associated Anesthesiologists' Cardiac CRNAs, the number of anesthesia services Associated Anesthesiologists had the ability to provide to Memorial Medical Center for cardiac procedures on a daily basis declined.

315.    At that point, Memorial Medical Center hired the five Cardiac CRNAs then employed by Associated Anesthesiologists to continue assisting Associated Anesthesiologists with cardiac anesthesia services provided at Memorial Medical Center ("MMC Cardiac CRNAs").   Associated Anesthesiologists ceased employment of Cardiac CRNAs at that time.

316.    Despite the employer of the MMC Cardiac CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC Cardiac CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC Cardiac CRNA's benefit to Associated Anesthesiologists and payment for said MMC Cardiac CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

317.    Approximately $185,000 of costs per MMC Cardiac CRNA per year has been diverted to Memorial Medical Center from Associated Anesthesiologists and the total costs have been reported on Memorial Medical Center's annual Medicare and Medicaid cost reports.

318.    Prior to 2008, the exclusive anesthesia provider agreement between Associated Anesthesiologists and Memorial Medical Center was an oral agreement.  In 2008, the entities executed a Professional Services Agreement for Anesthesia Services memorializing their agreement.  A copy of an October 22, 2007 draft of the Professional Services Agreement is attached hereto as Exhibit C.

319.    Edgar J. Curtis, President and CEO of Memorial Health System, was the Memorial Medical Center signor on the 2008 Professional Services Agreement for Anesthesia Services by and between Memorial Medical Center and Associated Anesthesiologists.

320.    Section 3.1 of the Professional Services Agreement provides that:

MMC [Memorial Medical Center] shall provide to the Group [Associated Anesthesiologists] **at no cost to the group** the facilities, equipment, supplies, services and non-physician personnel (the "MMC Personnel") which MMC determines are reasonably necessary

89

and appropriate for the Group's delivery of Anesthesia Services and Administrative Services hereunder, subject to and consistent with the financial condition and constraints of MMC.  MMC Personnel shall be MMC employees or independent contractors, shall be subject to MMC policies and procedures, and rules and regulations, shall be under the control and supervision of MMC, and shall report to their respective departments.

See Exhibit C, p. 10, line 4-11 (emphasis added).

321.   After the execution of said agreement, Memorial Medical Center has continued to date to provide to Associated Anesthesiologists the following:

A)       office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)       anesthesia equipment for its use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)       anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)       MMC CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists' patients at no charge to Associated Anesthesiologists.

Associated Anesthesiologists has continued to bill for services performed by the MMC CRNAs since the execution of said agreement and collect all amounts due for said MMC CRNA services rendered at Memorial Medical Center.

322.   Memorial Medical Centers' agreement with Associated Anesthesiologists to provide free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was entered into by Memorial Medical Center with the knowledge of Memorial Health Systems and the intent by Memorial Health Systems for these items to serve as compensation to Associated Anesthesiologists for its services to Memorial Medical Center as its exclusive anesthesia services provider.

323.    Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

324.    At all times relevant hereto, 42 U.S.C. §1302a-7b(b)(2) provided that it was illegal to knowingly and willingly offer or pay any remuneration to induce referrals for healthcare services to be paid for by a Federal health care program (hereafter "Stark Law).

325.    At all times relevant hereto, 42 U.S.C. §1395nn(a) prohibited referrals by a physician to an entity in which he held a financial interest and prohibited claims be made to Medicare when the services were rendered as a result of such a prohibited relationship (hereafter "Anti-Kickback Law").

326.    The agreement between Memorial Medical Center and Associated Anesthesiologists in which Memorial Medical Center, with the full knowledge and consent of Memorial Health System, provided a financial benefit to Associated Anesthesiologists by employing CRNAs but allowing Associated Anesthesiologists to receive Medicare payments for the CRNAs work constitutes an indirect kick-back in violation of both the Stark Law and the Anti-Kickback Law.

327.    At all times relevant hereto, Memorial Medical Center was enrolled as a participating provider in the Medicare program. In order to enroll in the Medicare Program, Memorial Medical Center had specifically agreed to be bound by statutes, rules and regulations of Medicare, including the Stark Law and Anti-Kickback Law, by submitting a

Medicare Enrollment Application, Institutional Providers, CMS 855A, in which it certified that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

328. As an acute care medical center, Memorial Medical Center received Medicare payment for its services under the Inpatient PPS, as discussed above, during the period of at least 1997 to the present. The payments received by Memorial Medical Center consisted of interim cost payments based upon the DRG assignment given to Medicare patients discharged from Memorial Medical Center as well as a final settlement payment each year based upon Memorial Medical Center's actual costs incurred in performing those services.

329. The agreement between Memorial Medical Center and Associated Anesthesiologists, with the knowledge of Memorial Health Systems, for Memorial Medical Center to employ the MMC CRNAs while Associated Anesthesiologists billed Medicare for the MMC CRNA's services allowed Memorial Medical Center, with the knowledge of Memorial Health System, to include wages and other employment benefits for the MMC CRNAs in its annual cost reports, potentially resulting in additional reimbursements from

Medicare for services rendered to Medicare beneficiaries.  Said cost reports are false as said costs were incurred in direct violation of the Stark Law and Anti-Kickback Law.

330.   Each cost report submitted to Medicare by Memorial Medical Center included a certification by Memorial Medical Center stating as follows:

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

I HEREBY CERTIFY THAT I HAVE READ THE ABOVE STATEMENT AND THAT I HAVE EXAMINED THE ACCOMPANYING ELECTRONICALLY FILED OR MANUALLY SUBMITTED COST REPORT AND THE BALANCE SHEET AND STATEMENT OF REVENUE AND EXPENSES PREPARED BY (PROVIDER NAME(S) AND NUMBER(S)) FOR THE COST REPORTING PERIOD BEGINNING [DATE] AND ENDING [DATE], AND THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS A TRUE, CORRECT AND COMPLETE STATEMENT PREPARED FROM THE BOOKS AND RECORDS OF THE PROVIDER IN ACCORDANCE WITH APPLICABLE INSTRUCTIONS, EXCEPT AS NOTED.  I FURTHER CERTIFY THAT I AM FAMILIAR WITH THE LAWS AND REGULATIONS REGARDING THE PROVISION OF HEALTH CARE SERVICES AND THAT THE SERVICES IDENTIFIED IN THIS COST REPORT WERE PROVIDED IN COMPLIANCE WITH SUCH LAWS AND REGULATIONS.

Said certifications were false as said costs reported by Memorial Medical Center on its cost reports, with the knowledge of Memorial Health System, were incurred in direct violation of the Stark Law and Anti-Kickback Law.

331.   As parent company of Memorial Medical Center, Memorial Health System shared in the additional reimbursements from Medicare to Memorial Medical Center as a result of Memorial Medical Center's false cost reports.

332.   By virtue of the acts described above, Memorial Health System defrauded the United States by causing false or fraudulent claims to allowed and paid by Medicare in violation of 31 U.S.C. §3729(a)(1).

333.    By virtue of the acts described above, Memorial Health System knowingly caused to be submitted false or fraudulent claims to the United States for payment of benefits by Medicare in violation of 31 U.S.C. §3729(a)(1).

334.    By virtue of the acts described above, Memorial Health System defrauded the United States by causing false records and statements to be made to support false claims allowed and paid by Medicare in violation of 31 U.S.C. 3729(a)(2).

335.    By virtue of the acts described above, Memorial Health System knowingly caused to be created false records to support submitted false or fraudulent claims to the United States for payment of benefits by Medicare in violation of 31 U.S.C. 3729(a)(2).

336.    By virtue of the acts described above, Memorial Health System knowingly caused to be made or used false statements to obtain government payment for false and fraudulent claims submitted to Medicare in violation of 31 U.S.C. §3729(a)(2).

337.    The United States, unaware of the falsity of the claims made or caused to be made by Memorial Health System paid cost reimbursements to Memorial Medical Center that would otherwise not been paid.

338.    By reason of these payments, the United States has been damaged since at least 1997 to the present, and continues to be damaged in a substantial amount.

339.    Memorial Health System has not notified the United States of the violations of the False Claims Act alleged herein.

340.    Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 31 U.S.C. §3730(d)(1).

WHEREFORE, the United States of America, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Memorial Health System, and issue orders in accordance with the False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically as follows:

A.      Order Defendant to cease and desist from violating the False Claims Act, 31 U.S.C. §3729 *et seq.*;

B.      Order Defendant to pay a compensatory amount equal to three times the amount of damages the United States of America has sustained for each false record it made or caused to be made, plus a civil penalty of $10,000 for any false claims submitted prior to September 29, 1999, $11,000 for any false claim submitted on or after September 29, 1999, and the costs of this action pursuant to 31 U.S.C. § 3729(a);

C.      Order Defendant to pay Relator's reasonable costs and expenses, including attorneys' fees, pursuant to 31 U.S.C. §3730(d)(1);

D.      Order that the Relator be awarded the statutory percentage of the amount received by the government pursuant to 31 U.S.C. §3730 (d)(1); and,

E.      Order such other and further relief as this Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

 /s/ Ronald E. Osman
BY:    Ronald E. Osman
        Attorney for Relator,
        Donald Helfer, M.D.

**COUNT X**
**False Claims Act, 31 U.S.C. § 3730(h)**
**(Retaliatory Discharge by**
**Associated Anesthesiologists of Springfield, Ltd.)**

NOW COMES the Plaintiff, Donald Helfer, M.D., individually, through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Associated Anesthesiologists of Springfield, Ltd. as follows:

341.   Relator was employed by Associated Anesthesiologists as an AAS Anesthesiologist from August 1990 to October 2009.  Relator was also a shareholder in Associated Anesthesiologists and as such a Board of Director member of the company during this time period.

342.   Through his employment with Associated Anesthesiologists and various officer positions held in Associated Anesthesiologists throughout his tenure, Relator came into contact with and has knowledge of the daily operations of the AAS Anesthesiologists employed by Associated Anesthesiologists and handling of patient care by AAS Anesthesiologists.

343.   From 1997 to September 30, 2008, Associated Anesthesiologists contracted with MMP to perform its medical billing, including the preparation and submission of claims to Medicare.

344.   Since October 1, 2008, Associated Anesthesiologists has contracted with ABC to perform its medical billing, including the preparation and submission of claims to Medicare.

345.   In a corporate board meeting held in April 2009, Rita Astani, the ABC representative assigned to Associated Anesthesiologists, reported that ABC was planning

96

to resubmit all claims submitted to all insurance carriers for labor and delivery epidural anesthesia services to indicate that the labor and delivery epidural anesthesia services had been continuously performed from the time of induction of the epidural anesthesia to the delivery of the child.   Astani also stated that MMP had billed Associated Anesthesiologists' labor and delivery epidural anesthesia service claims in this manner. Dr. Reg Bulkley, Associated Anesthesiologists' liaison physician with ABC, proposed that billing for these epidural anesthesia services be capped at 90% of the maximum amount billed for such services by other Illinois anesthesia groups so that they would not be flagged by insurance companies for charges which were out of line with their area.

346.    After this April 2009, meeting, Relator accessed the CMS public website to review billing regulations regarding anesthesia services.   Relator located regulations indicating that "medical direction" of services could only be billed to Medicare when no more than four concurrent anesthesia services were being directed by an anesthesiologist and that labor and delivery epidural anesthesia services must be counted as a concurrent service unless they qualify as a short, emergency procedure.

347.    Relator printed the information he found from the CMS website and provided it to Dr. Peter Martin, who indicated he would give it to their ABC representative.

348.    Relator also gave the information to Dr. Bulkley, who retorted that Relator was just trying to cause trouble.

349.    Relator asked both Dr. Martin and Dr. Bulkley to address the issue prior to the next scheduled board meeting on June 1, 2009, and report their findings at that meeting.

350.    At the June 1, 2009, meeting, Relator raised the issue about billing for continuous time with labor epidurals. Astani affirmed that ABC billed on behalf of Associated Anesthesiologists for epidural anesthesia continuous time with a cap.   Relator responded that no AAS Anesthesiologist stays in Obstetrics after beginning an epidural anesthesia service and there is neither a hand-off of responsibility to another AAS Anesthesiologist nor a sign-out at the end of anesthesia time.  Relator further stated that in fact some AAS Anesthesiologists often left the hospital after beginning an epidural anesthesia service.  Astani's response was that other anesthesia practices did maintain more signatures on their patient files.

351.    A few days following the June 1, 2009, meeting, Relator again addressed the issue with Dr. Martin, requesting that Dr. Martin call the CMS Help-Line for direction on the issue if ABC did not plan to take action.  Relator also made this request to Dr. Baulkey, who responded, "Why don't you call?  You probably already did."

352.    On June 4, 2009, Relator called the CMS Help-Line and was given an e-mail address to which his billing question could be sent.  Relator then sent an e-mail to CMS outlining his question.

353.    Relator received a response from CMS on Friday, June 12, 2009, stating that epidural anesthesia services could only be billed for actual time spent with the patient and such continuous billing caused the concurrent procedures to be "medical supervision".  Relator called Dr. Martin on Sunday, June 14, 2009, to alert him to the e-mail and inform him he would provide him a copy on Monday, June 15, 2009.  A copy of the response is attached hereto and made a part hereof as Exhibit D.

354.    Relator provided Dr. Martin a copy of the CMS e-mail on June 15, 2009.  Dr. Martin briefly reviewed the e-mail and stated to Relator that "the guys aren't going to like this."

355.    Thereafter, Relator began receiving copies of e-mails between Dr. Martin and Astani discussing the billing situation and Relator's e-mailing of a billing question to Medicare.  One such e-mail stated that ABC's corporate counsel would be sending Medicare another e-mail with a re-wording of Relator's question so the practice would not be flagged by Medicare for review.

356.    On July 2, 2009, Relator reported to work at Memorial Medical Center after having worked the majority of his shift at OSCI.  Relator was relieved from duty by the Charge Anesthesiologist at approximately 2:30 p.m. in accordance with the regular work schedule.

357.    At approximately 2:46 p.m., Relator was paged by Dr. Martin and returned the page via cell phone.  Dr. Martin asking Relator to return to Memorial Medical Center.  Relator asked Dr. Martin why he needed to return to the hospital, and Dr. Martin stated, "you know you shouldn't have talked to Medicare."  Relator responded that all he did was e-mail a question to Medicare, and Dr. Martin responded, "I know, but you didn't go through me."  Relator stated that he would not return to the hospital until the next morning as scheduled.

358.    Sometime after 5:00 p.m. that night, Relator received a call from Dr. Joe Ducaji, who again wanted him to return to Memorial Medical Center.  Relator again responded that he could not return because he had to go to the local high school and hold practice for its cross country team, for which he served as coach.  Dr. Ducaji then stated

that Relator was being terminated without cause from Associated Anesthesiologists or he could resign, his services were no longer needed by Associated Anesthesiologists and he should not return to work – including the upcoming holiday weekend call, and he would be given 90 days wages and benefits as specified in his employment contract.

359.    Relator thereafter called Ed Curtis, CEO of Memorial Medical Center, to ask if he knew why Relator was being let go from Associated Anesthesiologists.  Curtis responded that the Executive Committee from Associated Anesthesiologists was in his office at that moment with a Motion for Termination which had been signed by all shareholders of Associated Anesthesiologists.

360.    Relator's termination was a direct result of his investigating of Associated Anesthesiologists' practice of fraudulently billing anesthesia services to Medicare and attempts by Associated Anesthesiologists to prevent Medicare from discovering the fraudulent billing activities.

361.    As a direct and proximate cause of the foregoing, Relator has lost, and will continue to lose, significant income and benefits and has suffered intangible losses, including mental anguish, embarrassment and inconvenience.

WHEREFORE, the Relator Donald Helfer, M.D. prays this Court give judgment in his favor against Defendant Associated Anesthesiologists of Springfield, Ltd., and issue orders in accordance with the False Claims Act, 31 U.S.C. §3730(h), specifically that:

A)    Order Defendant immediately reinstate Relator to his former job at the same rate of pay with normal pay increases from the date of discharge to the date of reinstatement;

B)    Order Defendant to pay Relator two times the amount of back pay and

benefits, plus interest on the back pay and benefits from the date of discharge to the date of reinstatement;

C)     Order Defendant to pay Relator's costs and attorneys' fees in accordance with 31 U.S.C. 3730(h); and,

D)     Such other and further relief as this Court deems just and proper.

### REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demand trial by jury.

Respectfully submitted,

/s/ Ronald E. Osman
BY:    Ronald E. Osman
        Attorney for Relator,
        Donald Helfer, M.D.

### COUNT XI
### Illinois Whistleblower Reward and Protection Act
### 740 ILCS 175/3(a)(1)(A) & (B)
### (False Claims Submitted to Illinois Medicaid by
### Associated Anesthesiologists of Springfield, Ltd.)

NOW COMES the Plaintiff, the State of Illinois, by the Relator Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Associated Anesthesiologists of Springfield, Ltd. as follows:

362.    Illinois Medicaid provides payment for epidural anesthesia services for expectant mothers during labor and delivery when ordered by an attending physician.  305 ILCS 5/5-16.7a.  Coverage is provided to the patient for epidural services from the beginning of labor to delivery.  Illinois Medicaid Handbook for Providers ("HP"), Chapter 200, §A-283.12.

363.    Illinois Medicaid pays anesthesiologists for continuous epidural services based upon an anesthesia value base unit assigned to the CPT Code for continuous epidural services multiplied by the number of time units the anesthesiologist indicates he spent with the patient.

364.    Illinois Medicaid requires that anesthesiologists report time on their claims as outlined by the American Medical Association in the CPT book.  HP A-283.12.  The CPT book provides that:

> Time for anesthesia procedures may be reported as is customary in the local area.  Anesthesia time begins when the anesthesiologist begins to prepare the patient for the induction of anesthesia in the operating room or in a equivalent area and ends when the anesthesiologist is no longer in personal attendance, that is, when the patient may be safely placed under postoperative supervision.

CPT 2008, p. 37.  Time is to be reported in minutes on the anesthesia claim form.  HP A-283.12; HP Appendix A-1, p. 7, Field 24F.

365.    Up to 24 hours of continuous epidural time may be submitted to Medicaid for payment without an anesthesiologist being required to submit his anesthesia record to support his charges.  HP A-283.1.

366.    Epidural anesthesia services for labor and delivery patients in the Obstetrics Department are not included on the daily hospital surgical schedule or the AAS Anesthesiologist anesthesia service assignment schedule.

367.    When a pregnant woman presents to Memorial Medical Center in labor and it has previously been determined that she will receive epidural anesthesia services during her labor, the Obstetrics Department pages the Charge Anesthesiologist.  The Charge Anesthesiologist then calls one of the AAS Anesthesiologists on duty to leave their

assigned procedure rooms or other departmental assignment to go to the Obstetrics Department to begin the epidural anesthesia.

368.  Upon information and belief, from at least 1997 to the present, Associated Anesthesiologists has billed anesthesia time for all epidural anesthesia services performed by AAS Anesthesiologists as if the AAS Anesthesiologist has continuously been either in the room with the patient or monitoring her epidural services from the time the epidural anesthesia service is started until the delivery of the baby.

369.  When the AAS Anesthesiologist arrives at the patient room, he signs the patient chart to indicate he is the responsible anesthesiologist for the patient's epidural anesthesia service.

370.  The AAS Anesthesiologist starting epidural anesthesia for the patient, however, does not stay with the patient throughout the use of the epidural anesthesia but rather returns to his assigned procedures rooms and continues his regular duties.  He also performs no monitoring of the epidural anesthesia services and only returns to the patient's room if called regarding a problem with the anesthesia service.  He does not sign the patient's record as concluding the epidural anesthesia service as is done by AAS Anesthesiologists for anesthesia services of other types.

371.  If the AAS Anesthesiologist happens to be at the end of his shift when he is called to begin an epidural, he leaves the hospital after beginning the epidural and takes no further action whatsoever regarding epidural anesthesia service to the patient.  At no time does the AAS Anesthesiologist sign the patient medical chart to indicate he has left the hospital premises and is not providing continuous anesthesia services to the patient.

372.    At no time does an AAS Anesthesiologist transfer care of an epidural anesthesia service patient to another AAS Anesthesiologist as indicated by his signature on the patient's epidural record.

373.    There is not a CRNA present at any time during the epidural anesthesia services.

374.    From 1997 to the present, Associated Anesthesiologists has provided anesthesia services to patients who are covered and eligible for reimbursement of their medical expenses through Illinois Medicaid and has submitted claims to Illinois Medicaid for epidural anesthesia services indicating continuous treatment and monitoring by an AAS Anesthesiologist during the entire labor and delivery time regardless of whether the AAS Anesthesiologist assigned to the patient was with the patient during that entire period or even on the hospital premises during that entire period.

375.    For the period January 1, 2000, to December 2010, Associated Anesthesiologists billed Medicaid a total of 4,601 obstetrics anesthesia services, claiming a total amount due to them of $5,353,616.44.    Medicaid has paid Associated Anesthesiologists $719,264.22 for those services. A year-by-year breakdown of the amounts charged to Medicaid and amounts paid by Medicaid is attached hereto as Exhibit E.

376.    For specific examples, Relator was designated by Charge Anesthesiologist on the following dates to begin labor epidural services on the following Illinois Medicaid patients:

| Date | Patient |
|------|---------|
| 4/18/06 | Patient 11 |

| Date | Patient |
|------|---------|
| 12/13/06 | Patient 12 |
| 2/21/07 | Patient 13 |
| 10/26/07 | Patient 14 |
| 12/29/07 | Patient 15 |
| 12/10/08 | Patient 16 |
| 3/13/09 | Patient 17 |

Relator was instructed by the Charge Anesthesiologist on each date listed above that he could leave the hospital for the day after beginning the respective patient's labor epidural services. Relator therefore left the hospital on each date listed above after beginning the respective patient's labor epidural service and took no further action in regard to each patient's labor epidural service. At no time was the responsibility for Patient 9-15 transferred from Relator to another AAS Anesthesiologist.

377. Despite the fact that Relator was actually instructed to and did leave the hospital after beginning the epidural anesthesia services for Patients 11 – 17, Associated Anesthesiologists billed Illinois Medicare for continuous anesthesia time from the time Relator started the epidural anesthesia service until the delivery of a baby for each respective patient.

378. Claims for continuous epidural anesthesia services with continuous anesthesia time were submitted by Associated Anesthesiologists to the State of Illinois for Patients 11 – 17 and other Illinois Medicaid recipients, including but not limited to those referenced in paragraph 169 above and Exhibit E, on the CMS-1500, known as the HFS

2360 for purposes of Illinois Medicaid, or the electronic equivalent thereof, for payment by Illinois Medicaid.

379.   In filing the paper HFS 2360 forms, Associated Anesthesiologists certified that:

> My Signature on the reverse side of this bill certifies that all entries on this claim are true, accurate and complete.   I agree that payment received according to the State's Medical Assistant Program pricing limits will be accepted as payment in full and I will not accept additional payment from any person or persons.
>
> I agree to keep and make available such records as are necessary to disclose fully the nature and extent of services provided and to furnish such information regarding any payments claimed as State and Federal officials may request.   I understand that payment is made from State and Federal funds and that any false claims, statement, or documents, or concealment of material facts may be cause for prosecution or other appropriate legal action.

*See* Exhibit A.   When filing claims electronically, Associated Anesthesiologists was required to execute a DPA 194-M-C Billing Certification Form upon receipt of the Illinois Medicaid payment attesting to the accuracy of the information submitted on its claims.   HP, Chapter 100, §130.5.

380.   Said epidural anesthesia claims were submitted by Associated Anesthesiologists to Illinois Medicaid from at least 1997 to the present with the knowledge by Associated Anesthesiologists that the claims were false as the anesthesia time reported on the claim form was not the anesthesia time actually furnished to the patients.

381.   Illinois Medicaid reimbursed Associated Anesthesiologists for the epidural anesthesia services charged during the period of 1997 to the present as a result of Associated Anesthesiologists' submission of the false claims containing inflated anesthesia time.

382.   By virtue of the acts described above, Associated Anesthesiologists defrauded the State of Illinois by getting false or fraudulent epidural anesthesia service claims allowed and paid by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(A) & (B).

383.   By virtue of the acts described above, Associated Anesthesiologists knowingly submitted or caused to be submitted false or fraudulent epidural anesthesia service claims to the State of Illinois for payment of benefits by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(A).

384.   By virtue of the acts described above, Associated Anesthesiologists knowingly made, used or caused to be made or used false statements to obtain state payment for false and fraudulent epidural anesthesia service claims submitted to Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

385.   The State of Illinois, unaware of the falsity of the records, statements, or claims made or caused to be made by Associated Anesthesiologists, paid for false epidural anesthesia service claims through the Illinois Medicaid program that would otherwise not have been allowed or would have been reduced.

386.   By reason of these payments, the State of Illinois has been damaged from 1997 to the present and continues to be damaged in a substantial amount.

387.   Associated Anesthesiologists has not notified the State of Illinois of the violations of the Illinois Whistleblower Reward and Protection Act alleged herein.

388.   Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 740 ILCS 175/4(d)(1).

WHEREFORE, the State of Illinois, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Associated Anesthesiologists of Springfield, Ltd. and issue orders in accordance with the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, et seq., specifically as follows:

A.      Order Defendant to cease and desist from violating the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.;*

B.      Order Defendant to pay a compensatory amount equal to three times the amount of damages the State has sustained for each false claim submitted by the Defendant, plus a civil penalty of $10,000 for any false claims submitted prior to July 31, 2006, a civil penalty of $11,000 for any false claims submitted after July 31, 2006, and the costs of this action pursuant to 740 ILCS 175/3;

C.      Order Defendant to pay the Attorney General's expenses, including reasonable attorneys' fees and costs, pursuant to 740 ILCS 175/4;

D.      Order Defendant to pay the Relator's reasonable costs and expenses, including reasonable attorneys fees', pursuant to 740 ILCS 175/4(d)(1);

E.      Order that the Relator be awarded the statutory percentage of the amount received by the State of Illinois pursuant to 740 ILCS 175/4(d); and,

F.      Such other and further relief as this Court deems just and proper.

## **REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

 /s/ Ronald E. Osman
BY:    Ronald E. Osman
       Attorney for Relator,
       Donald Helfer, M.D.


### COUNT XII
### Illinois Whistleblower Reward and Protection Act
### 740 ILCS 175/3(a)(1)(B)
### ((False Records Created by Associated Anesthesiologists
### of Springfield, Ltd. to Support False Illinois Medicaid Claims)

NOW COMES the Plaintiff, the State of Illinois, by the Relator Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Associated Anesthesiologists of Springfield, Ltd. as follows:

389.    Illinois Medicaid provides payment for epidural anesthesia services for expectant mothers during labor and delivery when ordered by an attending physician.  305 ILCS 5/5-16.7a.   Coverage is provided to the patient for epidural services from the beginning of labor to delivery.  Illinois Medicaid Handbook for Providers ("HP"), Chapter 200, §A-283.12.

390.    Illinois Medicaid pays anesthesiologists for epidural services based upon an anesthesia value base unit assigned to the CPT Code for epidural services multiplied by the number of time units the anesthesiologist indicates he spent with the patient.

391.    Illinois Medicaid requires that anesthesiologists report time on their claims as outlined by the American Medical Association in the CPT book.  HP A-283.12.  The CPT book provides that:

> Time for anesthesia procedures may be reported as is customary in the local area.  Anesthesia time begins when the anesthesiologist begins to prepare the patient for the induction of anesthesia in the operating room or in a equivalent area and ends when the anesthesiologist is no longer in personal

attendance, that is, when the patient may be safely placed under postoperative supervision.

CPT 2008, p. 37. Time is to be reported in minutes on the anesthesia claim form. HP A-283.12; HP Appendix A-1, p. 7, Field 24F.

392.    Up to 24 hours of continuous epidural time may be submitted to Medicaid for payment without an anesthesiologist being required to submit his anesthesia record to support his charges. HP A-283.1.

393.    Epidural anesthesia services for labor and delivery patients in the Obstetrics Department are not included on the daily hospital surgical schedule or the AAS Anesthesiologist anesthesia service assignment schedule.

394.    When a pregnant woman presents to Memorial Medical Center in labor and it has previously been determined that she will receive epidural anesthesia services during her labor, the Obstetrics Department pages the Charge Anesthesiologist. The Charge Anesthesiologist then calls one of the AAS Anesthesiologists on duty to leave his assigned procedure rooms or other departmental assignment to go to the Obstetrics Department to begin the epidural anesthesia.

395.    Upon information and belief, from at least 1997 to the present, Associated Anesthesiologists has billed anesthesia time for all epidural anesthesia services performed by AAS Anesthesiologists as if the AAS Anesthesiologist has continuously been either in the room with the patient or monitoring her epidural services from the time the epidural anesthesia service is started until the delivery of the baby.

396.    When the AAS Anesthesiologist arrives at the patient room, he signs the patient chart to indicate he is the responsible anesthesiologist for the patient's epidural anesthesia service.

397.   The AAS Anesthesiologist starting epidural anesthesia for the patient, however, does not stay with the patient throughout the use of the epidural anesthesia but rather returns to his assigned procedures rooms and continues his regular duties.  He also performs no monitoring of the epidural anesthesia services and only returns to the patient's room if called regarding a problem with the anesthesia service.  He does not sign the patient's record as concluding the epidural anesthesia service as is done by AAS Anesthesiologists for anesthesia services of other types.

398.   If the AAS Anesthesiologist happens to be at the end of his shift when he is called to begin an epidural, he leaves the hospital after beginning the epidural and takes no further action whatsoever regarding epidural anesthesia service to the patient.  At no time does the AAS Anesthesiologist sign the patient medical chart to indicate he has left the hospital premises and is not providing continuous anesthesia services to the patient.

399.   From 1997 to the present, Associated Anesthesiologists provided anesthesia services to patients who are covered and eligible for reimbursement of their medical expenses through Illinois Medicaid and has submitted claims to Illinois Medicaid for epidural anesthesia services indicating continuous treatment and monitoring by an AAS Anesthesiologist during the entire labor and delivery time regardless of whether the AAS Anesthesiologist assigned to the patient was with the patient during that entire period or even on the hospital premises during that entire period.

400.   For example, Relator was designated by Charge Anesthesiologist on the following dates to begin labor epidural services on the following Illinois Medicaid patients:

| Date | Patient |
|------|---------|
| 4/18/06 | Patient 11 |

| Date | Patient |
|------|---------|
| 12/13/06 | Patient 12 |
| 2/21/07 | Patient 13 |
| 10/26/07 | Patient 14 |
| 12/29/07 | Patient 15 |
| 12/10/08 | Patient 16 |
| 3/13/09 | Patient 17 |

Relator was instructed by the Charge Anesthesiologist on each date listed above that he could leave the hospital for the day after beginning the respective patient's labor epidural services.  Relator therefore left the hospital on each date listed above after beginning the respective patient's labor epidural service and took no further action in regard to each patient's labor epidural service.

401.   Despite the fact that Relator was actually instructed to and did leave the hospital after beginning the epidural anesthesia services for Patients 11 – 17, Associated Anesthesiologists billed Illinois Medicare for continuous anesthesia time from the time Relator started the epidural anesthesia service until the delivery of a baby for each respective patient.

402.   Claims for continuous epidural anesthesia services with continuous anesthesia time were submitted by Associated Anesthesiologists to the State of Illinois for Patients 9 – 15 and other Illinois Medicaid recipients, including those referenced in paragraph 169 and listed on Exhibit E, were submitted by Associated Anesthesiologists to

the State of Illinois on the CMS-1500, known as the HFS 2360 for purposes of Illinois Medicaid, or the electronic equivalent thereof, for payment by Illinois Medicaid.

403.    In filing the paper HFS 2360 forms, Associated Anesthesiologists certified that:

> My Signature on the reverse side of this bill certifies that all entries on this claim are true, accurate and complete.  I agree that payment received according to the State's Medical Assistant Program pricing limits will be accepted as payment in full and I will not accept additional payment from any person or persons.
>
> I agree to keep and make available such records as are necessary to disclose fully the nature and extent of services provided and to furnish such information regarding any payments claimed as State and Federal officials may request.  I understand that payment is made from State and Federal funds and that any false claims, statement, or documents, or concealment of material facts may be cause for prosecution or other appropriate legal action.

*See* Exhibit A.   When filing claims electronically, Associated Anesthesiologists was required to execute a DPA 194-M-C Billing Certification Form upon receipt of the Illinois Medicaid payment attesting to the accuracy of the information submitted on its claims.  HP, Chapter 100, §130.5.

404.    Said epidural anesthesia claims were submitted by Associated Anesthesiologists to Illinois Medicaid from at least 1997 to the present with the knowledge by Associated Anesthesiologists that the medical records had been falsified to indicate the presence of an AAS Anesthesiologist with the patient at all times.

405.    Illinois Medicaid reimbursed Associated Anesthesiologists for the epidural anesthesia services charged during the period of 1997 to the present as a result of Associated Anesthesiologists' submission of the false claims supported by the false medical records created by Associated Anesthesiologists.

406.   By virtue of the acts described above, Associated Anesthesiologists defrauded the State of Illinois by making, using or causing to be made a false record to get a false or fraudulent epidural anesthesia service claim allowed and paid by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

407.   By virtue of the acts described above, Associated Anesthesiologists knowingly submitted or caused to be submitted false or fraudulent epidural anesthesia service claims to the State of Illinois based upon false medical records it knowingly made, used or caused to be made specifically to induce payment of benefits by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

408.   By virtue of the acts described above, Associated Anesthesiologists knowingly made, used or caused to be made or used false medical records to obtain state payment for false and fraudulent epidural anesthesia service claims submitted to Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

409.   The State of Illinois, unaware of the falsification of medical records by Associated Anesthesiologists to support its false claims, paid for false epidural anesthesia service claims through the Illinois Medicaid program that would otherwise not have been allowed or would have been reduced.

410.   By reason of these payments, the State of Illinois has been damaged from 1997 to the present and continues to be damaged in a substantial amount.

411.   Associated Anesthesiologists has not notified the State of Illinois of the violations of the Illinois Whistleblower Reward and Protection Act alleged herein.

412.     Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 740 ILCS 175/4(d)(1).

WHEREFORE, the State of Illinois, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Associated Anesthesiologists of Springfield, Ltd. and issue orders in accordance with the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, et seq., specifically as follows:

A.      Order Defendant to cease and desist from violating the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.;*

B.      Order Defendant to pay a compensatory amount equal to three times the amount of damages the State has sustained for each false claim submitted by the Defendant, plus a civil penalty of $10,000 for any false claims submitted prior to July 31, 2006, a civil penalty of $11,000 for any false claims submitted after July 31, 2006, and the costs of this action pursuant to 740 ILCS 175/3;

C.      Order Defendant to pay the Attorney General's expenses, including reasonable attorneys' fees and costs, pursuant to 740 ILCS 175/4;

D.      Order Defendant to pay the Relator's reasonable costs and expenses, including reasonable attorneys' fees, pursuant to 740 ILCS 175/4(d)(1);

E.      Order that the Relator be awarded the statutory percentage of the amount received by the State of Illinois pursuant to 740 ILCS 175/4(d); and,

F.      Such other and further relief as this Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

  /s/ Ronald E. Osman
BY:    Ronald E. Osman
          Attorney for Relator,
          Donald Helfer, M.D.


## COUNT XIII
### Illinois Whistleblower Reward and Protection Act
### 740 ILCS 175/3(a)(1)(B)
### (False Records Made or Caused to be Made by
### CBIZ Medical Management Professionals, Inc.)

NOW COMES the Plaintiff, the State of Illinois, by the Relator Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against CBIZ Medical Management Professionals, Inc. as follows:

413.    Illinois Medicaid provides payment for epidural anesthesia services for expectant mothers during labor and delivery when ordered by an attending physician.  305 ILCS 5/5-16.7a.  Coverage is provided to the patient for epidural services from the beginning of labor to delivery.  Illinois Medicaid Handbook for Providers ("HP"), Chapter 200, §A-283.12.

414.    Illinois Medicaid pays anesthesiologists for epidural services based upon an anesthesia value base unit assigned to the CPT Code for epidural services multiplied by the number of time units the anesthesiologist indicates he spent with the patient.

415.    Illinois Medicaid requires that anesthesiologists report time on their claims as outlined by the American Medical Association in the CPT book.  HP A-283.12.  The CPT book provides that:

> Time for anesthesia procedures may be reported as is customary in the local area.  Anesthesia time begins when the anesthesiologist begins to prepare the patient for the induction of anesthesia in the operating room or in a equivalent area and ends when the anesthesiologist is no longer in personal attendance, that is, when the patient may be safely placed under postoperative supervision.

CPT 2008, p. 37.  Time is to be reported in minutes on the anesthesia claim form.  HP A-283.12; HP Appendix A-1, p. 7, Field 24F.

416.    Up to 24 hours of continuous epidural time may be submitted to Medicaid for payment without an anesthesiologist being required to submit his anesthesia record to support his charges.  HP A-283.1.

417.    Epidural anesthesia services for labor and delivery patients in the Obstetrics Department are not included on the daily hospital surgical schedule or the AAS Anesthesiologist anesthesia service assignment schedule.

418.    When a pregnant woman presents to Memorial Medical Center in labor and it has previously been determined that she will receive epidural anesthesia services during her labor, the Obstetrics Department pages the Charge Anesthesiologist.  The Charge Anesthesiologist then calls one of the AAS Anesthesiologists on duty to leave his assigned procedure rooms or other departmental assignment to go to the Obstetrics Department to begin the epidural anesthesia.

419.    Upon information and belief, from at least 1997 to the present, Associated Anesthesiologists has billed anesthesia time for all epidural anesthesia services performed by AAS Anesthesiologists as if the AAS Anesthesiologist has continuously been either in

the room with the patient or monitoring her epidural services from the time the epidural anesthesia service is started until the delivery of the baby.

420.    When the AAS Anesthesiologist arrives at the patient room, he signs the patient chart to indicate he is the responsible anesthesiologist for the patient's epidural anesthesia service.

421.    The AAS Anesthesiologist starting epidural anesthesia for the patient, however, does not stay with the patient throughout the use of the epidural anesthesia but rather returns to his assigned procedures rooms and continues his regular duties.  He also performs no monitoring of the epidural anesthesia services and only returns to the patient's room if called regarding a problem with the anesthesia service.  He does not sign the patient's record as concluding the epidural anesthesia service as is done by AAS Anesthesiologists for anesthesia services of other types.

422.    If the AAS Anesthesiologist happens to be at the end of his shift when he is called to begin an epidural, he leaves the hospital after beginning the epidural and takes no further action whatsoever regarding epidural anesthesia service to the patient.  At no time does the AAS Anesthesiologist sign the patient medical chart to indicate he has left the hospital premises and is not providing continuous anesthesia services to the patient.

423.    During the period of 1997 to September 30, 2008, billing for Associated Anesthesiologists was handled by MMP.  MMP maintained an employee on-site at Memorial Medical Center, Dianne Sommer, whose responsibilities were to:  (1) obtain a listing from Obstetrics Department daily of each patient for whom an epidural was given by an AAS Anesthesiologist the previous day, showing the time of the epidural induction and the delivery time of the baby; (2) input this information into a billing system for Associated

Anesthesiologists set up and maintained by MMP; and (3) transmit the information to MMP for processing and submission to Medicare, Medicaid, other Federal health insurance programs and private insurance companies.

424.   MMP instructed Sommer to input billing time for all epidural services given by AAS Anesthesiologists as being the time from the induction of the epidural to the delivery of the baby regardless of whether the AAS Anesthesiologist was providing services to the patient for that entire period.

425.   From 1997 to September 30, 2008, Associated Anesthesiologists provided anesthesia services to patients who are covered and eligible for reimbursement of their medical expenses through Illinois Medicaid and submitted claims to Medicaid for epidural anesthesia services for continuous treatment and monitoring by an AAS Anesthesiologist during the entire labor and delivery time regardless of whether the AAS Anesthesiologist assigned to the patient was with the patient during that entire period or even on the hospital premises during that entire period.

426.   For example, Relator was designated by Charge Anesthesiologist on the following dates to begin labor epidural services on the following Illinois Medicaid patients:

| Date | Patient |
|------|---------|
| 4/18/06 | Patient 11 |
| 12/13/06 | Patient 12 |
| 2/21/07 | Patient 13 |
| 10/26/07 | Patient 14 |
| 12/29/07 | Patient 15 |

Relator was instructed by the Charge Anesthesiologist on each date listed above that he could leave the hospital for the day after beginning the respective patient's labor epidural services.  Relator therefore left the hospital on each date listed above after beginning the respective patient's labor epidural service and took no further action in regard to each patient's labor epidural service.  At no time was the care for Patients 11-15 transferred from Relator to another AAS Anesthesiologist.

427.    Despite the fact that Relator was actually instructed to and did leave the hospital after beginning the epidural anesthesia services for Patients 11 – 15, Associated Anesthesiologists billed Illinois Medicare for continuous anesthesia time from the time Relator started the epidural anesthesia service until the delivery of a baby for each respective patient.

428.    Claims for continuous epidural anesthesia services with continuous anesthesia time for Patients 11 – 15 and other Illinois Medicaid recipients, including those listed on Exhibit E, were submitted by Associated Anesthesiologists to the State of Illinois on the CMS-1500, known as the HFS 2360 for purposes of Illinois Medicaid, or the electronic equivalent thereof, for payment by Illinois Medicaid.

429.    In filing the paper HFS 2360 forms, Associated Anesthesiologists certified that:

> My Signature on the reverse side of this bill certifies that all entries on this claim are true, accurate and complete.  I agree that payment received according to the State's Medical Assistant Program pricing limits will be accepted as payment in full and I will not accept additional payment from any person or persons.
>
> I agree to keep and make available such records as are necessary to disclose fully the nature and extent of services provided and to furnish such information regarding any payments claimed as State and Federal officials may request.  I understand that payment is made from State and Federal

funds and that any false claims, statement, or documents, or concealment of material facts may be cause for prosecution or other appropriate legal action.

*See* Exhibit A. When filing claims electronically, Associated Anesthesiologists was required to execute a DPA 194-M-C Billing Certification Form upon receipt of the Illinois Medicaid payment attesting to the accuracy of the information submitted on its claims. HP, Chapter 100, §130.5.

430. The claims submitted by Associated Anesthesiologists were based upon false billing records created by MMP.

431. As a result of MMP's creation of these false billing records upon which Associated Anesthesiologists' CMS-1500s were based, Illinois Medicaid reimbursed Associated Anesthesiologists for services that were not rendered to the patient.

432. By virtue of the acts described above, MMP defrauded the State of Illinois by creating false records or causing false records to be made to support false claims allowed and paid by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

433. By virtue of the acts described above, MMP knowingly created or caused to be created false records to support submitted false or fraudulent claims to the State of Illinois for payment of benefits by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

434. By virtue of the acts described above, MMP knowingly created or caused to be created false records to allow Associated Anesthesiologists to obtain government payment for false and fraudulent claims submitted to Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

435. The State of Illinois, unaware of the falsity of the records made or caused to be made by MMP, paid for Associated Anesthesiologists' claims through the Illinois Medicaid program that would otherwise have been paid at a lower amount.

436. By reason of these payments, the State of Illinois was been damaged from 1997 to September 30, 2008, and continues to be damaged in a substantial amount.

437. MMP has not notified the State of Illinois of the violations of the Illinois Whistleblower Reward and Protection Act alleged herein.

438. Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 740 ILCS 175/4(d)(1).

WHEREFORE, the State of Illinois, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant CBIZ Medical Management Professionals, Inc. and issue orders in accordance with the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, et seq., specifically as follows:

A.     Order Defendant to cease and desist from violating the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.;*

B.     Order Defendant to pay a compensatory amount equal to three times the amount of damages the State has sustained for each false claim submitted by the Defendant, plus a civil penalty of $10,000 for any false claims submitted prior to July 31, 2006, a civil penalty of $11,000 for any false claims submitted after July 31, 2006, and the costs of this action pursuant to 740 ILCS 175/3;

C.      Order Defendant to pay the Attorney General's expenses, including reasonable attorneys' fees and costs, pursuant to 740 ILCS 175/4;

D.      Order Defendant to pay the Relator's reasonable costs and expenses, including reasonable attorneys' fees, pursuant to 740 ILCS 175/4(d)(1);

E.      Order that the Relator be awarded the statutory percentage of the amount received by the State of Illinois pursuant to 740 ILCS 175/4(d); and,

F.      Such other and further relief as this Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

/s/ Ronald E. Osman
BY:     Ronald E. Osman
        Attorney for Relator,
        Donald Helfer, M.D.

## COUNT XIV
## Illinois Whistleblower Reward and Protection Act
## 740 ILCS 175/3(a)(1)(B)
### (False Records Made or Caused to be Made by
### Anesthesia Business Consultants, Inc.)

NOW COMES the Plaintiff, the State of Illinois, by the Relator Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Anesthesia Business Consultants, Inc. as follows:

439.    Illinois Medicaid provides payment for epidural anesthesia services for expectant mothers during labor and delivery when ordered by an attending physician.  305 ILCS 5/5-16.7a.   Coverage is provided to the patient for epidural services from the

beginning of labor to delivery.  Illinois Medicaid Handbook for Providers ("HP"), Chapter 200, §A-283.12.

440.    Illinois Medicaid pays anesthesiologists for epidural services based upon an anesthesia value base unit assigned to the CPT Code for epidural services multiplied by the number of time units the anesthesiologists indicates he spent with the patient.

441.    Illinois Medicaid requires that anesthesiologists report time on their claims as outlined by the American Medical Association in the CPT book.  HP A-283.12.  The CPT book provides that:

> Time for anesthesia procedures may be reported as is customary in the local area.  Anesthesia time begins when the anesthesiologist begins to prepare the patient for the induction of anesthesia in the operating room or in a equivalent area and ends when the anesthesiologist is no longer in personal attendance, that is, when the patient may be safely placed under postoperative supervision.

CPT 2008, p. 37.  Time is to be reported in minutes on the anesthesia claim form.  HP A-283.12; HP Appendix A-1, p. 7, Field 24F.

442.    Up to 24 hours of continuous epidural time may be submitted to Medicaid for payment without an anesthesiologist being required to submit his anesthesia record to support his charges.  HP A-283.1.

443.    Epidural anesthesia services for labor and delivery patients in the Obstetrics Department are not included on the daily hospital surgical schedule or the AAS Anesthesiologist anesthesia service assignment schedule.

444.    When a pregnant woman presents to Memorial Medical Center in labor and it has previously been determined that she will receive epidural anesthesia services during her labor, the Obstetrics Department pages the Charge Anesthesiologist.  The Charge Anesthesiologist then calls one of the AAS Anesthesiologists on duty to leave his assigned

procedure rooms or other departmental assignment to go to the Obstetrics Department to begin the epidural anesthesia.

445.    Upon information and belief, from at least 1997 to the present, Associated Anesthesiologists has billed anesthesia time for all epidural anesthesia services performed by AAS Anesthesiologists as if the AAS Anesthesiologist has continuously been either in the room with the patient or monitoring her epidural services from the time the epidural anesthesia service is started until the delivery of the baby.

446.    When the AAS Anesthesiologist arrives at the patient room, he signs the patient chart to indicate he is the responsible anesthesiologist for the patient's epidural anesthesia service.

447.    The AAS Anesthesiologist starting epidural anesthesia for the patient, however, does not stay with the patient throughout the use of the epidural anesthesia but rather returns to his assigned procedures rooms and continues his regular duties.  He also performs no monitoring of the epidural anesthesia services and only returns to the patient's room if called regarding a problem with the anesthesia service.  He does not sign the patient's record as concluding the epidural anesthesia service as is done by AAS Anesthesiologists for anesthesia services of other types.

448.    If the AAS Anesthesiologist happens to be at the end of his shift when he is called to begin an epidural, he leaves the hospital after beginning the epidural and takes no further action whatsoever regarding epidural anesthesia service to the patient.  At no time does the AAS Anesthesiologist sign the patient medical chart to indicate he has left the hospital premises and is not providing continuous anesthesia services to the patient.

449.   During the period of October 1, 2008, to the present, billing for Associated Anesthesiologists has been handled by ABC.  ABC maintained an employee on-site at Memorial Medical Center, Dianne Sommer, whose sole responsibilities were to:  (1) obtain a listing from Obstetrics Department daily of each patient for whom an epidural was given by an AAS Anesthesiologist the previous day, showing the time of the epidural induction and the delivery time of the baby; (2) input this information into a billing system for Associated Anesthesiologists set up and maintained by ABC; and (3) transmit the information to ABC for processing and submission to Medicare, Medicaid, other Federal health insurance programs and private insurance companies.

450.   ABC instructed Sommer to input billing time for all epidural services given by AAS Anesthesiologists as being the time from the induction of the epidural to the delivery of the baby regardless of whether the AAS Anesthesiologist was providing services to the patient for that entire period.

451.   From October 1, 2008, to the present, Associated Anesthesiologists has provided anesthesia services to patients who are covered and eligible for reimbursement of their medical expenses through Illinois Medicaid and has submitted claims to Illinois Medicaid for epidural anesthesia services for continuous treatment and monitoring by an AAS Anesthesiologist during the entire labor and delivery time regardless of whether the AAS Anesthesiologist assigned to the patient was with the patient during that entire period or even on the hospital premises during that entire period.

452.   For example, Relator was designated by Charge Anesthesiologist on the following dates to begin labor epidural services on the following Illinois Medicaid patients:

| Date | Patient |
|------|---------|
| 12/10/08 | Patient 16 |
| 3/13/09 | Patient 17 |

Relator was instructed by the Charge Anesthesiologist on each date listed above that he could leave the hospital for the day after beginning the respective patient's labor epidural services.  Relator therefore left the hospital on each date listed above after beginning the respective patient's labor epidural service and took no further action in regard to each patient's labor epidural service.  At no time was the care for Patients 16-17 transferred from Relator to another AAS Anesthesiologist.

453.   Despite the fact that Relator was actually instructed to and did leave the hospital after beginning the epidural anesthesia services for Patients 16 – 17, Associated Anesthesiologists billed Illinois Medicare for continuous anesthesia time from the time Relator started the epidural anesthesia service until the delivery of a baby for each respective patient.

454.   Claims for continuous epidural anesthesia services with continuous anesthesia time for Patients 16 – 17 and other Illinois Medicaid recipients, including those listed on Exhibit E, were submitted by Associated Anesthesiologists to the State of Illinois on the CMS-1500, known as the HFS 2360 for purposes of Illinois Medicaid, or the electronic equivalent thereof, for payment by Illinois Medicaid.

455.   In filing the paper HFS 2360 forms, Associated Anesthesiologists certified that:

> My Signature on the reverse side of this bill certifies that all entries on this claim are true, accurate and complete.   I agree that payment received

according to the State's Medical Assistant Program pricing limits will be accepted as payment in full and I will not accept additional payment from any person or persons.

I agree to keep and make available such records as are necessary to disclose fully the nature and extent of services provided and to furnish such information regarding any payments claimed as State and Federal officials may request.  I understand that payment is made from State and Federal funds and that any false claims, statement, or documents, or concealment of material facts may be cause for prosecution or other appropriate legal action.

*See* Exhibit A.  When filing claims electronically, Associated Anesthesiologists was required to execute a DPA 194-M-C Billing Certification Form upon receipt of the Illinois Medicaid payment attesting to the accuracy of the information submitted on its claims.  HP, Chapter 100, §130.5.

456.    The claims submitted by Associated Anesthesiologists were based upon false billing records created by ABC.

457.    As a result of ABC's creation of these false billing records upon which Associated Anesthesiologists' CMS-1500s were based, Illinois Medicaid reimbursed Associated Anesthesiologists for services that were not rendered to the patient.

458.    By virtue of the acts described above, ABC defrauded the State of Illinois by creating false records or causing false records to be made to support false claims allowed and paid by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

459.    By virtue of the acts described above, ABC knowingly created or caused to be created false records to support submitted false or fraudulent claims to the State of Illinois for payment of benefits by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

460.    By virtue of the acts described above, ABC knowingly created or caused to be created false records to allow Associated Anesthesiologists to obtain government

payment for false and fraudulent claims submitted to Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

461. The State of Illinois, unaware of the falsity of the records made or caused to be made by ABC, paid for Associated Anesthesiologists' claims through the Illinois Medicaid program that would otherwise have been paid at a lower amount.

462. By reason of these payments, the State of Illinois was been damaged from October 1, 2008, to the present, and continues to be damaged in a substantial amount.

463. ABC has not notified the State of Illinois of the violations of the Illinois Whistleblower Reward and Protection Act alleged herein.

464. Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 740 ILCS 175/4(d)(1).

WHEREFORE, the State of Illinois, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Anesthesia Business Consultants, LLC and issue orders in accordance with the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, et seq., specifically as follows:

A. Order Defendant to cease and desist from violating the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.;*

B. Order Defendant to pay a compensatory amount equal to three times the amount of damages the State has sustained for each false claim submitted by the Defendant, plus a civil penalty of $10,000 for any false claims submitted prior to July 31, 2006, a civil penalty of $11,000 for any false claims submitted after July 31, 2006, and the costs of this action pursuant to

740 ILCS 175/3;

C.     Order Defendant to pay the Attorney General's expenses, including reasonable attorneys' fees and costs, pursuant to 740 ILCS 175/4;

D.     Order Defendant to pay the Relator's reasonable costs and expenses, including reasonable attorneys' fees, pursuant to 740 ILCS 175/4(d)(1);

E.     Order that the Relator be awarded the statutory percentage of the amount received by the State of Illinois pursuant to 740 ILCS 175/4(d); and,

F.     Such other and further relief as this Court deems just and proper.

**REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

  /s/ Ronald E. Osman
BY:    Ronald E. Osman
       Attorney for Relator,
       Donald Helfer, M.D.


**COUNT XV**
**Illinois Whistleblower Reward and Protection Act**
**740 ILCS 175/3(a)(1)(A) & (B)**
**(False Claims, Records and Statements Made or Caused to be Made by Associated Anesthesiologists of Springfield, Ltd. as a result of Stark Law and Anti-Kickback Statutes violations – False Medicaid Claims Submitted by Associated Anesthesiologists of Springfield, Ltd.)**

NOW COMES the Plaintiff, the United States of America, by the Relator, Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Associated Anesthesiologists of Springfield, Ltd. as follows:

465.   From at least 1997 to the present, Associated Anesthesiologists has exclusively served as the provider of anesthesia services to Memorial Medical Center.

466.   From at least 1997 to the present, Memorial Medical Center has provided the following to Associated Anesthesiologists in exchange for this exclusive relationship:

A)      office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)      anesthesia equipment for use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)      anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)      Memorial Medical Center employed CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists at no charge to Associated Anesthesiologists for all anesthesia services rendered other than those needed for cardiac procedures ("MMC CRNAs").

467.   Despite the employer of the MMC CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC CRNAs' benefits to Associated Anesthesiologists and payment for said MMC CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

468.   Associated Anesthesiologists' agreement with Memorial Medical Center to receive free office space, supplies and equipment, use of MMC CRNAs and collection of

Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was knowingly and willfully entered into by Associated Anesthesiologists as compensation for its services to Memorial Medical Center as its exclusive anesthesia services provider.

469.   Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

470.   Prior to 2004, Associated Anesthesiologists itself employed CRNAs to assist with its anesthesia work for cardiac procedures at Memorial Medical Center ("Cardiac CRNAs").   Associated Anesthesiologists billed patients, Medicare, Medicaid and other third-party payors for services performed by both its anesthesiologists and its Cardiac CRNAs.

471.   In 2004, Associated Anesthesiologists began having difficulty retaining Cardiac CRNAs in their employ due to various issues, including the cost of employing the Cardiac CRNAs.   As a result of the decrease in Associated Anesthesiologists' Cardiac CRNAs, the number of anesthesia services Associated Anesthesiologists had the ability to provide to Memorial Medical Center for cardiac procedures on a daily basis declined.

472.   At that point, Memorial Medical Center hired the five Cardiac CRNAs then employed by Associated Anesthesiologists to continue assisting Associated Anesthesiologists with cardiac anesthesia services provided at Memorial Medical Center

("MMC Cardiac CRNAs").  Associated Anesthesiologists ceased employment of Cardiac CRNAs at that time.

473.   Despite the employer of the MMC Cardiac CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC Cardiac CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC Cardiac CRNA's benefit to Associated Anesthesiologists and payment for said MMC Cardiac CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

474.   Approximately $185,000 of costs per MMC Cardiac CRNA per year has been diverted to Memorial Medical Center from Associated Anesthesiologists and the total costs have been reported on Memorial Medical Center's annual Medicare and Medicaid cost reports.

475.   Prior to 2008, the exclusive anesthesia provider agreement between Associated Anesthesiologists and Memorial Medical Center was an oral agreement.  In 2008, the entities executed a Professional Services Agreement for Anesthesia Services memorializing their agreement.  A copy of an October 22, 2007 draft of the Professional Services Agreement is attached hereto as Exhibit C.

476.   Section 3.1 of the Professional Services Agreement provides that:

> MMC [Memorial Medical Center] shall provide to the Group [Associated Anesthesiologists] **at no cost to the group** the facilities, equipment, supplies, services and non-physician personnel (the "MMC Personnel") which MMC determines are reasonably necessary and appropriate for the Group's delivery of Anesthesia Services and Administrative Services hereunder, subject to and consistent with the financial condition and constraints of MMC.  MMC Personnel shall be MMC employees or independent contractors, shall be subject to

133

MMC policies and procedures, and rules and regulations, shall be under the control and supervision of MMC, and shall report to their respective departments.

See Exhibit C, p. 10, line 4-11 (emphasis added).

477.   After the execution of said agreement, Memorial Medical Center has continued to date to provide to Associated Anesthesiologists the following:

A)      office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)      anesthesia equipment for use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)      anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)      MMC CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists' patients at no charge to Associated Anesthesiologists.

Associated Anesthesiologists has continued to bill for services performed by the MMC CRNAs since the execution of said agreement and collect all amounts due for said MMC CRNA services rendered at Memorial Medical Center.

478.   Associated Anesthesiologists' agreement with Memorial Medical Center to receive free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was knowingly and willfully entered into by Associated Anesthesiologists as compensation for its services to Memorial Medical Center as its exclusive anesthesia services provider.

479.   Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater

than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

480.   At all times relevant hereto, Associated Anesthesiologists was a participating provider in the Illinois Medicaid program and was required to by Illinois law to, among other things:

      A.    provide supplies and services in full compliance with all applicable provisions of state and federal laws; and

      B.    comply with the requirements of applicable federal and state laws and not engage in practices prohibited by said laws.

89 Ill.Adm.Code 140.12.   Associated Anesthesiologists agreed to these conditions by executing an Agreement for Participation in the Illinois Medicaid Program, a sample of which is attached hereto as Exhibit F.   By executing the Agreement for Participation, Associated Anesthesiologists also:

      A.    agreed to continually comply with all program policy and billing provisions set forth in the Illinois Medicaid rules and handbooks;

      B.    agreed to be fully liable for the truth, accuracy and completeness of all claims submitted to Illinois Medicaid;

      C.    certified that all services provided by it would be in compliance with state and federal law and Illinois Medicaid rules and handbooks;

      D.    acknowledged that compliance with state and federal law and Illinois Medicaid rules and handbooks was a condition of payment for all claims submitted; and

      E.    certified that all services rendered by it as of the effective date of the Agreement for Participation were rendered in compliance with and subject to the terms of the Agreement for Participation.

*See* Exhibit F.

481.    At all times relevant hereto, 42 U.S.C. §1302a-7b(b)(2) provided that it was illegal to knowingly and willingly offer or pay any remuneration to induce referrals for healthcare services to be paid for by a Federal health care program (hereafter "Stark Law").

482.    At all times relevant hereto, 42 U.S.C. §1395nn(a) prohibited referrals by a physician to an entity in which he held a financial interest and prohibited claims be made to Medicare when the services were rendered as a result of such a prohibited relationship (hereafter "Anti-Kickback Law").

483.    At all times relevant hereto, 305 ILCS 5/8A-3 prohibited an Illinois Medicaid provider from soliciting, offering or receiving any remuneration, directly or indirectly, in cash or in kind in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment is made by Illinois Medicaid (hereafter "Illinois Anti-Kickback Law").

484.    The agreement between Memorial Medical Center and Associated Anesthesiologists in which Memorial Medical Center provided financial benefits to Associated Anesthesiologists in order to induce referrals of patients to Memorial Medical Center constitutes an indirect kick-back in violation of the Stark Law, the Anti-Kickback Law and the Illinois Anti-Kickback Law.

485.    Claims for services rendered by MMC CRNAs were submitted by Associated Anesthesiologists on CMS-1500 forms, known as the HFS 2360 for purposes of Illinois Medicaid, or the electronic equivalent thereof, for payment by Illinois Medicaid. When filing claims electronically, Associated Anesthesiologists was required to execute a DPA 194-M-C Billing Certification Form upon receipt of the Illinois Medicaid payment

attesting to the accuracy of the information submitted on its claims based its knowledge of the pertinent Illinois Medicaid policies and procedures.  HP, Chapter 100, §130.5; Illinois Department of Public Aid Billing Certification, Form HFS 194-M-C.

486.    Said claims were false as Associated Anesthesiologists did not employ the MMC CRNAs at the time the claimed services were rendered but rather received the benefit of the MMC CRNAs as an indirect kickback from Memorial Medical Center in violation of the Stark Law, Anti-Kickback Law and Illinois Anti-Kickback Law.

487.    Said claims for services performed by MMC CRNAs were submitted by Associated Anesthesiologists to Illinois Medicaid from at least 1997 to the present with the knowledge by Associated Anesthesiologists that the claims were false as they were knowingly in violation of the Stark Law, Anti-Kickback Law and Illinois Anti-Kickback Law.

488.    As a result of Associated Anesthesiologists filings of these false CMS-1500s, Illinois Medicaid reimbursed Associated Anesthesiologists for services by MMC CRNAs when Associated Anesthesiologists was not entitled to receive said Illinois Medicaid payments.

489.    By virtue of the acts described above, Associated Anesthesiologists defrauded the State of Illinois by getting false or fraudulent claims for services by MMC CRNAs allowed and paid by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(A) & (B).

490.    By virtue of the acts described above, Associated Anesthesiologists knowingly submitted or caused to be submitted false or fraudulent claims for services by MMC CRNAs to the State of Illinois for payment of benefits by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(A).

491.  By virtue of the acts described above, Associated Anesthesiologists defrauded the State of Illinois by creating false records and making false statements or causing false records and statements to be made to support false claims allowed and paid by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

492.  By virtue of the acts described above, Associated Anesthesiologists knowingly made, used or caused to be made or used false records to obtain state payment for false and fraudulent claims for services performed by MMC CRNAs submitted to Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

493.  By virtue of the acts described above, Associated Anesthesiologists knowingly made, used or caused to be made or used false statements to obtain state payment for false and fraudulent claims for services performed by MMC CRNAs submitted to Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

494.  The State of Illinois, unaware of the falsity of the records, statements, or claims made or caused to be made by Associated Anesthesiologists, paid Associated Anesthesiologists for false claims for services by MMC CRNAs through the Illinois Medicaid program that would otherwise not have been allowed.

495.  By reason of these payments, the State of Illinois has been damaged from 1997 to the present and continues to be damaged in a substantial amount.

496.  Associated Anesthesiologists has not notified the State of Illinois of the violations of the Illinois Whistleblower Reward and Protection Act alleged herein.

497.  Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 740 ILCS 175/4(d)(1).

WHEREFORE, the State of Illinois, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Associated Anesthesiologists of Springfield and issue orders in accordance with the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, et seq., specifically as follows:

A.      Order Defendant to cease and desist from violating the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.;*

B.      Order Defendant to pay a compensatory amount equal to three times the amount of damages the State has sustained for each false claim submitted by the Defendant, plus a civil penalty of $10,000 for any false claims submitted prior to July 31, 2006, a civil penalty of $11,000 for any false claims submitted after July 31, 2006, and the costs of this action pursuant to 740 ILCS 175/3;

C.      Order Defendant to pay the Attorney General's expenses, including reasonable attorneys' fees and costs, pursuant to 740 ILCS 175/4;

D.      Order Defendant to pay the Relator's reasonable costs and expenses, including reasonable attorneys' fees, pursuant to 740 ILCS 175/4(d)(1);

E.      Order that the Relator be awarded the statutory percentage of the amount received by the State of Illinois pursuant to 740 ILCS 175/4(d); and,

F.      Such other and further relief as this Court deems just and proper.

## **REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

_/s/ Ronald E. Osman_____

BY:    Ronald E. Osman
        Attorney for Relator,
        Donald Helfer, M.D.


## COUNT XVI
### Illinois Whistleblower Reward and Protection Act
### 740 ILCS 175/3(a)(1)(A) & (B)
### (False Claims, Records & Statements Caused to be made by
### Memorial Medical Center as a result of Stark Law and
### Anti-Kickback Statutes violations - False Medicaid Claims
### Submitted by Associated Anesthesiologists of Springfield, Ltd.

NOW COMES the Plaintiff, the State of Illinois, by the Relator, Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Memorial Medical Center as follows:

498.   From at least 1997 to the present, Associated Anesthesiologists has exclusively served as the provider of anesthesia services to Memorial Medical Center.

499.   From at least 1997 to the present, Memorial Medical Center has provided the following to Associated Anesthesiologists in exchange for this exclusive relationship:

A)      office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)      anesthesia equipment for use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)      anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)      Memorial Medical Center employed CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists at no charge to

Associated Anesthesiologists for all anesthesia services rendered other than those needed for cardiac procedures ("MMC CRNAs").

500.    Despite the employer of the MMC CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC CRNAs' benefit to Associated Anesthesiologists and payment for said MMC CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

501.    Memorial Medical Center's agreement with Associated Anesthesiologists to provide free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was knowingly and willfully entered into by Memorial Medical Center to serve as compensation for Associates Anesthesiologists' services to Memorial Medical Center as its exclusive anesthesia services provider.

502.    Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

503.    Prior to 2004, Associated Anesthesiologists itself employed CRNAs to assist with its anesthesia work for cardiac procedures at Memorial Medical Center ("Cardiac

CRNAs"). Associated Anesthesiologists billed patients, Medicare, Medicaid and other third-party payors for services performed by both its anesthesiologists and its Cardiac CRNAs.

504. In 2004, Associated Anesthesiologists began having difficulty retaining Cardiac CRNAs in their employ due to various issues, including the cost of employing the Cardiac CRNAs. As a result of the decrease in Associated Anesthesiologists' Cardiac CRNAs, the number of anesthesia services Associated Anesthesiologists had the ability to provide to Memorial Medical Center for cardiac procedures on a daily basis declined.

505. At that point, Memorial Medical Center hired the five Cardiac CRNAs then employed by Associated Anesthesiologists to continue assisting Associated Anesthesiologists with cardiac anesthesia services provided at Memorial Medical Center ("MMC Cardiac CRNAs"). Associated Anesthesiologists ceased employment of Cardiac CRNAs at that time.

506. Despite the employer of the MMC Cardiac CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC Cardiac CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC Cardiac CRNA's benefit to Associated Anesthesiologists and payment for said MMC Cardiac CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

507. Approximately $185,000 of costs per MMC Cardiac CRNA per year has been diverted to Memorial Medical Center from Associated Anesthesiologists and the total

costs have been reported on Memorial Medical Center's annual Medicare and Medicaid cost reports.

508.    Prior to 2008, the exclusive anesthesia provider agreement between Associated Anesthesiologists and Memorial Medical Center was an oral agreement.  In 2008, the entities executed a Professional Services Agreement for Anesthesia Services memorializing their agreement.  A copy of an October 22, 2007 draft of the Professional Services Agreement is attached hereto as Exhibit C.

509.    Section 3.1 of the Professional Services Agreement provides that:

> MMC [Memorial Medical Center] shall provide to the Group [Associated Anesthesiologists] **at no cost to the group** the facilities, equipment, supplies, services and non-physician personnel (the "MMC Personnel") which MMC determines are reasonably necessary and appropriate for the Group's delivery of Anesthesia Services and Administrative Services hereunder, subject to and consistent with the financial condition and constraints of MMC.  MMC Personnel shall be MMC employees or independent contractors, shall be subject to MMC policies and procedures, and rules and regulations, shall be under the control and supervision of MMC, and shall report to their respective departments.

See Exhibit C, p. 10, line 4-11 (emphasis added).

510.    After the execution of said agreement, Memorial Medical Center has continued to date to provide to Associated Anesthesiologists the following:

A)      office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)      anesthesia equipment for its use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)      anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)      MMC CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists' patients at no charge to Associated Anesthesiologists.

143

Associated Anesthesiologists has continued to bill for services performed by the MMC CRNAs since the execution of said agreement and collect all amounts due for said MMC CRNA services rendered at Memorial Medical Center.

511.   Memorial Medical Center's agreement with Associated Anesthesiologists to provide free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was knowingly and willfully entered into by Memorial Medical Center to serve as compensation for Associates Anesthesiologists' services to Memorial Medical Center as its exclusive anesthesia services provider.

512.   Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

513.   At all times relevant hereto, Memorial Medical Center was a participating provider in the Illinois Medicaid program and was required to by Illinois law to, among other things:

> A.   provide supplies and services in full compliance with all applicable provisions of state and federal laws; and

> B.   comply with the requirements of applicable federal and state laws and not engage in practices prohibited by said laws.

89 Ill.Adm.Code 140.12.   Memorial Medical Center agreed to these conditions by executing an Agreement for Participation in the Illinois Medicaid Program, a sample of

which is attached hereto as Exhibit F.  By executing the Agreement for Participation, Memorial Medical Center also:

> A.    agreed to continually comply with all program policy and billing provisions set forth in the Illinois Medicaid rules and handbooks;
>
> B.    agreed to be fully liable for the truth, accuracy and completeness of all claims submitted to Illinois Medicaid;
>
> C.    certified that all services provided by it would be in compliance with state and federal law and Illinois Medicaid rules and handbooks;
>
> D.    acknowledged that compliance with state and federal law and Illinois Medicaid rules and handbooks was a condition of payment for all claims submitted; and
>
> E.    certified that all services rendered by it as of the effective date of the Agreement for Participation were rendered in compliance with and subject to the terms of the Agreement for Participation.

*See* Exhibit F.

514.    At all times relevant hereto, 42 U.S.C. §1302a-7b(b)(2) provided that it was illegal to knowingly and willingly offer or pay any remuneration to induce referrals for healthcare services to be paid for by a Federal health care program (hereafter "Stark Law").

515.    At all times relevant hereto, 42 U.S.C. §1395nn(a) prohibited referrals by a physician to an entity in which he held a financial interest and prohibited claims be made to Medicare when the services were rendered as a result of such a prohibited relationship (hereafter "Anti-Kickback Law").

516.    At all times relevant hereto, 305 ILCS 5/8A-3 prohibited an Illinois Medicaid provider from soliciting, offering or receiving any remuneration, directly or indirectly, in cash or in kind in return for referring an individual to a person for the furnishing or

arranging for the furnishing of any item or service for which payment is made by Illinois Medicaid (hereafter "Illinois Anti-Kickback Law").

517.   The agreement between Memorial Medical Center and Associated Anesthesiologists in which Memorial Medical Center providing financial benefits to Associated Anesthesiologists in order to induce referrals of patients to Memorial Medical Center constitutes an indirect kick-back in violation of the Stark Law, the Anti-Kickback Law and the Illinois Anti-Kickback Law.

518.   Claims for services rendered by MMC CRNAs were submitted by Associated Anesthesiologists on CMS-1500 forms, known as the HFS 2360 for purposes of Illinois Medicaid, or the electronic equivalent thereof, for payment by Illinois Medicaid. When filing claims electronically, Associated Anesthesiologists was required to execute a DPA 194-M-C Billing Certification Form upon receipt of the Illinois Medicaid payment attesting to the accuracy of the information submitted on its claims based its knowledge of the pertinent Illinois Medicaid policies and procedures.  HP, Chapter 100, §130.5; Illinois Department of Public Aid Billing Certification, Form HFS 194-M-C.

519.   Said claims were false as Associated Anesthesiologists did not employ the MMC CRNAs at the time the claimed services were rendered but rather received the benefit of the MMC CRNAs as an indirect kickback from Memorial Medical Center in violation of the Stark Law, Anti-Kickback Law and Illinois Anti-Kickback Law.

520.   Said claims for services performed by MMC CRNAs were caused to be submitted by Memorial Medical Center to Illinois Medicaid from at least 1997 to the present with the knowledge by Memorial Medical Center that the claims were false as they

were knowingly in violation of the Stark Law, Anti-Kickback Law and Illinois Anti-Kickback Law.

521.    As a result of Memorial Medical Center causing these false CMS-1500s to be submitted, Illinois Medicaid reimbursed Associated Anesthesiologists for services by MMC CRNAs when Associated Anesthesiologists was not entitled to receive said Illinois Medicaid payments.

522.    By virtue of the acts described above, Memorial Medical Center defrauded the State of Illinois by causing false or fraudulent claims for services by MMC CRNAs allowed and paid by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(A) & (B).

523.    By virtue of the acts described above, Memorial Medical Center knowingly caused to be submitted false or fraudulent claims for services by MMC CRNAs to the State of Illinois for payment of benefits by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(A).

524.    By virtue of the acts described above, Memorial Medical Center defrauded the United States by causing false records and statements to be made to support false claims allowed and paid by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

525.    By virtue of the acts described above, Memorial Medical Center knowingly caused to be made or used false records to obtain state payment for false and fraudulent claims for services performed by MMC CRNAs submitted to Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

526.    By virtue of the acts described above, Memorial Medical Center knowingly caused to be made or used false statements to obtain state payment for false and

fraudulent claims for services performed by MMC CRNAs submitted to Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

527.    The State of Illinois, unaware of the falsity of the records, statements, or claims made or caused to be made by Memorial Medical Center, paid Associated Anesthesiologists for false claims for services by MMC CRNAs through the Illinois Medicaid program that would otherwise not have been allowed.

528.    By reason of these payments, the State of Illinois has been damaged from 1997 to the present and continues to be damaged in a substantial amount.

529.    Memorial Medical Center has not notified the State of Illinois of the violations of the Illinois Whistleblower Reward and Protection Act alleged herein.

530.    Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 740 ILCS 175/4(d)(1).

WHEREFORE, the State of Illinois, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Memorial Medical Center and issue orders in accordance with the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, et seq., specifically as follows:

A.      Order Defendant to cease and desist from violating the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.;*

B.      Order Defendant to pay a compensatory amount equal to three times the amount of damages the State has sustained for each false claim submitted by the Defendant, plus a civil penalty of $10,000 for any false claims submitted prior to July 31, 2006, a civil penalty of $11,000 for any false

claims submitted after July 31, 2006, and the costs of this action pursuant to 740 ILCS 175/3;

C.     Order Defendant to pay the Attorney General's expenses, including reasonable attorneys' fees and costs, pursuant to 740 ILCS 175/4;

D.     Order Defendant to pay the Relator's reasonable costs and expenses, including reasonable attorneys' fees, pursuant to 740 ILCS 175/4(d)(1);

E.     Order that the Relator be awarded the statutory percentage of the amount received by the State of Illinois pursuant to 740 ILCS 175/4(d); and,

F.     Such other and further relief as this Court deems just and proper.

### <u>REQUEST FOR TRIAL BY JURY</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

 /s/ Ronald E. Osman
BY:    Ronald E. Osman
        Attorney for Relator,
        Donald Helfer, M.D.

### <u>COUNT XVII</u>
### <u>Illinois Whistleblower Reward and Protection Act</u>
### <u>740 ILCS 175/3(a)(1)(A) & (B)</u>
### (False Claims, Records & Statements Caused to be made by
### Memorial Health System as a result of Stark Law and
### Anti-Kickback Statutes violations - False Medicaid Claims
### Submitted by Associated Anesthesiologists of Springfield, Ltd.)

NOW COMES the Plaintiff, the State of Illinois, by the Relator, Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Memorial Health System as follows:

531.  At all times relevant hereto, Defendant Memorial Health System was the parent company of Memorial Medical Center and directed the daily operations of Memorial Medical Center.

532.  From at least 1997 to the present, Associated Anesthesiologists has exclusively served as the provider of anesthesia services to Memorial Medical Center.

533.  From at least 1997 to the present, Memorial Medical Center has provided the following to Associated Anesthesiologists in exchange for this exclusive relationship:

A)  office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)  anesthesia equipment for use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)  anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)  Memorial Medical Center employed CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists at no charge to Associated Anesthesiologists for all anesthesia services rendered other than those needed for cardiac procedures ("MMC CRNAs").

534.  Despite the employer of the MMC CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC CRNAs' benefits to Associated Anesthesiologists and payment for said MMC CRNA services was paid by the

patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

535.    Memorial Medical Centers' agreement with Associated Anesthesiologists to provide free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was entered into by Memorial Medical Center with the knowledge of Memorial Health Systems and the intent by Memorial Health Systems for these items to serve as compensation to Associated Anesthesiologists for its services to Memorial Medical Center as its exclusive anesthesia services provider.

536.    Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

537.    Prior to 2004, Associated Anesthesiologists itself employed CRNAs to assist with its anesthesia work for cardiac procedures at Memorial Medical Center ("Cardiac CRNAs").  Associated Anesthesiologists billed patients, Medicare, Medicaid and other third-party payors for services performed by both its anesthesiologists and its Cardiac CRNAs.

538.    In 2004, Associated Anesthesiologists began having difficulty retaining Cardiac CRNAs in their employ due to various issues, including the cost of employing the Cardiac CRNAs.  As a result of the decrease in Associated Anesthesiologists' Cardiac

CRNAs, the number of anesthesia services Associated Anesthesiologists had the ability to provide to Memorial Medical Center for cardiac procedures on a daily basis declined.

539.    At that point, Memorial Medical Center hired the five Cardiac CRNAs then employed by Associated Anesthesiologists to continue assisting Associated Anesthesiologists with cardiac anesthesia services provided at Memorial Medical Center ("MMC Cardiac CRNAs").  Associated Anesthesiologists ceased employment of Cardiac CRNAs at that time.

540.    Despite the employer of the MMC Cardiac CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC Cardiac CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC Cardiac CRNA's benefit to Associated Anesthesiologists and payment for said MMC Cardiac CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

541.    Approximately $185,000 of costs per MMC Cardiac CRNA per year has been diverted to Memorial Medical Center from Associated Anesthesiologists and the total costs have been reported on Memorial Medical Center's annual Medicare and Medicaid cost reports.

542.    Prior to 2008, the exclusive anesthesia provider agreement between Associated Anesthesiologists and Memorial Medical Center was an oral agreement.  In 2008, the entities executed a Professional Services Agreement for Anesthesia Services memorializing their agreement.  A copy of an October 22, 2007 draft of the Professional Services Agreement is attached hereto as Exhibit C.

543.    Edgar J. Curtis, President and CEO of Memorial Health System was the Memorial Medical Center signor on the 2008 Professional Services Agreement for Anesthesia Services by and between Memorial Medical Center and Associated Anesthesiologists.

544.    Section 3.1 of the Professional Services Agreement provides that:

> MMC [Memorial Medical Center] shall provide to the Group [Associated Anesthesiologists] **at no cost to the group** the facilities, equipment, supplies, services and non-physician personnel (the "MMC Personnel") which MMC determines are reasonably necessary and appropriate for the Group's delivery of Anesthesia Services and Administrative Services hereunder, subject to and consistent with the financial condition and constraints of MMC.  MMC Personnel shall be MMC employees or independent contractors, shall be subject to MMC policies and procedures, and rules and regulations, shall be under the control and supervision of MMC, and shall report to their respective departments.

See Exhibit C, p. 10, line 4-11 (emphasis added).

545.    After the execution of said agreement, Memorial Medical Center has continued to date to provide to Associated Anesthesiologists the following:

A)    office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)    anesthesia equipment for use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)    anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)    MMC CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists' patients at no charge to Associated Anesthesiologists.

Associated Anesthesiologists has continued to bill for services performed by the MMC CRNAs since the execution of said agreement and collect all amounts due for said MMC CRNA services rendered at Memorial Medical Center.

546.    Memorial Medical Centers' agreement with Associated Anesthesiologists to provide free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was entered into by Memorial Medical Center with the knowledge of Memorial Health Systems and the intent by Memorial Health Systems for these items to serve as compensation to Associated Anesthesiologists for its services to Memorial Medical Center as its exclusive anesthesia services provider.

547.    Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

548.    At all times relevant hereto, Memorial Medical Center was a participating provider in the Illinois Medicaid program and was required to by Illinois law to, among other things:

> A.    provide supplies and services in full compliance with all applicable provisions of state and federal laws; and

> B.    comply with the requirements of applicable federal and state laws and not engage in practices prohibited by said laws.

89 Ill.Adm.Code 140.12.    Memorial Medical Center agreed to these conditions by executing an Agreement for Participation in the Illinois Medicaid Program, a sample of which is attached hereto as Exhibit F.   By executing the Agreement for Participation, Memorial Medical Center also:

A.      agreed to continually comply with all program policy and billing provisions set forth in the Illinois Medicaid rules and handbooks;

B.      agreed to be fully liable for the truth, accuracy and completeness of all claims submitted to Illinois Medicaid;

C.      certified that all services provided by it would be in compliance with state and federal law and Illinois Medicaid rules and handbooks;

D.      acknowledged that compliance with state and federal law and Illinois Medicaid rules and handbooks was a condition of payment for all claims submitted; and

E.      certified that all services rendered by it as of the effective date of the Agreement for Participation were rendered in compliance with and subject to the terms of the Agreement for Participation.

*See* Exhibit F.

549.    At all times relevant hereto, 42 U.S.C. §1302a-7b(b)(2) provided that it was illegal to knowingly and willingly offer or pay any remuneration to induce referrals for healthcare services to be paid for by a Federal health care program (hereafter "Stark Law").

550.    At all times relevant hereto, 42 U.S.C. §1395nn(a) prohibited referrals by a physician to an entity in which he held a financial interest and prohibited claims be made to Medicare when the services were rendered as a result of such a prohibited relationship (hereafter "Anti-Kickback Law").

551.    At all times relevant hereto, 305 ILCS 5/8A-3 prohibited an Illinois Medicaid provider from soliciting, offering or receiving any remuneration, directly or indirectly, in cash or in kind in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment is made by Illinois Medicaid (hereafter "Illinois Anti-Kickback Law").

552.   The agreement between Memorial Medical Center and Associated Anesthesiologists in which Memorial Medical Center provided financial benefits to Associated Anesthesiologists in order to induce referrals of patients to Memorial Medical Center constitutes an indirect kick-back in violation of the Stark Law, the Anti-Kickback Law and the Illinois Anti-Kickback Law.

553.   Claims for services rendered by MMC CRNAs were submitted by Associated Anesthesiologists on CMS-1500 forms, known as the HFS 2360 for purposes of Illinois Medicaid, or the electronic equivalent thereof, for payment by Illinois Medicaid. When filing claims electronically, Associated Anesthesiologists was required to execute a DPA 194-M-C Billing Certification Form upon receipt of the Illinois Medicaid payment attesting to the accuracy of the information submitted on its claims based its knowledge of the pertinent Illinois Medicaid policies and procedures.  HP, Chapter 100, §130.5; Illinois Department of Public Aid Billing Certification, Form HFS 194-M-C.

554.   Said claims were false as Associated Anesthesiologists did not employ the MMC CRNAs at the time the claimed services were rendered but rather received the benefit of the MMC CRNAs as an indirect kickback from Memorial Health Systems in violation of the Stark Law, Anti-Kickback Law and Illinois Anti-Kickback Law.

555.   Said claims for services performed by MMC CRNAs were caused to be submitted by Memorial Health System to Illinois Medicaid from at least 1997 to the present with the knowledge by Memorial Health System that the claims were false as they were knowingly in violation of the Stark Law, Anti-Kickback Law and Illinois Anti-Kickback Law.

556.   As a result of Memorial Health System causing the filing of these false CMS-1500s, Illinois Medicaid reimbursed Associated Anesthesiologists for services by MMC

CRNAs when Associated Anesthesiologists was not entitled to receive said Illinois Medicaid payments.

557.   By virtue of the acts described above, Memorial Health System defrauded the State of Illinois by getting false or fraudulent claims for services by MMC CRNAs allowed and paid by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(A).

558.   By virtue of the acts described above, Memorial Health Systems knowingly caused to be submitted false or fraudulent claims for services by MMC CRNAs to the State of Illinois for payment of benefits by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(A).

559.   By virtue of the acts described above, Memorial Health System defrauded the State of Illinois by creating false records and making false statements or causing false records and statements to be made to support false claims allowed and paid by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

560.   By virtue of the acts described above, Memorial Health Systems knowingly caused to be made or used false records to obtain state payment for false and fraudulent claims for services performed by MMC CRNAs submitted to Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

561.   By virtue of the acts described above, Memorial Health Systems knowingly caused to be made or used false statements to obtain state payment for false and fraudulent claims for services performed by MMC CRNAs submitted to Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

562.   The State of Illinois, unaware of the falsity of the records, statements, or claims caused to be made by Memorial Health System, paid Associated Anesthesiologists

for false claims for services by MMC CRNAs through the Illinois Medicaid program that would otherwise not have been allowed.

563.   By reason of these payments, the State of Illinois has been damaged from 1997 to the present and continues to be damaged in a substantial amount.

564.   Memorial Health System has not notified the State of Illinois of the violations of the Illinois Whistleblower Reward and Protection Act alleged herein.

565.   Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 740 ILCS 175/4(d)(1).

WHEREFORE, the State of Illinois, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Memorial Health System and issue orders in accordance with the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, et seq., specifically as follows:

A.   Order Defendant to cease and desist from violating the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.;*

B.   Order Defendant to pay a compensatory amount equal to three times the amount of damages the State has sustained for each false claim submitted by the Defendant, plus a civil penalty of $10,000 for any false claims submitted prior to July 31, 2006, a civil penalty of $11,000 for any false claims submitted after July 31, 2006, and the costs of this action pursuant to 740 ILCS 175/3;

C.   Order Defendant to pay the Attorney General's expenses, including reasonable attorneys' fees and costs, pursuant to 740 ILCS 175/4;

D.    Order Defendant to pay the Relator's reasonable costs and expenses, including reasonable attorneys' fees, pursuant to 740 ILCS 175/4(d)(1);

E.    Order that the Relator be awarded the statutory percentage of the amount received by the State of Illinois pursuant to 740 ILCS 175/4(d); and,

F.    Such other and further relief as this Court deems just and proper.

## **REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

 /s/ Ronald E. Osman
BY:    Ronald E. Osman
           Attorney for Relator,
           Donald Helfer, M.D.

## COUNT XVIII
## Illinois Whistleblower Reward and Protection Act
## 740 ILCS 175/3(a)(1)(B)
## (False Claims, Records & Statements Caused to be made by
## Associated Anesthesiologists of Springfield, Ltd. as a result of
## Stark Law and Anti-Kickback Statutes violations – False Cost Reports
## Filed by Memorial Medical Center)

NOW COMES the Plaintiff, the State of Illinois, by the Relator, Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Associated Anesthesiologists of Springfield, Ltd. as follows:

566.    From at least 1997 to the present, Associated Anesthesiologists has exclusively served as the provider of anesthesia services to Memorial Medical Center.

567.    From at least 1997 to the present, Memorial Medical Center has provided the following to Associated Anesthesiologists in exchange for this exclusive relationship:

A)      office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)      anesthesia equipment for use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)      anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)      Memorial Medical Center employed CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists at no charge to Associated Anesthesiologists for all anesthesia services rendered other than those needed for cardiac procedures ("MMC CRNAs").

568.    Despite the employer of the MMC CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC CRNAs was

billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC CRNAs' benefits to Associated Anesthesiologists and payment for said MMC CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

569.   Associated Anesthesiologists agreement with Memorial Medical Center to receive free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was knowingly and willfully entered into by Associated Anesthesiologists as compensation for its services to Memorial Medical Center as its exclusive anesthesia services provider.

570.   Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

571.   Prior to 2004, Associated Anesthesiologists itself employed CRNAs to assist with its anesthesia work for cardiac procedures at Memorial Medical Center ("Cardiac CRNAs").   Associated Anesthesiologists billed patients, Medicare, Medicaid and other third-party payors for services performed by both its anesthesiologists and its Cardiac CRNAs.

572.   In 2004, Associated Anesthesiologists began having difficulty retaining Cardiac CRNAs in their employ due to various issues, including the cost of employing the Cardiac CRNAs.  As a result of the decrease in Associated Anesthesiologists' Cardiac CRNAs, the number of anesthesia services Associated Anesthesiologists had the ability to provide to Memorial Medical Center for cardiac procedures on a daily basis declined.

573.   At that point, Memorial Medical Center hired the five Cardiac CRNAs then employed by Associated Anesthesiologists to continue assisting Associated Anesthesiologists with cardiac anesthesia services provided at Memorial Medical Center ("MMC Cardiac CRNAs").  Associated Anesthesiologists ceased employment of Cardiac CRNAs at that time.

574.   Despite the employer of the MMC Cardiac CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC Cardiac CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC Cardiac CRNA's benefit to Associated Anesthesiologists and payment for said MMC Cardiac CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

575.   Approximately $185,000 of costs per MMC Cardiac CRNA per year has been diverted to Memorial Medical Center from Associated Anesthesiologists and the total costs have been reported on Memorial Medical Center's annual Medicare and Medicaid cost reports.

576.   Prior to 2008, the exclusive anesthesia provider agreement between Associated Anesthesiologists and Memorial Medical Center was an oral agreement.  In

2008, the entities executed a Professional Services Agreement for Anesthesia Services

memorializing their agreement.  A copy of an October 22, 2007 draft of the Professional

Services Agreement is attached hereto as Exhibit C.

577.  Section 3.1 of the Professional Services Agreement provides that:

> MMC [Memorial Medical Center] shall provide to the Group [Associated Anesthesiologists] **at no cost to the group** the facilities, equipment, supplies, services and non-physician personnel (the "MMC Personnel") which MMC determines are reasonably necessary and appropriate for the Group's delivery of Anesthesia Services and Administrative Services hereunder, subject to and consistent with the financial condition and constraints of MMC.  MMC Personnel shall be MMC employees or independent contractors, shall be subject to MMC policies and procedures, and rules and regulations, shall be under the control and supervision of MMC, and shall report to their respective departments.

See Exhibit C, p. 10, line 4-11 (emphasis added).

578.  After the execution of said agreement, Memorial Medical Center has

continued to date to provide to Associated Anesthesiologists the following:

A)  office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)  anesthesia equipment for its use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)  anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)  MMC CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists' patients at no charge to Associated Anesthesiologists.

Associated Anesthesiologists has continued to bill for services performed by the MMC

CRNAs since the execution of said agreement and collect all amounts due for said MMC

CRNA services rendered at Memorial Medical Center.

579.    Associated Anesthesiologists agreement with Memorial Medical Center to receive free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was knowingly and willfully entered into by Associated Anesthesiologists as compensation for its services to Memorial Medical Center as its exclusive anesthesia services provider.

580.    Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

581.    At all times relevant hereto, Associated Anesthesiologists was a participating provider in the Illinois Medicaid program and was required to by Illinois law to, among other things:

> A.    provide supplies and services in full compliance with all applicable provisions of state and federal laws; and
>
> B.    comply with the requirements of applicable federal and state laws and not engage in practices prohibited by said laws.

89 Ill.Adm.Code 140.12.   Associated Anesthesiologists agreed to these conditions by executing an Agreement for Participation in the Illinois Medicaid Program, a sample of which is attached hereto as Exhibit F.   By executing the Agreement for Participation, Associated Anesthesiologists also:

> A.    agreed to continually comply with all program policy and billing provisions set forth in the Illinois Medicaid rules and handbooks;

B.      agreed to be fully liable for the truth, accuracy and completeness of all claims submitted to Illinois Medicaid;

C.      certified that all services provided by it would be in compliance with state and federal law and Illinois Medicaid rules and handbooks;

D.      acknowledged that compliance with state and federal law and Illinois Medicaid rules and handbooks was a condition of payment for all claims submitted; and

E.      certified that all services rendered by it as of the effective date of the Agreement for Participation were rendered in compliance with and subject to the terms of the Agreement for Participation.

*See* Exhibit F.

582.    At all times relevant hereto, 42 U.S.C. §1302a-7b(b)(2) provided that it was illegal to knowingly and willingly offer or pay any remuneration to induce referrals for healthcare services to be paid for by a Federal health care program (hereafter "Stark Law").

583.    At all times relevant hereto, 42 U.S.C. §1395nn(a) prohibited referrals by a physician to an entity in which he held a financial interest and prohibited claims be made to Medicare when the services were rendered as a result of such a prohibited relationship (hereafter "Anti-Kickback Law").

584.    At all times relevant hereto, 305 ILCS 5/8A-3 prohibited an Illinois Medicaid provider from soliciting, offering or receiving any remuneration, directly or indirectly, in cash or in kind in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment is made by Illinois Medicaid (hereafter "Illinois Anti-Kickback Law").

585.    The agreement between Memorial Medical Center and Associated Anesthesiologists in which Memorial Medical Center providing financial benefits to

Associated Anesthesiologists in order to induce referrals of patients to Memorial Medical Center constitutes an indirect kick-back in violation of the Stark Law, the Anti-Kickback Law and the Illinois Anti-Kickback Law.

586.   As an acute care medical center, Memorial Medical Center received Illinois Medicaid payment for its services under the DRG PPS, as discussed above, during the period of at least 1997 to the present.  The payments received by Memorial Medical Center consisted of payments based upon the diagnosis of each Medicaid patient at discharge.  The amount of each patient specific payment was based upon an amount pre-determined by Illinois Medicaid to reimburse Memorial Medical Center for its costs in treating a patient with that diagnosis.

587.   The pre-determined amount for each diagnosis was made by Illinois Medicaid based upon an analysis of the costs reported to it by Memorial Medical Center on its required annual cost report.

588.   In addition to DRG PPS payments, Memorial Medical Center received supplemental payments from Illinois Medicaid based upon the admissions, patient diagnosis and costs reported on its annual cost report.  In FY 2011, Memorial Medical Center received the following supplemental payment amounts from Illinois Medicaid:

A.      Tertiary Care Adjustment Payments - $1,154,176.00; and

B.      Trauma Center Adjustment Payments: - $635,250.

589.   The agreement between Memorial Medical Center and Associated Anesthesiologists for Memorial Medical Center to employ the MMC CRNAs while Associated Anesthesiologists billed Medicare for the MMC CRNA's services allowed Memorial Medical Center to include wages and other employment benefits for the MMC

CRNAs in its annual cost reports, potentially resulting in additional reimbursements from Medicare for services rendered to Medicare beneficiaries.  Said cost reports are false as said costs were incurred in direct violation of the Stark Law, Anti-Kickback Law and Illinois Anti-Kickback Law.

590.    Each cost report submitted to Illinois Medicaid by Memorial Medical Center included a certification by Memorial Medical Center stating as follows:

Certification by Officer or Administrator of Provider(s):

I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying cost report and the Balance Sheet and Statement of Revenue and Expense prepared by (Provider name(s) and number(s)) for the cost report beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

Said certifications were false as said costs reported by Memorial Medical Center on its cost reports were incurred in direct violation of the Stark Law, Anti-Kickback Law and Illinois Anti-Kickback Law.

591.    As a result of Associated Anesthesiologists causing Memorial Medical Center to submit false cost reports to Illinois Medicaid, Memorial Medical Center received higher DRG PPS per diagnosis payments than it would have otherwise been entitled to receive and higher supplemental payments than it would have otherwise been entitled to receive.

592.    By virtue of the acts described above, Associated Anesthesiologists defrauded the State of Illinois by getting false or fraudulent claims allowed and paid by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(A).

593.   By virtue of the acts described above, Associated Anesthesiologists knowingly caused to be submitted false or fraudulent claims for services to the State of Illinois for payment of benefits by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(A).

594.   By virtue of the acts described above, Associated Anesthesiologists defrauded the State of Illinois by creating false records and making false statements or causing false records and statements to be made to support false claims allowed and paid by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

595.   By virtue of the acts described above, Associated Anesthesiologists knowingly caused to be made or used false records to obtain state payment for false and fraudulent claims submitted to Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

596.   By virtue of the acts described above, Associated Anesthesiologists knowingly caused to be made or used false statements to obtain state payment for false and fraudulent claims submitted to Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

597.   The State of Illinois, unaware of the falsity of the claims made or caused to be made by Associated Anesthesiologists paid Memorial Medical Center higher DRG PPS per diagnosis payments and higher supplemental payments than it would otherwise have not paid.

598.   By reason of these payments, the State of Illinois has been damaged from 1997 to the present and continues to be damaged in a substantial amount.

599.   Associated Anesthesiologists has not notified the State of Illinois of the violations of the Illinois Whistleblower Reward and Protection Act alleged herein.

600.    Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 740 ILCS 175/4(d)(1).

WHEREFORE, the State of Illinois, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Associated Anesthesiologists of Springfield, Ltd. and issue orders in accordance with the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, et seq., specifically as follows:

A.    Order Defendant to cease and desist from violating the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.;*

B.    Order Defendant to pay a compensatory amount equal to three times the amount of damages the State has sustained for each false claim submitted by the Defendant, plus a civil penalty of $10,000 for any false claims submitted prior to July 31, 2006, a civil penalty of $11,000 for any false claims submitted after July 31, 2006, and the costs of this action pursuant to 740 ILCS 175/3;

C.    Order Defendant to pay the Attorney General's expenses, including reasonable attorneys' fees and costs, pursuant to 740 ILCS 175/4;

D.    Order Defendant to pay the Relator's reasonable costs and expenses, including reasonable attorneys' fees, pursuant to 740 ILCS 175/4(d)(1);

E.    Order that the Relator be awarded the statutory percentage of the amount received by the State of Illinois pursuant to 740 ILCS 175/4(d); and,

F.    Such other and further relief as this Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

 /s/ Ronald E. Osman
BY:    Ronald E. Osman
          Attorney for Relator,
          Donald Helfer, M.D.


## COUNT XIX
### Illinois Whistleblower Reward and Protection Act
### 740 ILCS 175/3(a)(1)(A) & (B)
### (False Claims, Records and Statements Made or Caused to be made by Memorial Medical Center as a result of Stark Law and Anti-Kickback Statutes violations - False Cost Reports Filed by Memorial Medical Center)

NOW COMES the Plaintiff, the State of Illinois, by the Relator, Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Memorial Medical Center as follows:

601.   From at least 1997 to the present, Associated Anesthesiologists has exclusively served as the provider of anesthesia services to Memorial Medical Center.

602.   From at least 1997 to the present, Memorial Medical Center has provided the following to Associated Anesthesiologists in exchange for this exclusive relationship:

A)          office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)          anesthesia equipment for use at Memorial Medical Center at no charge to Associated Anesthesiologists;

170

C)        anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)        Memorial Medical Center employed CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists at no charge to Associated Anesthesiologists for all anesthesia services rendered other than those needed for cardiac procedures ("MMC CRNAs").

603.    Despite the employer of the MMC CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC CRNAs' benefits to Associated Anesthesiologists and payment for said MMC CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

604.    Memorial Medical Center's agreement with Associated Anesthesiologists to provide free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was knowingly and willfully entered into by Memorial Medical Center to serve as compensation for Associates Anesthesiologists' services to Memorial Medical Center as its exclusive anesthesia services provider.

605.    Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial

Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

606.    Prior to 2004, Associated Anesthesiologists itself employed CRNAs to assist with its anesthesia work for cardiac procedures at Memorial Medical Center ("Cardiac CRNAs").  Associated Anesthesiologists billed patients, Medicare, Medicaid and other third-party payors for services performed by both its anesthesiologists and its Cardiac CRNAs.

607.    In 2004, Associated Anesthesiologists began having difficulty retaining Cardiac CRNAs in their employ due to various issues, including the cost of employing the Cardiac CRNAs.  As a result of the decrease in Associated Anesthesiologists' Cardiac CRNAs, the number of anesthesia services Associated Anesthesiologists had the ability to provide to Memorial Medical Center for cardiac procedures on a daily basis declined.

608.    At that point, Memorial Medical Center hired the five Cardiac CRNAs then employed by Associated Anesthesiologists to continue assisting Associated Anesthesiologists with cardiac anesthesia services provided at Memorial Medical Center ("MMC Cardiac CRNAs").  Associated Anesthesiologists ceased employment of Cardiac CRNAs at that time.

609.    Despite the employer of the MMC Cardiac CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC Cardiac CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC Cardiac CRNA's benefit to Associated Anesthesiologists and payment for said MMC Cardiac CRNA

services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

610.   Approximately $185,000 of costs per MMC Cardiac CRNA per year has been diverted to Memorial Medical Center from Associated Anesthesiologists and the total costs have been reported on Memorial Medical Center's annual Medicare and Medicaid cost reports.

611.   Prior to 2008, the exclusive anesthesia provider agreement between Associated Anesthesiologists and Memorial Medical Center was an oral agreement.   In 2008, the entities executed a Professional Services Agreement for Anesthesia Services memorializing their agreement.   A copy of an October 22, 2007 draft of the Professional Services Agreement is attached hereto as Exhibit C.

612.   Section 3.1 of the Professional Services Agreement provides that:

> MMC [Memorial Medical Center] shall provide to the Group [Associated Anesthesiologists] **at no cost to the group** the facilities, equipment, supplies, services and non-physician personnel (the "MMC Personnel") which MMC determines are reasonably necessary and appropriate for the Group's delivery of Anesthesia Services and Administrative Services hereunder, subject to and consistent with the financial condition and constraints of MMC.  MMC Personnel shall be MMC employees or independent contractors, shall be subject to MMC policies and procedures, and rules and regulations, shall be under the control and supervision of MMC, and shall report to their respective departments.

See Exhibit C, p. 10, line 4-11 (emphasis added).

613.   After the execution of said agreement, Memorial Medical Center has continued to date to provide to Associated Anesthesiologists the following:

A)        office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)      anesthesia equipment for its use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)      anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)      MMC CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists at no charge to Associated Anesthesiologists.

Associated Anesthesiologists has continued to bill for services performed by the MMC CRNAs since the execution of said agreement and collect all amounts due for said MMC CRNA services rendered at Memorial Medical Center.

614.    Memorial Medical Center's agreement with Associated Anesthesiologists to provide free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was knowingly and willfully entered into by Memorial Medical Center to serve as compensation for Associates Anesthesiologists' services to Memorial Medical Center as its exclusive anesthesia services provider.

615.    Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

616.    At all times relevant hereto, Memorial Medical Center was a participating provider in the Illinois Medicaid program and was required to by Illinois law to, among other things:

A.     provide supplies and services in full compliance with all applicable provisions of state and federal laws; and

B.     comply with the requirements of applicable federal and state laws and not engage in practices prohibited by said laws.

89 Ill.Adm.Code 140.12.   Memorial Medical Center agreed to these conditions by executing an Agreement for Participation in the Illinois Medicaid Program, a sample of which is attached hereto as Exhibit F.   By executing the Agreement for Participation, Memorial Medical Center also:

A.     agreed to continually comply with all program policy and billing provisions set forth in the Illinois Medicaid rules and handbooks;

B.     agreed to be fully liable for the truth, accuracy and completeness of all claims submitted to Illinois Medicaid;

C.     certified that all services provided by it would be in compliance with state and federal law and Illinois Medicaid rules and handbooks;

D.     acknowledged that compliance with state and federal law and Illinois Medicaid rules and handbooks was a condition of payment for all claims submitted; and

E.     certified that all services rendered by it as of the effective date of the Agreement for Participation were rendered in compliance with and subject to the terms of the Agreement for Participation.

*See* Exhibit F.

617.   At all times relevant hereto, 42 U.S.C. §1302a-7b(b)(2) provided that it was illegal to knowingly and willingly offer or pay any remuneration to induce referrals for healthcare services to be paid for by a Federal health care program (hereafter "Stark Law").

618.   At all times relevant hereto, 42 U.S.C. §1395nn(a) prohibited referrals by a physician to an entity in which he held a financial interest and prohibited claims be made to

Medicare when the services were rendered as a result of such a prohibited relationship (hereafter "Anti-Kickback Law").

619.    At all times relevant hereto, 305 ILCS 5/8A-3 prohibited an Illinois Medicaid provider from soliciting, offering or receiving any remuneration, directly or indirectly, in cash or in kind in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment is made by Illinois Medicaid (hereafter "Illinois Anti-Kickback Law").

620.    The agreement between Memorial Medical Center and Associated Anesthesiologists in which Memorial Medical Center provided financial benefits to Associated Anesthesiologists in order to induce referrals of patients to Memorial Medical Center constitutes an indirect kick-back in violation of the Stark Law, the Anti-Kickback Law and the Illinois Anti-Kickback Law.

621.    As an acute care medical center, Memorial Medical Center received Illinois Medicaid payment for its services under the DRG PPS, as discussed above, during the period of at least 1997 to the present.  The payments received by Memorial Medical Center consisted of payments based upon the diagnosis of each Medicaid patient at discharge.  The amount of each patient specific payment was based upon an amount pre-determined by Illinois Medicaid to reimburse Memorial Medical Center for its costs in treating a patient with that diagnosis.

622.    The pre-determined amount for each diagnosis was made by Illinois Medicaid based upon an analysis of the costs reported to it by Memorial Medical Center on its required annual cost report.

623. In addition to DRG PPS payments, Memorial Medical Center received supplemental payments from Illinois Medicaid based upon the admissions, patient diagnosis and costs reported on its annual cost report. In FY 2011, Memorial Medical Center received the following supplemental payment amounts from Illinois Medicaid:

A.  Tertiary Care Adjustment Payments - $1,154,176.00; and

B.  Trauma Center Adjustment Payments: - $635,250.

624. The agreement between Memorial Medical Center and Associated Anesthesiologists for Memorial Medical Center to employ the MMC CRNAs while Associated Anesthesiologists billed Medicare for the MMC CRNA's services allowed Memorial Medical Center to include wages and other employment benefits for the MMC CRNAs in its annual cost reports, potentially resulting in additional reimbursements from Medicare for services rendered to Medicare beneficiaries. Said cost reports are false as said costs were incurred in direct violation of the Stark Law, Anti-Kickback Law and Illinois Anti-Kickback Law.

625. Each cost report submitted to Illinois Medicaid by Memorial Medical Center included a certification by Memorial Medical Center stating as follows:

Certification by Officer or Administrator of Provider(s):

I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying cost report and the Balance Sheet and Statement of Revenue and Expense prepared by (Provider name(s) and number(s)) for the cost report beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

Said certifications were false as said costs reported by Memorial Medical Center on its cost reports were incurred in direct violation of the Stark Law, Anti-Kickback Law and Illinois Anti-Kickback Law.

626.    As a result of Memorial Medical Center's submission of false cost reports to Illinois Medicaid, Memorial Medical Center received higher DRG PPS per diagnosis payments than it would have otherwise been entitled to receive and higher supplemental payments than it would have otherwise been entitled to receive.

627.    By virtue of the acts described above, Memorial Medical Center defrauded the State of Illinois by getting false or fraudulent claims allowed and paid by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(A).

628.    By virtue of the acts described above, Memorial Medical Center knowingly submitted or caused to be submitted false or fraudulent claims for services to the State of Illinois for payment of benefits by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(A).

629.    By virtue of the acts described above, Memorial Medical Center defrauded the State of Illinois by creating false records and making false statements or causing false records and statements to be made to support false claims allowed and paid by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

630.    By virtue of the acts described above, Memorial Medical Center knowingly made, used or caused to be made or used false records to obtain state payment for false and fraudulent claims submitted to Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

631.    By virtue of the acts described above, Memorial Medical Center knowingly made, used or caused to be made or used false statements to obtain state payment for false and fraudulent claims submitted to Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

632.    The State of Illinois, unaware of the falsity of the claims made or caused to be made by Memorial Medical Center paid Memorial Medical Center higher DRG PPS per

diagnosis payments and higher supplemental payments than it would otherwise have not paid.

633.    By reason of these payments, the State of Illinois has been damaged from 1997 to the present and continues to be damaged in a substantial amount.

634.    Memorial Medical Center has not notified the State of Illinois of the violations of the Illinois Whistleblower Reward and Protection Act alleged herein.

635.    Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 740 ILCS 175/4(d)(1).

WHEREFORE, the State of Illinois, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Memorial Medical Center and issue orders in accordance with the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, et seq., specifically as follows:

A.    Order Defendant to cease and desist from violating the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.;*

B.    Order Defendant to pay a compensatory amount equal to three times the amount of damages the State has sustained for each false claim submitted by the Defendant, plus a civil penalty of $10,000 for any false claims submitted prior to July 31, 2006, a civil penalty of $11,000 for any false claims submitted after July 31, 2006, and the costs of this action pursuant to 740 ILCS 175/3;

C.    Order Defendant to pay the Attorney General's expenses, including reasonable attorneys' fees and costs, pursuant to 740 ILCS 175/4;

D.      Order Defendant to pay the Relator's reasonable costs and expenses, including reasonable attorneys' fees, pursuant to 740 ILCS 175/4(d)(1);

E.      Order that the Relator be awarded the statutory percentage of the amount received by the State of Illinois pursuant to 740 ILCS 175/4(d); and,

F.      Such other and further relief as this Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

/s/ Ronald E. Osman
BY:    Ronald E. Osman
        Attorney for Relator,
        Donald Helfer, M.D.

## COUNT XX
## Illinois Whistleblower Reward and Protection Act
## 740 ILCS 175/3(a)(1)(A) & (B)
**(False Claims Caused to be made by
Memorial Health System as a result of Stark Law and
Anti-Kickback Statutes violations - False Cost Reports
Filed by Memorial Medical Center)**

NOW COMES the Plaintiff, the State of Illinois, by the Relator, Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Memorial Health System as follows:

636.    At all times relevant hereto, Defendant Memorial Health System was the parent company of Memorial Medical Center and directed the daily operations of Memorial Medical Center.

637.   From at least 1997 to the present, Memorial Medical Center has provided the following to Associated Anesthesiologists in exchange for this exclusive relationship:

A)      office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B)      anesthesia equipment for use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C)      anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D)      Memorial Medical Center employed CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists at no charge to Associated Anesthesiologists for all anesthesia services rendered other than those needed for cardiac procedures ("MMC CRNAs").

638.   Despite the employer of the MMC CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC CRNAs' benefit to Associated Anesthesiologists and payment for said MMC CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

639.   Memorial Medical Centers' agreement with Associated Anesthesiologists to provide free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was entered into by Memorial Medical Center with the knowledge of Memorial

Health Systems and the intent by Memorial Health Systems for these items to serve as compensation to Associated Anesthesiologists for its services to Memorial Medical Center as its exclusive anesthesia services provider.

640.    Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

641.    Prior to 2004, Associated Anesthesiologists itself employed CRNAs to assist with its anesthesia work for cardiac procedures at Memorial Medical Center ("Cardiac CRNAs").   Associated Anesthesiologists billed patients, Medicare, Medicaid and other third-party payors for services performed by both its anesthesiologists and its Cardiac CRNAs.

642.    In 2004, Associated Anesthesiologists began having difficulty retaining Cardiac CRNAs in their employ due to various issues, including the cost of employing the Cardiac CRNAs.  As a result of the decrease in Associated Anesthesiologists' Cardiac CRNAs, the number of anesthesia services Associated Anesthesiologists had the ability to provide to Memorial Medical Center for cardiac procedures on a daily basis declined.

643.    At that point, Memorial Medical Center hired the five Cardiac CRNAs then employed by Associated Anesthesiologists to continue assisting Associated Anesthesiologists with cardiac anesthesia services provided at Memorial Medical Center

("MMC Cardiac CRNAs").  Associated Anesthesiologists ceased employment of Cardiac CRNAs at that time.

644.    Despite the employer of the MMC Cardiac CRNAs being Memorial Medical Center rather than Associated Anesthesiologists, the work performed by the MMC Cardiac CRNAs was billed to the patient, Medicare, Medicaid or other third-party medical benefit payor by Associated Anesthesiologists through assignment of the MMC Cardiac CRNA's benefit to Associated Anesthesiologists and payment for said MMC Cardiac CRNA services was paid by the patient, Medicare, Medicaid or other third-party medical benefit payor to Associated Anesthesiologists.

645.    Approximately $185,000 of costs per MMC Cardiac CRNA per year has been diverted to Memorial Medical Center from Associated Anesthesiologists and the total costs have been reported on Memorial Medical Center's annual Medicare and Medicaid cost reports.

646.    Prior to 2008, the exclusive anesthesia provider agreement between Associated Anesthesiologists and Memorial Medical Center was an oral agreement.  In 2008, the entities executed a Professional Services Agreement for Anesthesia Services memorializing their agreement.  A copy of an October 22, 2007 draft of the Professional Services Agreement is attached hereto as Exhibit C.

647.    Edgar J. Curtis, President and CEO of Memorial Health System was the Memorial Medical Center signor on the 2008 Professional Services Agreement for Anesthesia Services by and between Memorial Medical Center and Associated Anesthesiologists.

648.    Section 3.1 of the Professional Services Agreement provides that:

MMC [Memorial Medical Center] shall provide to the Group [Associated Anesthesiologists] **at no cost to the group** the facilities, equipment, supplies, services and non-physician personnel (the "MMC Personnel") which MMC determines are reasonably necessary and appropriate for the Group's delivery of Anesthesia Services and Administrative Services hereunder, subject to and consistent with the financial condition and constraints of MMC. MMC Personnel shall be MMC employees or independent contractors, shall be subject to MMC policies and procedures, and rules and regulations, shall be under the control and supervision of MMC, and shall report to their respective departments.

See Exhibit C, p. 10, line 4-11 (emphasis added).

649. After the execution of said agreement, Memorial Medical Center has continued to date to provide to Associated Anesthesiologists the following:

A) office space at Memorial Medical Center at no charge to Associated Anesthesiologists;

B) anesthesia equipment for its use at Memorial Medical Center at no charge to Associated Anesthesiologists;

C) anesthesia supplies for use at Memorial Medical Center at no charge to Associated Anesthesiologists; and

D) MMC CRNAs to perform anesthesia services on behalf of Associated Anesthesiologists' patients at no charge to Associated Anesthesiologists.

Associated Anesthesiologists has continued to bill for services performed by the MMC CRNAs since the execution of said agreement and collect all amounts due for said MMC CRNA services rendered at Memorial Medical Center.

650. Memorial Medical Centers' agreement with Associated Anesthesiologists to provide free office space, supplies and equipment, use of MMC CRNAs and collection of Medicare, Medicaid and other third-party medical benefits for the services of the MMC CRNAs was entered into by Memorial Medical Center with the knowledge of Memorial Health Systems and the intent by Memorial Health Systems for these items to serve as

compensation to Associated Anesthesiologists for its services to Memorial Medical Center as its exclusive anesthesia services provider.

651.    Said agreement resulted in referrals of Medicare and Medicaid patients to Memorial Medical Center for surgical services and increased the number of Medicare and Medicaid patients admitted to Memorial Medical Center (hereafter "Admissions") greater than the number of Medicare and Medicaid patient referrals and Admissions Memorial Medical Center would have received for surgical services but for the presence of Associated Anesthesiologists at its facility.

652.    At all times relevant hereto, Memorial Medical Center was a participating provider in the Illinois Medicaid program and was required to by Illinois law to, among other things:

> A.    provide supplies and services in full compliance with all applicable provisions of state and federal laws; and
>
> B.    comply with the requirements of applicable federal and state laws and not engage in practices prohibited by said laws.

89 Ill.Adm.Code 140.12.    Memorial Medical Center agreed to these conditions by executing an Agreement for Participation in the Illinois Medicaid Program, a sample of which is attached hereto as Exhibit F.    By executing the Agreement for Participation, Memorial Medical Center also:

> A.    agreed to continually comply with all program policy and billing provisions set forth in the Illinois Medicaid rules and handbooks;
>
> B.    agreed to be fully liable for the truth, accuracy and completeness of all claims submitted to Illinois Medicaid;
>
> C.    certified that all services provided by it would be in compliance with state and federal law and Illinois Medicaid rules and handbooks;

    D.    acknowledged that compliance with state and federal law and Illinois Medicaid rules and handbooks was a condition of payment for all claims submitted; and

    E.    certified that all services rendered by it as of the effective date of the Agreement for Participation were rendered in compliance with and subject to the terms of the Agreement for Participation.

*See* Exhibit F.

653.   At all times relevant hereto, 42 U.S.C. §1302a-7b(b)(2) provided that it was illegal to knowingly and willingly offer or pay any remuneration to induce referrals for healthcare services to be paid for by a Federal health care program (hereafter "Stark Law").

654.   At all times relevant hereto, 42 U.S.C. §1395nn(a) prohibited referrals by a physician to an entity in which he held a financial interest and prohibited claims be made to Medicare when the services were rendered as a result of such a prohibited relationship (hereafter "Anti-Kickback Law").

655.   At all times relevant hereto, 305 ILCS 5/8A-3 prohibited an Illinois Medicaid provider from soliciting, offering or receiving any remuneration, directly or indirectly, in cash or in kind in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment is made by Illinois Medicaid (hereafter "Illinois Anti-Kickback Law").

656.   The agreement between Memorial Medical Center and Associated Anesthesiologists in which Memorial Medical Center, with the full knowledge and consent of Memorial Health System, provided a financial benefit to Associated Anesthesiologists by employing CRNAs but allowing Associated Anesthesiologists to receive Medicare

payments for the CRNAs work constitutes an indirect kick-back in violation of the Stark Law, the Anti-Kickback Law and the Illinois Anti-Kickback Law.

657.   As an acute care medical center, Memorial Medical Center received Illinois Medicaid payment for its services under the DRG PPS, as discussed above, during the period of at least 1997 to the present.  The payments received by Memorial Medical Center consisted of payments based upon the diagnosis of each Medicaid patient at discharge.  The amount of each patient specific payment was based upon an amount pre-determined by Illinois Medicaid to reimburse Memorial Medical Center for its costs in treating a patient with that diagnosis.

658.   The pre-determined amount for each diagnosis was made by Illinois Medicaid based upon an analysis of the costs reported to it by Memorial Medical Center on its required annual cost report.

659.   In addition to DRG PPS payments, Memorial Medical Center received supplemental payments from Illinois Medicaid based upon the admissions, patient diagnosis and costs reported on its annual cost report.  In FY 2011, Memorial Medical Center received the following supplemental payment amounts from Illinois Medicaid:

A.      Tertiary Care Adjustment Payments - $1,154,176.00; and

B.      Trauma Center Adjustment Payments: - $635,250.

660.   The agreement between Memorial Medical Center and Associated Anesthesiologists, with the knowledge of Memorial Health System, for Memorial Medical Center to employ the MMC CRNAs while Associated Anesthesiologists billed Medicare for the MMC CRNA's services allowed Memorial Medical Center, with the knowledge of Memorial Health System, to include wages and other employment benefits for the MMC

CRNAs in its annual cost reports, potentially resulting in additional reimbursements from Medicare for services rendered to Medicare beneficiaries.  Said cost reports are false as said costs were incurred in direct violation of the Stark Law, Anti-Kickback Law and Illinois Anti-Kickback Law.

661.   Each cost report submitted to Illinois Medicaid by Memorial Medical Center, with the knowledge of Memorial Health System, included a certification by Memorial Medical Center stating as follows:

Certification by Officer or Administrator of Provider(s):

I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying cost report and the Balance Sheet and Statement of Revenue and Expense prepared by (Provider name(s) and number(s)) for the cost report beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

Said certifications were false as said costs reported by Memorial Medical Center on its cost reports were incurred in direct violation of the Stark Law, Anti-Kickback Law and Illinois Anti-Kickback Law.

662.   As a result of Memorial Health System causing Memorial Medical Center to submit false cost reports to Illinois Medicaid, Memorial Medical Center received higher DRG PPS per diagnosis payments than it would have otherwise been entitled to receive and higher supplemental payments than it would have otherwise been entitled to receive.

663.   As parent company of Memorial Medical Center, Memorial Health System shared in the benefits realized by the additional reimbursements from Medicare to Memorial Medical Center as a result of Memorial Medical Center's false cost reports.

664.    By virtue of the acts described above, Memorial Health System defrauded the State of Illinois by causing false or fraudulent claims to be allowed and paid by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(A)(B).

665.    By virtue of the acts described above, Memorial Health System knowingly caused to be submitted false or fraudulent claims for services to the State of Illinois for payment of benefits by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(A).

666.    By virtue of the acts described above, Memorial Health System defrauded the State of Illinois by causing false records and statements to be made to support false claims allowed and paid by Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

667.    By virtue of the acts described above, Memorial Health System knowingly caused to be made or used false records to obtain state payment for false and fraudulent claims submitted to Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

668.    By virtue of the acts described above, Memorial Health System knowingly caused to be made or used false statements to obtain state payment for false and fraudulent claims submitted to Illinois Medicaid in violation of 740 ILCS 175/3(a)(1)(B).

669.    The State of Illinois, unaware of the falsity of the claims made or caused to be made by Memorial Health System paid Memorial Medical Center higher DRG PPS per diagnosis payments and higher supplemental payments than it would otherwise have not paid.

670.    By reason of these payments, the State of Illinois has been damaged from 1997 to the present and continues to be damaged in a substantial amount.

671.    Memorial Health System has not notified the State of Illinois of the violations of the Illinois Whistleblower Reward and Protection Act alleged herein.

672.    Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 740 ILCS 175/4(d)(1).

WHEREFORE, the State of Illinois, by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against the Defendant Memorial Health System and issue orders in accordance with the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, et seq., specifically as follows:

A.    Order Defendant to cease and desist from violating the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.;*

B.    Order Defendant to pay a compensatory amount equal to three times the amount of damages the State has sustained for each false claim submitted by the Defendant, plus a civil penalty of $10,000 for any false claims submitted prior to July 31, 2006, a civil penalty of $11,000 for any false claims submitted after July 31, 2006, and the costs of this action pursuant to 740 ILCS 175/3;

C.    Order Defendant to pay the Attorney General's expenses, including reasonable attorneys' fees and costs, pursuant to 740 ILCS 175/4;

D.    Order Defendant to pay the Relator's reasonable costs and expenses, including reasonable attorneys' fees, pursuant to 740 ILCS 175/4(d)(1);

E.    Order that the Relator be awarded the statutory percentage of the amount received by the State of Illinois pursuant to 740 ILCS 175/4(d); and,

F.    Such other and further relief as this Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

 /s/ Ronald E. Osman
BY:    Ronald E. Osman
       Attorney for Relator,
       Donald Helfer, M.D.

## COUNT XXI
## Illinois Whistleblower Reward and Protection Act
## 740 ILCS 175/4(g)
## (Retaliatory Discharge by
## Associated Anesthesiologists of Springfield, Ltd.)

NOW COMES the Plaintiff, Donald Helfer, M.D., individually, through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Associated Anesthesiologists of Springfield, Ltd. as follows:

673.    Relator was employed by Associated Anesthesiologist as an AAS Anesthesiologist from August 1990 to October 2009.  Relator was also a shareholder in Associated Anesthesiologists and as such a Board of Director member of the company during this time period.

674.    Through his employment with Associated Anesthesiologists and various officer positions held in Associated Anesthesiologists throughout his tenure, Relator came into contact with and has knowledge of the daily operations of the AAS Anesthesiologists employed by Associated Anesthesiologists and handling of patient care by AAS Anesthesiologists.

675.  From 1997 to September 30, 2008, Associated Anesthesiologists contracted with MMP to perform its medical billing, including the preparation and submission of claims to Medicare.

676.  Since October 1, 2008, Associated Anesthesiologists has contracted with ABC to perform its medical billing, including the preparation and submission of claims to Medicare.

677.  In a corporate board meeting held in April 2009, Rita Astani, the ABC representative assigned to Associated Anesthesiologists, reported that ABC was planning to resubmit all claims submitted to all insurance carriers for labor and delivery epidural anesthesia services to indicate that the labor and delivery epidural anesthesia services had been continuously performed from the time of induction of the epidural anesthesia to the delivery of the child.  Astani also stated that MMP had billed Associated Anesthesiologists' labor and delivery epidural anesthesia service claims in this manner. Dr. Reg Bulkley, Associated Anesthesiologists' liaison physician with ABC, proposed that billing for these epidural anesthesia services be capped at 90% of the maximum amount billed for such services by other Illinois anesthesia groups so that they would not be flagged by insurance companies for charges which were out of line with their area.

678.  After this April 2009, meeting Relator accessed the CMS public website to review billing regulations regarding anesthesia services.  Relator located regulations indicating that "medical direction" of services could only be billed to Medicare when no more than four concurrent anesthesia services were being directed by an anesthesiologist and that labor and delivery epidural anesthesia services must be counted as a concurrent service unless they qualify as a short, emergency procedure.

679.    Relator printed the information he found from the CMS website and provided it to Dr. Peter Martin, who indicated he would give it to their ABC representative.

680.    Relator also gave the information to Dr. Bulkley, who retorted that Relator was just trying to cause trouble.

681.    Relator asked both Dr. Martin and Dr. Bulkley to address the issue prior to the next scheduled board meeting on June 1, 2009, and report their findings at that meeting.

682.    At the June 1, 2009, meeting, Relator raised the issue about billing for continuous time with labor epidurals. Astani affirmed that ABC billed on behalf of Associated Anesthesiologists for epidural anesthesia continuous time with a cap.  Relator responded that no AAS Anesthesiologist stays in Obstetrics after beginning an epidural anesthesia service and there is neither a hand-off of responsibility to another AAS Anesthesiologist nor a sign-out at the end of anesthesia time.  Relator further stated that in fact some AAS Anesthesiologists often left the hospital after beginning an epidural anesthesia service.  Astani's response was that other anesthesia practices did maintain more signatures on their patient files.

683.    A few days following the June 1, 2009, meeting, Relator again addressed the issue with Dr. Martin, requesting that Dr. Martin call the CMS Help-Line for direction on the issue if ABC did not plan to take action.  Relator also made this request to Dr. Bulkley, who responded, "Why don't you call?  You probably already did."

684.    On June 4, 2009, Relator called the CMS Help-Line and was given an e-mail address to which his billing question could be sent.  Relator then sent an e-mail to CMS outlining his question.

685.    Relator received a response from CMS on Friday, June 12, 2009, stating that epidural anesthesia services could only be billed for actual time spent with the patient and such continuous billing pushed the concurrent services over the allowed four.  Relator called Dr. Martin on Sunday, June 14, 2009, to alert him to the e-mail and inform him he would provide him a copy on Monday, June 15, 2009.

686.    Relator provided Dr. Martin a copy of the CMS e-mail on June 15, 2009.  Dr. Martin briefly reviewed the e-mail and stated to Relator that "the guys aren't going to like this."

687.    Thereafter, Relator began receiving copies of e-mails between Dr. Martin and Astani discussing the billing situation and Relator's e-mailing of a billing question to Medicare.  One such e-mail stated that ABC's corporate counsel would be sending Medicare another e-mail with a re-wording of Relator's question so the practice would not be flagged by Medicare for review.

688.    On July 2, 2009, Relator reported to work at Memorial Medical Center after having worked the majority of his shift at OSCI.  Relator was relieved from duty by the Charge Anesthesiologist at approximately 2:30 p.m. in accordance with the regular work schedule.

689.    At approximately 2:46 p.m., Relator was paged by Dr. Martin and returned the page via cell phone.  Dr. Martin asking Relator to return to Memorial Medical Center. Relator asked Dr. Martin why he needed to return to the hospital, and Dr. Martin stated, "you know you shouldn't have talked to Medicare."  Relator responded that all he did was e-mail a question to Medicare, and Dr. Martin responded, "I know, but you didn't go

through me." Relator stated that he would not return to the hospital until the next morning as scheduled.

690.    Sometime after 5:00 p.m. that night, Relator received a call from Dr. Joe Ducaji, who again wanted him to return to Memorial Medical Center. Relator again responded that he could not return because he had to go to the local high school and hold practice for its cross country team, for which he served as coach. Dr. Ducaji then stated that Relator was being terminated without cause from Associated Anesthesiologists or he could resign, his services were no longer needed by Associated Anesthesiologists and he should not return to work – including the upcoming holiday weekend call, and he would be given 90 days wages and benefits as specified in his employment contract.

691.    Relator thereafter called Ed Curtis, CEO of Memorial Medical Center, to ask if he knew why Relator was being let go from Associated Anesthesiologists. Curtis responded that the Executive Committee from Associated Anesthesiologists was in his office at that moment with a Motion for Termination which had been signed by all shareholders of Associated Anesthesiologists.

692.    Relator's termination was a direct result of his investigating of Associated Anesthesiologists' practice of fraudulently billing anesthesia services to Illinois Medicaid and attempts by Associated Anesthesiologists to prevent Illinois Medicaid from discovering the fraudulent billing activities.

693.    As a direct and proximate cause of the foregoing, Relator has lost, and will continue to lose, significant income and benefits and has suffered intangible losses, including mental anguish, embarrassment and inconvenience.

WHEREFORE, the Relator Donald Helfer, M.D. prays this Court give judgment in his favor against Defendant Associated Anesthesiologists of Springfield, Ltd., and issue orders in accordance with the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.*, specifically that:

A)      Defendant immediately reinstate Relator to his former job at the same rate of pay with normal pay increases from the date of discharge to the date of reinstatement;

B)      Defendant pay Relator two times the amount of back pay and benefits, plus interest on the back pay and benefits from the date of discharge to the date of reinstatement;

C)      Defendant pay Relator's costs and attorneys fees in accordance with  740 ILCS 175/4(g); and,

D)      Such other and further relief as this Court deems just and proper.

## **REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator hereby demand trial by jury.

Respectfully submitted,

 /s/ Ronald E. Osman
BY:    Ronald E. Osman
          Attorney for Relator
          Donald Helfer, M.D.

## COUNT XXI
## Insurance Claims Fraud Prevention Act
## 740 ILCS 92/1, *et seq.*
## (False claims submitted to Private Insurance Carriers Policies
## by Associated Anesthesiologists of Springfield, Ltd.)

NOW COMES the Plaintiff, the State of Illinois, by the Relator Donald Helfer, M.D., through his attorney, Ronald E. Osman of Ronald E. Osman & Associates, Ltd., and complains against Defendant Associated Anesthesiologists of Springfield, Ltd. as follows:

694.    Numerous private health insurance companies operating in Illinois, including but not limited to Blue Cross Blue Shield of Illinois (hereafter "Private Illinois Insurance Companies") provide medical insurance coverage for epidural anesthesia services for women during labor and delivery of a baby.

695.    Private Illinois Insurance Companies utilize the same HCPCS coding for billing purposes as utilized by Medicare and Illinois Medicaid.

696.    The medical services codes of the HCPCS are known as "Common Procedure Terminology" Codes a/k/a "CPT Codes". The CPT Code manual provides that:

> Time for anesthesia procedures may be reported as is customary in the local area. Anesthesia time begins when the anesthesiologist begins to prepare the patient for the induction of anesthesia in the operating room or in a equivalent area and ends when the anesthesiologist is no longer in personal attendance, that is, when the patient may be safely placed under postoperative supervision.

CPT 2008, p. 37.

697.    Epidural anesthesia services for labor and delivery patients in the Obstetrics Department are not included on the daily hospital surgical schedule or the AAS Anesthesiologist anesthesia service assignment schedule.

698.    When a woman presents to Memorial Medical Center in labor and it has previously been determined that she will receive epidural anesthesia services during her

labor, the Obstetrics Department pages the Charge Anesthesiologist.   The Charge Anesthesiologist then calls one of the AAS Anesthesiologists on duty to leave their assigned procedure rooms or other departmental assignment to go to the Obstetrics Department to begin the epidural anesthesia.

699.   Upon information and belief, since at least 1997, Associated Anesthesiologists has billed anesthesia time for all epidural anesthesia services performed by AAS Anesthesiologists as if the AAS Anesthesiologist has continuously been either in the room with the patient or monitoring her epidural services from the time the epidural anesthesia service is started until the delivery of the baby.

700.   When the AAS Anesthesiologist arrives at the patient room, he signs the patient chart to indicate he is the responsible anesthesiologist for the patient's epidural anesthesia service.

701.   The AAS Anesthesiologist starting epidural anesthesia for the patient, however, does not stay with the patient throughout the use of the epidural anesthesia but rather returns to his assigned procedures rooms and continues his regular duties.   He also performs no monitoring of the epidural anesthesia services and only returns to the patient's room if called regarding a problem with the anesthesia service.   He does not sign the patient's record as concluding the epidural anesthesia service as is done by AAS Anesthesiologists for anesthesia services of other types.

702.   If the AAS Anesthesiologist happens to be at the end of his shift when he is called to begin an epidural, he leaves the hospital after beginning the epidural and takes no further action whatsoever regarding epidural anesthesia service to the patient.   At no

time does the AAS Anesthesiologist sign the patient medical chart to indicate he has left the hospital premises and is not providing continuous anesthesia services to the patient.

703.    CRNAs are not utilized by Associated Anesthesiologists to monitor epidural anesthesia services for labor and delivery.

704.    From 1997 to the present, Associated Anesthesiologists has provided anesthesia services to patients who are covered and eligible for reimbursement of their medical expenses through Private Illinois Insurance Companies and has submitted claims to Private Illinois Insurance Companies for epidural anesthesia services for patients for continuous treatment and monitoring by an AAS Anesthesiologist during the entire labor and delivery time regardless of whether the AAS Anesthesiologist assigned to the patient was with the patient during that entire period or even on the hospital premises during that entire period.

705. Claims for continuous epidural anesthesia services with continuous anesthesia time were submitted by Associated Anesthesiologists to Private Illinois Insurance Companies on the CMS-1500 or the electronic equivalents thereof.

706. Said epidural anesthesia claims were submitted by Associated Anesthesiologists to Private Illinois Insurance Companies from at least 1997 to the present with the knowledge by Associated Anesthesiologists that the claims were false as the anesthesia time reported on the claim form was not the anesthesia time actually furnished to the patients.

707. Private Illinois Insurance Companies reimbursed Associated Anesthesiologists for epidural anesthesia services billed from 1997 to the present as a result of Associated Anesthesiologists submission of the false claims.

708.   By virtue of the acts described above, Associated Anesthesiologists defrauded Private Illinois Insurance Companies by getting false or fraudulent claims allowed or paid in violation of 740 ILCS 92/1, *et seq.*.

709.   By virtue of the acts described above, Associated Anesthesiologists knowingly submitted or caused to be submitted false or fraudulent claims to Private Illinois Insurance Companies for payment of benefits in violation of 740 ILCS 92/1, *et seq.*

710.   By virtue of the acts described above, the Associated Anesthesiologists knowingly made, used or caused to be made or used false statements to obtain payment for false and fraudulent claims from the Private Illinois Insurance Companies in violation of 740 ILCS 92/1, *et seq.*

711.   By virtue of the these acts, Associated Anesthesiologists knowingly obtained, attempted to obtain, or caused to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on the policies of insurance issued by the Private Illinois Insurance Companies in violation of 740 ILCS 92/1, *et seq.*.

712.   Associated Anesthesiologists acted as described above with the intent to deprive a Private Illinois Insurance Company permanently of the use and benefit of its property.

713.   Unaware of the falsity of the records, statements, or claims made, or caused to be made, by Associated Anesthesiologists, Private Illinois Insurance Companies paid for claims that would otherwise not have been allowed or would have been reduced.

714.   By reason of these payments, Private Illinois Insurance Companies have been damaged since at least 1997, and continue to be damaged in a substantial amount.

715.    Associated Anesthesiologists has not notified the Private Illinois Insurance Companies or the State of Illinois of the violations of the Insurance Claims Fraud Prevention Act, 740 ILCS 92/1, et seq., alleged herein.

716.    Relator is entitled to reimbursement of his reasonable expenses, which includes his attorneys' fees and costs, incurred in maintaining this action, pursuant to 740 ILCS 92/25(e).

WHEREFORE, the State of Illinois by the Relator, Donald Helfer, M.D., prays this Court give judgment in its favor and against Defendant Associated Anesthesiologists of Springfield, Ltd. and issue orders in accordance with the Illinois Insurance Claims Fraud Act, 740 ILCS 92/1, *et seq.*, specifically as follows:

A.    Order Defendant to cease and desist from violating the Insurance Claims Fraud Prevention Act, 740 ILCS 92/1, *et seq.*;

B.    Order Defendant to pay a compensatory amount equal to three times the amount of each claim for compensation under a contract of insurance, plus a civil penalty of $10,000 for each claim in which Defendant participated, and the costs of this action;

C.    Order Defendant to pay Relator's reasonable costs and expenses, including attorneys' fees, pursuant to 740 ILCS 92/25(e);

D.    Order that the Relator be awarded the statutory percentage of the amount received by the government pursuant to 740 ILCS 92/25(a) or (b); and,

E.    Order such other and further relief as this Court deems just and proper.

## **REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and Relator

hereby demand trial by jury.

Respectfully submitted,

 /s/ Ronald E. Osman
BY:    Ronald E. Osman
          Attorney for Relator,
          Donald Helfer, M.D.

Ronald E. Osman    #3123542
RONALD E. OSMAN & ASSOCIATES, LTD.
1602 W. Kimmel Street, P.O. Box 939
Marion, Illinois  62959
Phone:  (618)997-5151
Fax:      (618)997-4983
e-mail:   rosman@marion.quitamlaw.com