# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **and the STATE OF ILLINOIS,** | ) | |
| **ex rel, DONALD HELFER, M.D.,** | ) | |
| **and DONALD HELFER,** | ) | |
| **individually** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-3076** |
| | ) | |
| **ASSOCIATED** | ) | |
| **ANESTHESIOLOGISTS OF** | ) | |
| **SPRINGFIELD, LTD., ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

Relator Donald Helfer has filed a qui tam action against Defendant Associated Anesthesiologists, Memorial Medical Center, Memorial Health System, CBIZ Medical Management Professionals, Inc., and Anesthesia Business Consultants, LLC, alleging violations of the False Claims Act, the Illinois False Claims Act, and the Illinois Insurance Claims Fraud Prevention Act. Defendant Associated Anesthesiologists filed a Motion to Dismiss Relator's claims for retaliatory discharge and collectively, all Defendants

moved to dismiss the remaining counts. Associated Anesthesiologists' Motion to Dismiss is DENIED because Relator has sufficiently alleged in Counts X and XXI-A that his former employer discharged him in violation of the False Claims Act and the Illinois False Claims Act. The Consolidated Motion to Dismiss is GRANTED in part and DENIED in part. Counts I-III, XI-XIV, XXI-B (Billing Counts), Counts IV-VI, XV-XVII (CRNA Counts) and Counts VII-IX, XVIII-XX (Cost Report Counts) are DISMISSED WITHOUT PREJUDICE for failing to comply with Rule 9(b). Relator's allegations of violations of the False Claims Act and Illinois False Claims Act before March 30, 2000, and allegations of violations of the Illinois Insurance Claims Fraud Prevention Act before March 30, 2002 are DISMISSED WITH PREJUDICE.

## I.    BACKGROUND[1]

From August 1990 to October 2009, Relator Donald Helfer, M.D. was an anesthesiologist, shareholder, and member of the Board of Directors at Defendant Associated Anesthesiologists of

---

[1] All background information is supplied from Relator's Amended Complaint, d/e 13. See Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir. 2008) (stating that when considering a motion to dismiss under Rule 12(b)(6), the Court construes the complaint in the light most favorable to plaintiff, accepting all well-pleaded allegations as true and construing all reasonable inferences in his favor.)

Springfield, LTD ("Associated") in Springfield, Illinois. Associated is the sole provider of anesthesia services to patients at Defendant Memorial Medical Center. Memorial Medical Center is an acute care hospital in Springfield, Illinois that is an affiliate hospital of Defendant Memorial Health System. Memorial Health System operates three hospitals, one mental health center, one physician group, and one home health services agency.

In addition to providing anesthesia services to Memorial Medical Center, Associated's anesthesiologists also "medically direct" Certified Registered Nurse Anesthetists employed by Memorial Medical Center to perform anesthesia services. On any shift, Associated's anesthesiologists may work in Memorial Medical Center's 16 general operating rooms, four cardiac surgery rooms, two obstetrics surgical rooms, multiple obstetrics delivery rooms, the Radiology Department, the Gastrointestinal Lab, Heart Catheterization Lab, Orthopedic Surgery Center of Illinois, or the six operating rooms at the hospital's Ambulatory Surgery Center, which is across the street from the hospital.

Relator alleges in his Amended Complaint that Associated, as well as Defendants Memorial Medical Center, Memorial Health

System, CBIZ Medical Management Professionals, Inc. ("CBIZ Medical"), and Anesthesia Business Consultants, LLC ("ABC"), submitted false claims to the federal government and the State of Illinois or caused these false claims to be submitted.  Throughout Relator's tenure at Associated, either CBIZ Medical or ABC contracted with Associated to perform all of Associated's medical billing to private insurance companies, Medicare, and Medicaid. Until ABC took over on October 1, 2008, Associated contracted with CBIZ Medical to handle Associated's billing.  Relator additionally alleges he was terminated after he started to question the propriety of how Associated billed for anesthesia services performed for obstetrics patients.

Relator claims that at an Associated board meeting in April of 2009, an ABC representative assigned to Associated reported that ABC intended to resubmit claims to all insurance carriers for epidural services administered to patients who were in labor and delivery.  ABC's representative proposed billing for Associated's labor and delivery epidural anesthesia services in a way that would indicate that the anesthesiologist had continuously performed the service from the time the epidural anesthesia was administered to

the delivery of the child.  The ABC representative stated that CBIZ Medical had billed epidural anesthesia service claims the same way. According to Relator, the Associated physician who was the liaison to ABC proposed that Associated or ABC cap the billing for these services at 90 percent of the maximum amount that other Illinois anesthesia groups bill for them so insurance companies would not flag Associated for review.

In the Amended Complaint, Relator explains that after this meeting, he reviewed the billing regulations the Center for Medicare and Medicaid Services ("CMMS") promulgated for anesthesia services.  What Relator learned made him believe that the billing practice the ABC representative proposed was contrary to CMMS regulations.

The regulations distinguish between services that are "medically directed," and those that are "medically supervised." Services that are "medically directed" are billed at a higher rate than those that are "medically supervised."  Relator thought the regulations indicated that a service was "medically directed" when an anesthesiologist was directing two, three, or four concurrent anesthesia services.  Epidural anesthesia services for obstetrics

patients had to be counted as a concurrent service unless they qualified as short, emergency procedures. Relator was concerned that the regulations prohibited Associated from billing for "medically directing" concurrent procedures and also billing for continuous time with an obstetrics patient. If the anesthesiologist was with an obstetrics patient the entire time, he could not be medically directing other procedures.

Relator printed the relevant CMMS regulations from the CMMS website and gave them to Dr. Peter Martin, who told Relator he would pass along the regulations to Associated's ABC representative and Dr. Bulkley. Dr. Bulkley allegedly told Relator that "Relator was just trying to cause trouble." Am. Compl., d/e 1, ¶¶ 348, 680. Relator also asked Dr. Martin and Dr. Bulkley to address the epidural billing practice at the next board meeting on June 1, 2009.

At the June 1, 2009 board meeting, Relator inquired about the billing for obstetrics patients and was again told by the ABC representative that ABC billed for continuous time. Relator responded by stating that none of the anesthesiologists at Associated stayed in the Obstetrics Department after beginning an

epidural anesthesia service. He further explained that when the anesthesiologist leaves Obstetrics, he or she does not "sign-out" and no other anesthesiologist takes over care of the patient. Relator also said that Associated's anesthesiologists often leave the hospital after beginning an epidural anesthesia service. In response, the ABC representative stated that other anesthesia practices have more signatures on the patients' files, possibly indicating that more anesthesiologists monitor the patients who have been given anesthesia.

In the days following the June 1, 2009 board meeting, Relator asked Dr. Martin to call the CMMS Help-Line for guidance on the billing practice for epidurals if ABC refused to "take action." Am. Compl., d/e 1, ¶¶ 351, 683. Relator also asked Dr. Baulkey (who the Court believes may actually be the "Dr. Bulkley" referenced elsewhere in the Amended Complaint) to call the Help-Line. Relator alleges that Dr. Baulkey directed the question back at Relator: "Why don't you call? You probably already did." Id.

On June 4, 2009, Relator did call the CMMS Help-Line. Per CMMS's recommendation, Relator emailed his question about billing continuously for epidural services to an address CMMS

provided.  In the email, Relator asked CMMS whether "there was

any problem with concurrent cases counting the labor epidural"

when someone bills for continuous time on a labor epidural while

"supervising" four procedures in the operating rooms.  Am. Comp,

d/e 13-4 at 4.  He noted in the email that administering the

epidural requires an anesthesiologist to leave the operating rooms

for 30 minutes.  Id.

Eight days later, a CMMS contractor answered Relator's

question.  In an email dated June 12, 2009, the CMMS contractor

wrote that the "scenario provided does not meet the criteria of

medical direction of two, three, or four concurrent procedures."

Am. Compl., d/e 13-4 at 1.  The contractor cited parts of the

relevant section of CMMS's Internet-Only Manual stating that

"periodic" rather than "continuous" monitoring of an obstetrics

patient who has been given an anesthetic does not "diminish the

scope of control" a physician exercises while directing the

administration of anesthesia to surgical patients.  Based on the

Internet-Only Manual, the contractor concluded: "Because the

anesthesiologist is billing the labor epidural continuously (rather

than periodically), in addition to four concurrent procedures, the

anesthesiologist's services become supervisory in nature." Id. The contractor then detailed the rate of payment for medically supervised services and specified that a service is "medically supervised" when the anesthesiologist is involved in more than four concurrent procedures or performs "other services while directing concurrent procedures." Id. The actual text of the relevant section of the Internet-Only Manual is included in the email. Id.

Relator called Dr. Martin on June 14, 2009 to tell him about the email and inform him that Relator would bring him a copy of the email that next day, which was a Monday. After Dr. Martin read the email on June 15, 2009, Relator alleges that Dr. Martin said, "the guys aren't going to like this." Am. Comp., d/e 13 ¶¶ 354, 686. In the remaining weeks of June, Relator alleges that he was copied on emails Dr. Martin and the ABC representative exchanged about Relator's email to CMMS and the billing question. Relator alleges that one of these emails stated that ABC's corporate counsel would send Medicare another email "re-wording" Relator's question "so the practice would not be flagged by Medicare for review." Id. ¶¶ 355, 687.

On July 2, 2009, about 15 minutes after Relator was relieved from his shift at Memorial Medical Center, Dr. Martin paged Relator and asked him to return to the hospital. When Relator asked Dr. Martin why he had to go back, Dr. Martin allegedly responded: "you know you shouldn't have talked to Medicare." Id. ¶¶ 357, 689. After Relator told Dr. Martin that he only sent an email, Dr. Martin said, "I know, but you didn't go through me." Id. Relator refused to return to the hospital and told Dr. Martin he would be there the next day when he was scheduled to work. A few hours later around 5:00 p.m., Relator received another call from an Associated anesthesiologist, asking Relator to return to the hospital. When Relator explained that he could not return, the anesthesiologist on the other line—Dr. Joe Ducaji—told Relator that his services were no longer needed by Associated and that he should not return to work. Dr. Ducaji allegedly told Relator that he could resign or be terminated and that pursuant to this employment contract, Associated would give him 90-days' wages and benefits.

After Relator's call with Dr. Ducaji ended, Relator phoned the CEO of Memorial Medical Center to ask why Associated was firing him. The CEO told Relator that at that moment, Associated's

Executive Committee was in the CEO's office with a Motion for Termination signed by Associated's shareholders.

On March 30, 2010, Relator brought a qui tam action against Associated, ABC, and CBIZ Medical, alleging violations of the False Claims Act, the Illinois False Claims, including retaliatory discharge, and the Illinois Insurance Claims Fraud Prevention Act. In March of 2011, Relator filed a statement under seal that confirmed he had served both the Attorney General of the United States and the Illinois Attorney General.

After the United States declined to intervene on December 13, 2011, Relator filed an Amended Complaint, adding Memorial Medical Center and Memorial Health System as Defendants and asserting additional violations of the False Claims Act and the Illinois False Claims Act related to claims for services, salaries, and benefits of Certified Nurse Anesthetists ("CRNAs"). These additional counts allege that Associated submitted claims to Medicare and Illinois Medicaid for CRNA services, though Memorial Medical Center paid the CRNAs, and that Memorial Medical and Memorial Health System caused these false claims to be submitted. Similarly, Relator alleges that Memorial Medical Center and

Memorial Health System submitted false cost reports to Medicare when they engaged in a kickback scheme with Associated that violated certifications on the cost reports they submitted to Medicare. Relator then served Defendants, and two Motions to Dismiss followed.

In the Consolidated Memorandum in Support of the Motion to Dismiss, Defendants created a chart to organize and categorize the counts in the Amended Complaint. Relator adopted the categories Defendants created in Relator's Response to the Motions to Dismiss. The Court likewise adopts the categories for ease of reference. Due to the length of the Amended Complaint, which stretches to 200 pages, and the variety of claims and parties involved, the Court includes the chart as a helpful summary of the counts challenged in the Consolidated Motion to Dismiss, adding a column for the statute allegedly violated and further describing the alleged conduct in the CRNA and Cost Report Counts:

| Group | Count | Statute | Defendant | Alleged Conduct |
|-------|-------|---------|-----------|-----------------|
| Retaliatory Discharge | X | False Claims Act, 31 U.S.C. § 3730(h) | Associated | Associated terminated Relator for investigating Associated's practice of fraudulently billing anesthesia services to Medicare. |
| | XXI-A | Illinois False Claims Act, 740 ILCS 175/4(g) | Associated | |

| Group | Count | Statute | Defendant | Alleged Conduct |
|-------|-------|---------|-----------|-----------------|
| Billing Counts | I | False Claims Act, 31 U.S.C. § 3729 (a)(1)-(2) | Associated | Submission of claims to Medicare for surgical anesthesia services that Relator alleges were improperly coded as "medically directed." |
| | II | False Claims Act, 31 U.S.C. § 3729 (a)(2) | CBIZ Medical | Creation of records supporting the submission of claims to Medicare for surgical anesthesia services that Relator alleges were improperly coded as "medically directed." |
| | III | False Claims Act, 31 U.S.C. § 3729 (a)(2) | ABC | |
| | XI | Illinois False Claims Act, 740 ILCS 175/3(a)(1)(A) & (B) | Associated | Submission of claims to Illinois Medicaid and private insurers for continuous monitoring of epidural services that Relator alleges were improper. |
| | XXI-B | Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 | | |
| | XII | Illinois False Claims Act, 740 ILCS 175/3(a)(1) (B) | Associated | Creation of records in support of the submission of claims to Illinois Medicaid for continuous monitoring of epidural services that Relator alleges were improper. |
| | XIII | Illinois False Claims Act, 740 ILCS 175/3(a)(1) (B) | CBIZ Medical | |
| | XIV | Illinois False Claims Act, 740 ILCS 175/3(a)(1) (B) | ABC | |
| CRNA Counts | IV | False Claims Act, 31 U.S.C. § 3729 (a)(1)-(2) | Associated | Associated allegedly submitted claims to Medacre and Illinois Medicaid for CRNA services, even though Memorial paid the CRNAs' salaries and benefits. Memorial Medical and Memorial Health System cause these false claims to be submitted. |
| | XV | Illinois False Claims Act, 740 ILCS 175/3(a)(1)(A) & (B) | | |
| | V | False Claims Act, 31 U.S.C. § 3729 (a)(2) | Memorial Medical Center | |
| | XVI | Illinois False Claims Act, 740 ILCS 175/3(a)(1)(A) & (B) | | |
| | VI | False Claims Act, 31 U.S.C. § 3729 (a)(1)-(2) | Memorial Health System | |
| | XVII | Illinois False Claims Act, 740 ILCS 175/3(a)(1)(A) & (B) | | |
| Cost Report Counts | VII | False Claims Act, 31 U.S.C. § 3729 (a)(1)-(2) | Associated | Inclusion by Memorial of CRNA salaries and benefits on cost reports submitted to Medicare and Illinois Medicaid even though Associated allegedly submitted claims for payment for the CRNA services. Associated, Memorial Medical, and Memorial Health System engaged in anti-kickback scheme that violated certifications submitted to government agencies. |
| | XVIII | Illinois False Claims Act, 740 ILCS 175/3(a)(1)(B) | | |
| | VIII | False Claims Act, 31 U.S.C. § 3729 (a)(1)-(2) | Memorial Medical Center | |
| | XIX | Illinois False Claims Act, 740 ILCS 175/3(a)(1)(A) & (B) | | |
| | IX | False Claims Act, 31 U.S.C. § 3729 (a)(1)-(2) | Memorial Health System | |
| | XX | Illinois False Claims Act, 740 ILCS 175/3(a)(1)(A) & (B) | | |

Associated brought the first motion to dismiss Counts X and XXI-A of Relator's Amended Complaint, which allege retaliatory discharge claims under the False Claims Act and the Illinois False Claims Act. All Defendants moved to dismiss the remaining counts of Relator's Amended Complaint in the second, consolidated motion to dismiss.

## II.    VENUE & JURISDICTION

The federal questions posed by Relator's claims under the False Claims Act, 31 U.S.C. §§ 3729-3733, and the express language of the FCA give this Court subject-matter jurisdiction. See 28 U.S.C. § 1331 and § 1345; 28 U.S.C. § 3732(a). Personal jurisdiction and venue requirements are satisfied because a substantial part of the relevant acts occurred in this judicial district. See World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (personal jurisdiction exists where a defendant "purposefully avail[ed] [himself or herself] of the privilege of conducting activities" in the forum state); 31 U.S.C. § 1391(b)(2) (venue is proper in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is

situated); 31 U.S.C. § 3732(a) (venue is proper in any judicial district in which any act proscribed by 31 U.S.C. § 3729 occurred).

Additionally, this Court has supplemental jurisdiction over the claims asserted under Illinois state law pursuant to 28 U.S.C. § 1367, as they are so related to the claims within the Court's federal question jurisdiction that they form part of the same case or controversy.  See 31 U.S.C. § 3732(b) (granting jurisdiction to district courts "over any action brought under the laws of any State for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under section 3730").

### III.  LEGAL STANDARD

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint.  Christensen v. Cnty. of Boone, 483 F.3d 454, 458 (7th Cir. 2007).  To state a claim for relief, Relator's Amended Complaint need only provide a short and plain statement of the claim showing he is entitled to relief and giving Defendants fair notice of the claims.  Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir. 2008).  When considering a motion to dismiss under Rule 12(b)(6), the Court construes the complaint in the light most favorable to

Relator, accepting all well-pleaded allegations as true and construing all reasonable inferences in his favor.  Id.  However, the Complaint must set forth facts that plausibly demonstrate a claim for relief.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007).  A complaint has "facial plausibility" when it alleges factual content that allows the Court to reasonably infer a defendant is liable for the alleged misconduct.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Merely reciting the elements of a cause of action or supporting claims with conclusory statements is insufficient.  Id.

Claims brought under the False Claims Act ("FCA") are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  United States ex rel. Gross v. AIDS Research Alliance–Chicago, 415 F.3d 601, 604 (7th Cir. 2005).  Because the FCA is an anti-fraud statute, Rule 9(b) requires that Relator "state with particularity the circumstances constituting fraud . . . ."  The Seventh Circuit has explained that under this pleading standard, a plaintiff should plead "the who, what, when, where and how" of the alleged fraud.  United States ex rel. Garst v. Lockheed–Martin Corp., 328 F.3d 374, 376 (7th Cir. 2003).

# IV.   ANALYSIS

Associated is the sole defendant that filed a Motion to Dismiss Counts X and XXI-A of Relator's Amended Complaint.  See d/e 50. Those Counts allege violations of the False Claims Act and the Illinois False Claims Act for retaliatory discharge.  In the Consolidated Motion to Dismiss, all Defendants move to dismiss: Counts I-III, XI-XIV, and XXI-B (Billing Counts); Counts IV-VI and XV-XVII (CRNA Counts); and Counts VII-IX, XVII-XX (Cost Report Counts).  See d/e 56. After addressing Associated's Motion to Dismiss, the Court will turn to the Consolidated Motion.

## A. RETALIATORY DISCHARGE CLAIMS UNDER THE FALSE CLAIMS ACT AND ILLINOIS FALSE CLAIMS ACT

Counts X and XXI-A allege that Associated terminated Relator in retaliation for investigating Associate's alleged practice of fraudulently billing anesthesia services to Medicare and preventing Medicare from discovering the fraudulent practice.  See Am. Compl., Count X, d/e 13 ¶¶ 341-361; Count XXI-A, ¶¶ 637-93. Count X alleges that the termination violated the False Claims Act, 31 U.S.C. § 3730(h) ("FCA"), while Count XXI-A alleges a violation of what was previously the "Illinois Whistleblower Reward and

Protection Act," 740 ILCS 175/4(g), but has been renamed the "Illinois False Claims Act" ("Illinois FCA").  See 740 ILCS 175/1.

## 1. Relator Sufficiently Alleged Claims for Retaliatory Discharge Under the False Claims Act and Illinois False Claims Act.

The FCA imposes civil penalties upon anyone who submits "a false or fraudulent claim for payment or approval" to the United States Government.  31 U.S.C. § 3729(a)(1).  Private plaintiffs known as "relators" may bring qui tam actions on behalf of the government to enforce the statute, even when the government declines to intervene.  Glaser v. Wound Care Consultants, Inc., 570 F.3d 907, 912 (7th Cir. 2009) (citing 31 U.S.C. § 3730(b)).

In 1986, Congress added a whistleblower provision to the FCA that protected employees who were terminated due to "lawful acts done by the employee . . . in furtherance of an action under this section . . . ." 31 U.S.C. § 3730(h)(1986), amended by 31 U.S.C. § 3730(h)(1)(2009) (emphasis added).  Since 1986, Congress amended the retaliatory discharge section of the FCA in 2009 and then again in 2010.[2]  Because Relator alleges he engaged in protected activity

---

[2] The 2010 Amendment to § 3730(h)(1) of the FCA clarified that the FCA protected an employee who acted "in furtherance of an action under this section *or* other efforts to stop 1 or more violations of this subchapter."  Public

starting in June of 2009, the 2009 Amendment made effective on May 20, 2009, 31 U.S.C. § 3730(h)(1)(2009), applies.

The Fraud Enforcement and Recovery Act of 2009 amended the FCA to protect whistleblowers terminated for engaging in "lawful acts done by the employee in furtherance of *other efforts to stop 1 or more violations of this subchapter.*" See 31 U.S.C. § 3730(h)(1)(2009), amended by 31 U.S.C. § 3730(h)(1)(2010) (emphasis added).  Therefore, Relator must show that his Amended Complaint sufficiently alleges that his actions were protected by the FCA, that Associated knew of this protected conduct, and that his termination was motivated by the protected conduct.  See Fanslow v. Chi. Mfg. Ctr., Inc., 384 F.3d 469, 479 (7th Cir. 2004).

Associated urges this Court to dismiss the retaliatory discharge counts because Relator fails to allege both that his actions were "in furtherance of" an enforcement action under the FCA and Illinois FCA and that Associated knew that a qui tam action like the present one was a "distinct possibility."  Associated cites Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd, 277 F.3d

---

Law 111-203, 124 Stat 1376 at 2079; 31 U.S.C. 3730(h)(2014) (emphasis added).

936 (7th Cir. 2002) as the authority that requires a relator to prove these elements. <u>Brandon</u>'s facts are nearly identical to those alleged in Relator's Complaint: Brandon was an associate anesthesiologist who repeatedly raised concerns with shareholders about fraudulent billing practices related to "medically directed" billings, contacted Medicare to obtain information about billing regulations, angered shareholders by contacting Medicare, and was eventually terminated from the practice. 277 F.3d at 938-41.

The Seventh Circuit found that Brandon's actions were insufficient to alert his employer that such an FCA action was a "distinct possibility" because monitoring the practice's compliance with Medicare regulations was part of Brandon's duties. <u>Id.</u> at 944. The court concluded that "Brandon was simply trying to convince the shareholders to comply with the Medicare billing regulations. Such conduct is usually not protected by the FCA. . . . It is more accurate to say that Brandon's investigation of the billing reports was part of the general course of his responsibilities." <u>Id.</u> at 945.

Relator correctly points out, however, that the <u>Brandon</u> case relied on the 1986 version of the FCA, the operative language of which Congress amended in 2009 to protect employees discharge

for engaging in conduct "in furtherance of"—not only an FCA action—but "other efforts to stop 1 or more violations" of the FCA. See 31 U.S.C. § 3730(h)(1)(2009), amended by 31 U.S.C. § 3730(h)(1)(2010) (emphasis added). Since Brandon, the Seventh Circuit has recognized that the 2009 Amendment expanded protections for whistleblowers under the FCA to include "other efforts to stop' violations of the Act, such as reporting suspected misconduct to internal supervisors." Halasa v. ITT Educ. Servs., Inc., 690 F.3d 844, 847-48 (7th Cir. 2012) (affirming summary judgment for defendant when plaintiff failed to show he was fired because of his protected conduct). And even before Brandon, the Seventh Circuit seemed to retreat from the high bar Brandon established by recognizing that some "type of internal complaints [may be] protected by the FCA." Fanslow, 384 F.3d at 482-83 (reversing grant of summary judgment to defendant and remanding, in part, for trial court to more fully develop record and determine whether FCA protected plaintiff's internal complaints).

Recently, the Seventh Circuit found that internal complaints could be protected under the 2009 version of the FCA. In Halasa, the qui tam plaintiff investigated irregularities in how his employer,

Defendant ITT Educational Services, handled federally subsidized loans and grants to students. 690 F.3d 844. He then reported his findings to his superiors. Id. at 846-47. Although the Seventh Circuit "assumed" his conduct was protected under the 2009 version of the Act, the court found that Halasa's actions investigating claims and reporting his findings to his supervisors "presumably to ensure that [the school] ended these practices and to prevent [the school] from making false certifications . . . would permit a trier of fact to find that he engaged in 'efforts to stop' potential FCA violations." Id. at 849.

With that background, the Court turns to whether Relator sufficiently alleged that he was discharged for lawful acts done in furtherance of his efforts to stop violations of the FCA. Whether an employee engages in protected activity under the FCA involves both a subjective and objective analysis: "the relevant inquiry to determine whether an employee's actions are protected under § 3730(h) is whether: (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." Fanslow, 384 F.3d at 480 (internal citations omitted).

Relator alleges and explains his concern that Associated was fraudulently billing Medicare and documents his attempts to investigate the proper procedures.  Relator states that he consulted the website of the CMMS and printed material about CMMS's billing regulations.  Relator also called the CMMS hotline and emailed an individual at the Medicare Operations Branch to inquire about whether Associated's billing practices were in compliance with Medicare regulations.  At each stage of this investigation, Relator reported his findings and concerns about Associated's noncompliance with his superiors both individually and at board meetings.  These allegations demonstrate that Relator believed—in good faith—that Associated was committing fraud against the government by submitting billing reports that failed to comply with the applicable Medicare regulations.

Additionally, a "reasonable" employee in Relator's place would likely come to the same conclusion, especially after receiving an email from CMMS explicitly stating that the scenario Relator proposed in his email to CMMS "does not meet the criteria" that would allow Associate to bill for "medically directed" procedures. See Am. Compl., Ex. D, d/e 13-4 at 1.  Relator's investigation and

reporting—which occurred in a relatively short period of less than six months—are similar to those undertaken by the plaintiff in Halasa and, like Halasa's actions, sufficiently allege that Relator was engaged in "other efforts to stop" Associated from submitting false claims to the Government.

Associated further argues that Relator failed to allege Associated knew an FCA action was a "distinct possibility," again relying on Brandon. But the Seventh Circuit has explained that the "heightened notice standard" in Brandon is "reserved for employees who are charged with discovering fraud in the normal course of their job duties." Fanslow, 384 F.3d at 483-84. The anesthesiologist in Brandon was tasked with ensuring that the billing practices complied with Medicare rules and regulations. Id. at 484. Nothing in the Amended Complaint indicates that Relator had a similar duty. Although Relator was a shareholder, the Complaint specifically names another doctor as being the "liaison" between Associated and ABC, the company Associated hired to handle all of its billing. See Am. Compl., d/e 13 ¶¶ 345, 677. Accordingly, the heighted Brandon standard that applies to employees the Seventh Circuit has termed "fraud-alert employees"

is inapplicable here.  See Fanslow, 384 F.3d at 484 (stating that other circuit courts of appeal have also applied a heightened notice requirement for employees "charged with investigating fraud").

Two of Relator's allegations also distinguish this case from Brandon.  The first is the involvement of CMMS, the federal agency. In Brandon, the court noted that Brandon did not threaten to report the defendant's conduct to the government before he was terminated.  Although Relator does not claim to have threatened to report the billing practice of which he was suspicious, he showed Associated the email he sent to CMMS, a federal agency, inquiring about the propriety of Associated's billing practices in hypothetical terms.  While CMMS and the contractor who answered Relator's email may not have sensed that Associated was engaging in illegal conduct, Relator's Amended Complaint indicates that Associated and ABC feared that Relator's email could raise suspicions. Relator's allegation that either the ABC Representative or the Associated anesthesiologist with whom she was emailing stated that ABC's corporate counsel would send Medicare an email "re-word[ ]" Relator's email indicates that ABC, and possibly Associated, feared that Relator's actions would have legal consequences.  Even if this

were simply paranoia on the part of ABC, the fact that one of the defendants sought to "re-word[ ]" Relator's inquiry to avoid scrutiny by a federal agency shows that Relator's investigation into the billing practices may have been "reasonable in prospect" rather than an attempt to concoct a "tale of fraud." Lang v. Nw. Univ., 472 F.3d 493, 494 (7th Cir. 2006) (finding that plaintiff was "Chicken Little" who "imagined fraud but lacked any basis for that belief"). The Court finds that these distinctions, in addition to the other allegations in Relator's Amended Complaint, show that Relator has sufficiently alleged a retaliatory discharge claim even under the 1986 version of the FCA.

The next issue is whether Defendant was aware of Relator's investigation. See Fanslow, 384 F.3d at 484. In Fanslow, a case that preceded the 2009 FCA Amendment, the plaintiff alleged that he told three of his employer's executives about a conversation he had with a federal official concerning the alleged diversion of non-profit funds to a for-profit entity. Id. at 475. The plaintiff claimed that he reported the conversation to his superiors because he was concerned that the diversion would jeopardize the employer's federal funding. Id. The plaintiff later refused to purchase

equipment for the for-profit entity using non-profit funds and was terminated.  <u>Id.</u> at 476-78.  The court found that these actions gave the defendant employer sufficient notice under the FCA.  <u>Id.</u> at 485.

 Like the plaintiff in <u>Fanslow</u>, Relator voiced his concerns over the allegedly illegal billing practices to his superiors and relayed communication he had with the federal agency—CMMS—that implements the applicable rules and regulations.  And as previously mentioned, Associated was aware that ABC's corporate counsel was going to "re-word[ ]" Relator's email to CMMS to avoid any scrutiny.  Even if Relator failed to use the "magic words," "illegal" or "qui tam"—which the <u>Fanslow</u> court found were not required anyway— the Amended Complaint sufficiently alleges that Associated knew about Relator's investigation and Relator's concerns about the legality of Associated's conduct. <u>See Fanslow</u>, 384 F.3d at 484 (stating that plaintiff who was not fraud-alert employee was not required to use the "magic words" of "illegal" and "unlawful" to put his employer on notice of his investigation).

Finally, Relator must show that his termination was motivated by the protected conduct.  <u>Fanslow</u>, 384 F.3d at 485.  Again, the facts in <u>Fanslow</u> are similar to the present case.  As in <u>Fanslow</u>, the

temporal sequence of events here is "telling." Id. (citing Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1315 (7th Cir. 1989) and stating that a "telling temporal sequence" may demonstrate a "causal link" between adverse action and protect conduct).

Associated hired Relator in August of 1990 and at the time of his termination, Relator was a shareholder and a member of the Board of Directors at Associated. He initially had questions about Associated's billing practices in or around April of 2009 and voiced his concerns to a shareholder and ABC representative, and then at a shareholder meeting on June 1, 2009. One of his colleagues told him that he was "just trying to cause trouble." On June 12, 2009, CMMS responded to Relator's email stating that the practice Relator described did not comply with the Medicare regulations.

Three days later, when Relator gave a copy of CMMS's email to another doctor at Associated, Relator alleges that the doctor responded: "the guys aren't going to like this." After a series of email exchanges between this doctor and the ABC representative, Relator alleges that another doctor at Associated called him on July 2, 2009—three weeks after Relator gave the CMMS email to his colleague—and told Relator he was being terminated without cause.

Hours before receiving that phone call, Relator was told that he "shouldn't have talked to Medicare." When Relator called the CEO of Memorial Medical Center to inquire about the reasons for his termination, the CEO told him that Associated's Executive Committee was in the CEO's office with a Motion for Termination that had been signed by all of Associated's shareholders. The quick timeline of Relator's precipitous fall at Associated, in addition to the comments he alleges his colleagues made, sufficiently allege that his termination was motivated, at least in part, by his investigation of Associated's billing practices.

### 2. Relator Sufficiently Alleged a Claim for Retaliatory Discharge Under the Illinois False Claims Act, Though the Applicable Version of the Illinois False Claims Act Differs from the Federal False Claims Act.

Defendants also seek to dismiss Relator's state law claim under the Illinois FCA. Courts analyzing claims under the FCA and Illinois FCA treat the statutes equally because of the similarity of the language. See, e.g., McDonough v. City of Chi., 743 F. Supp.2d 961, 987 (N.D. Ill. 2010) (applying Brandon to Illinois FCA claim); U.S. ex rel Geschrey v. Generations Healthcare, LLC, 922 F.Supp.2d 695 n.4 (N.D. Ill. 2012) (applying 1986 version of FCA

and recognizing that Illinois courts have adopted interpretations of federal FCA when analyzing Illinois FCA claims); People ex rel. Levenstein v. Salafsky, 789 N.E.2d 844, 849, 338 Ill.App.3d 936 (2003) ("We presume that, when our legislature passed the [Illinois FCA], it was aware of federal court opinions that had construed the False Claims Act. Thus, we also give weight to federal court opinions that interpreted the federal law before the Act was passed.") (internal citations omitted).  Indeed, an Illinois Appellate Court has acknowledged that the Illinois FCA "mirrors" the federal FCA.  State ex rel. Beeler, Schad & Diamond, P.C. v. Burlington Coat Factory Warehouse Corp., 860 N.E.2d 423, 426, 369 Ill.App.3d 507, 511 (2006) (citing Scachitti v. UBS Financial Services, 831 N.E.2d 544, 557, 215 Ill.2d 484, 506-07 (2005)).

It is not surprising then that Relator's Amended Complaint alleging violations of both statutes and Associated's arguments for dismissing the two claims are identical.  However, Relator's actions in the spring and summer of 2009 occurred before the Illinois FCA was amended to incorporate the 2009 Amendment to the federal FCA.  2010 Ill. Legis. Serv. P.A. 96-1304 (West).  So at the time of Relator's actions, the Illinois FCA still only protected actions done

"in furtherance of an action under this Section."  740 ILCS 175/4 (amended July 27, 2010).  As discussed above, however, Relator has sufficient alleged a retaliatory discharge claim even under the 1986 version of the FCA due to the Seventh Circuit's finding in Fanslow that internal complaints may be protected even under the FCA version and the fact that Relator does not appear to have been a fraud-alert employee.  Accordingly, his claims under the 2009 version of the Illinois FCA are sufficient to survive the motion to dismiss.

## B. BILLING COUNTS ALLEGING VIOLATIONS OF FALSE CLAIMS ACT AND ILLINOIS FALSE CLAIMS ACT

In the Consolidated Motion to Dismiss, Defendants first move to dismiss Counts I-III, which the parties refer to as the "Billing Counts."  Counts I-III allege that Associated, CBIZ Medical, and ABC submitted false claims or caused false claims to be submitted to Medicare for "medically directed" anesthesia services that should have been billed at the lower "medically supervised" rate.  The Billing Counts brought under Illinois law allege that Associated, CBIZ Medical, and ABC submitted false claims for epidural services. Counts XI, XII, XIII, XIV allege violations of the Illinois FCA for

submitting false claims to Illinois Medicaid, while Count XXI-B

alleges a violation of the Illinois Claims Fraud Prevention Act

("ICFPA") for submitting false claims to private insurers.

Specifically, Count I alleges that Associated violated 31 U.S.C.

§ 3792(a)(1) and (2).  A person who knowingly presents a false claim

to the government for approval violates 31 U.S.C. § 3792(a)(1).

Three elements compose a claim under this subsection: 1) that a

false or fraudulent claim, 2) was submitted to the government for

payment or approval, and 3) by a defendant who knows the claim is

false.  United States ex rel. Fowler v. Caremark RX, LLC, 496 F.3d

730, 740-41 (7th Cir. 2007) overruled on other grounds by Glaser v.

Wound Care Consultants, Inc., 570 F.3d 907 (7th Cir. 2009).

Count I, as well as Count II, which names CBIZ Medical, and

Count III, which names ABC, also allege violations of 31 U.S.C.

§3792(a)(2).  That subsection of the FCA prohibits a person from

knowingly creating a false record or statement to obtain approval or

payment from the government for a false or fraudulent claim.  To

state a cause of action under § 3792(a)(2), Relator must allege that:

(1) the defendant made a statement or created a record to receive

money from the government, (2) the statement was false, and (3) the defendant knew the statement was false.  Id.

Relator has not demonstrated in his Amended Complaint that the claims submitted to and paid by the federal government and the State of Illinois for "medically directed" services were actually false claims.  In fact, Relator's pleading demonstrates that Associated's anesthesiologists were "medically directing" services and properly billing for them.

Anesthesia services are "medically directed" when a physician meets certain conditions or performs certain tasks, such as monitoring the administration of anesthesia at certain intervals and remaining available to diagnose and treat emergencies.  42 C.F.R. § 414.46(d)(i); 42 C.F.R. § 415.110 (describing activities physician must perform under 42 C.F.R. § 414.46(d)(i) for "medically directed" services); see also Medicare Claims Processing Manual, Ch.12, §50(C) (explaining when "medical direction" occurs).  Notably, a physician may medically direct up to four concurrent procedures. 42 C.F.R. § 415.110(a)(2); see also Medicare Claims Processing Manual, Ch.12, §50(J) (defining "Concurrent Medically Directed Anesthesia Procedures" and providing examples of concurrent

procedures). If a physician is involved in more than four concurrent procedures, he is no longer "medically directing" any of the procedures and must bill at the lower "medically supervised" rate for all of the services. 42 C.F.R. § 414.46(f). Similarly, a physician cannot "medically direct" a service if he is "perform[ing] any other services," because doing so would prohibit him from performing any of the activities necessary for him to qualify for "medically directing" other procedures. See 42 C.F.R. § 415.110(a)(2). For example, if an anesthesiologist leaves surgical patients in an operating suite for an extended period of time or is not available to respond to emergencies in the operating suite, the anesthesiologists would not meet the criteria for "medically directing" a procedure. However, he could still meet the criteria for "medical supervision" and would bill at that lower rate for that type of service. See Medicare Claims Processing Manual, Ch.12, § 50(C).

Medicare regulations do allow an anesthesiologist to leave his immediate "medical direction" area, like an operating suite, to tend to a brief emergency, administer an epidural, or *periodically* monitor an obstetrics patient. Medicare Claims Processing Manual, Ch.12, § 50(C). *Periodic* rather than *continuous* monitoring of an obstetrics

patient would still allow an anesthesiologist to "medically direct" other procedures. On the other hand, if an anesthesiologist were *continuously* monitoring an obstetrics patient, he would be unable to perform other services that would qualify him as "medically directing" other procedures. Accordingly, if an anesthesiologist were *continuously* monitoring an obstetrics patient, he would have to bill for other procedures at the lower "medically supervised" rate.

In Counts I-III, Relator alleges that Associated *billed* for continuously monitoring obstetrics patients, while billing for medically directing concurrent procedures. Associated would have submitted false claims for "medically directed" services if they allowed their anesthesiologists to "direct" four concurrent services *and* "perform" the "additional service" of continuously monitoring obstetrics patients. See 42 C.F.R. § 415.110(a)(2) (stating that Medicare pays for the "medical direction" of services when the physician "directs no more than four anesthesia services concurrently and does not perform any other services"). But Counts I-III and Counts XI-XIV, XXI-B indicate that Associated anesthesiologists did not actually *perform* any continuous monitoring of these patients. Counts I-III state that, after an

Associated anesthesiologist starts epidural anesthesia, he "does not stay with the patient throughout the use of the epidural anesthesia but rather returns to his assigned procedures rooms and continues with his duties . . . . [or] is allowed to leave the hospital after beginning the epidural." Am. Compl., d/e 13 ¶¶ 83, 108, 138. Similarly, Counts XI-XIV and XXI-B allege that Associated billed for continuous monitoring of obstetrics patients when in reality, an Associated anesthesiologist actually "performs no monitoring of the epidural anesthesia and only returns to the patient's room if called regarding a problem with anesthesia services." Am. Compl., d/e 13 ¶¶ 370, 397, 421, 447, 701. If Associated anesthesiologists are not continuously monitoring obstetrics patients, CMMS regulations allow an anesthesiologist to medically direct four concurrent procedures. Accordingly, claims submitted for "medically directing" procedures while not continuously monitoring obstetrics patients would not be false.

When alleging in Counts I-III that Associated submitted false claims due to continuous monitoring and in Counts XI-XIV, XXI-B that Associated anesthesiologists were not continuously monitoring the obstetrics patients, Relator is not simply proffering inconsistent

legal theories, as he suggests. Instead, Relator is offering allegations in Count I-III that fail to plausibly suggest a right to relief. Although Federal Rule of Civil Procedure 8(d) allows a complaint to contain inconsistent claims either alternatively or hypothetically in single or separate counts, Relator is not asserting inconsistent claims in the alternative. Rather than stating in Counts I-III that anesthesiologists "perform[ed]" continuous monitoring of obstetrics patients and billed for those services, which negates the "medical direction" of other procedures, Relator alleges only that the anesthesiologists "billed" for the continuous monitoring of the patients. The applicable regulations state that a physician cannot "medically direct" four concurrent services and "perform" additional services that interfere with his ability to "medically direct" other procedures. Although submitting bills to Illinois Medicaid for continuously monitoring obstetrics patients may indicate to Illinois Medicaid that the anesthesiologists actually performed this additional service, Relator fails to allege in Counts I-III that the physicians actually were continuously monitoring obstetrics patients. In fact, he alleges that they were not. See Am. Compl., Counts I-III, d/e 13 ¶¶ 83, 108, 138 (alleging that after an

anesthesiologist starts anesthesia for an epidural, he "does not stay with the patient throughout the use of the epidural anesthesia but rather returns to his assigned procedures rooms and continues with his duties . . . . [or] is allowed to leave the hospital after beginning the epidural"); see also Am. Compl., Counts XI-XIV, XXI-B, d/e 13 ¶¶ 370, 397, 421, 447, 701 (alleging that an Associated anesthesiologist "performs no monitoring of the epidural anesthesia and only returns to the patient's room if called regarding a problem with anesthesia services").

The only way for Relator to succeed on Counts I-III would be to contradict the allegations in the Amended Complaint that Associated anesthesiologists were not continuously monitoring obstetrics patients.  If the Amended Complaint must be contradicted to prevail on the merits, Relator has pleaded himself out of court.  See Tamayo, 526 F.3d at 1086 (stating that defendant may use facts included in plaintiff's pleading to demonstrate that plaintiff is not entitled to relief); Atkins v. City of Chi., 631 F.3d 823, 832 (7th Cir. 2011) (observing that plaintiff can "plead himself out of court by pleading facts that show that he has no legal claim").

The allegations in Counts I-III and XI-XIV, XXI-B that anesthesiologists were not continuously monitoring obstetrics patients may support the allegations in Counts XI-XIV, XXI-B that Associated submitted false claims under the Illinois FCA and ICFPA for continuously monitoring obstetrics patients. They do not, however, support the claims under the FCA in Counts I-III. Accordingly, Counts I-III are DISMISSED WITHOUT PREJUDICE for failing to plausibly demonstrate claims for relief.

However, Billing Counts XI-XIV, XXI-B allege that Defendants violated the Illinois FCA and ICFPA by submitting false claims to Illinois Medicaid and private insurers. Unlike Counts I-III, Relator alleges that Defendants violated these state statutes by submitting false claims for continuously monitoring obstetrics patients. These claims do not contain the same fatal flaw as Counts I-III.

Under 28 U.S.C. § 1367(c)(3), the Court may continue to exercise supplemental jurisdiction over these state law claims. See also Wright v. Associated Ins. Cos. Inc., 29 F.3d 1244, 1251 (7th Cir. 1994) ("A district court should consider and weigh the factors of judicial economy, convenience, fairness and comity in deciding whether to exercise jurisdiction over pendent state-law claims.").

The Court declines to do so and instead DISMISSES WITHOUT

PREJUDICE Counts XI-IV, and XXI-B.

### C. ALLEGING PARTICULARITY UNDER RULE (9)(B) FOR COUNTS ALLEGING VIOLATIONS OF THE FALSE CLAIMS ACT AND ILLINOIS FALSE CLAIMS ACT

Because the FCA is an anti-fraud statute, Rule 9(b) requires

Relator to "state with particularity the circumstances constituting

fraud . . ." in counts alleging violations of the FCA and Illinois FCA.

See Gross, 415 F.3d at 604. Defendants move to dismiss the

remaining counts that allege violations of the FCA, the CRNA

Counts (Counts IV-VI, XV-XVII) and the Cost Report Counts

(Counts VII-IX, XVIII-XX), for failing to reach Rule 9(b)'s heightened

pleading standard.  Because the Billing Counts have been

dismissed, the Court analyzes only whether the CRNA and Cost

Report Counts comply with Rule 9(b).

The Seventh Circuit has applied the journalistic formula of

"who, what, where, why, and when" to determine whether

complaints alleging fraud comply with Rule 9(b)'s heightened

pleading standard.  See, e.g., Ackerman v. Nw. Mut. Life Ins.

Co., 172 F.3d 467, 469 (7th Cir.1999) ("Greater precomplaint

investigation is warranted in fraud cases because public charges of

fraud can do great harm to the reputation of a business firm or other enterprise . . . .").  The circuit courts of appeal are split on what Rule 9(b) requires in a complaint alleging violations of the FCA.  See, e.g., Foglia v. Renal Ventures Mgmt., LLC, 754 F.3d 153, 155-56 (3d Cir. 2014) (discussing circuit split regarding Rule 9(b) and favoring "nuanced reading" of First, Fifth, and Ninth Circuits that plaintiff must allege "particular details of a scheme . . .  paired with reliable indicia to lead to a strong inference that claims were actually submitted" rather than the interpretation of the Fourth, Sixth, Eighth, and Eleventh Circuits that requires a plaintiff to show "representative samples" of alleged fraud, specifying time, place, and content of acts and identity of the actors).  District courts in the Seventh Circuit have applied both competing interpretations.  While some district courts have required a relator to identify a specific false claim that a defendant submitted, others call for a "representative sample" of the alleged fraud.  See, e.g., United States ex rel. Bragg v. SCR Med. Transp., Inc., 2012 WL 2072860, at *1 (N.D. Ill. 2012) (stating that plaintiff need not plead specifics about every instance of the fraud in scheme involving numerous transactions over time, but requiring complaint to plead

at least representative examples of the fraud and link conduct to fraud); United States ex rel. Garst v. Lockheed Integrated Solutions Co., 158 F. Supp. 2d 816, 821 (N.D. Ill. 2001) (dismissing complaint that failed to identify an example of any fraudulent record or statement submitted over a ten-year period), aff'd 328 F.3d 374 (7th Cir. 2003).

Although the Seventh Circuit has yet to resolve the circuit split, the court has warned district courts against taking an "overly rigid view" of Rule 9(b)'s particularity requirement.  See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co., 631 F.3d 436, 442 (7th Cir. 2011) (observing in case brought under the Illinois Consumer Fraud and Deceptive Business Practices Act that district courts tend to take an "overly rigid view" of Rule 9(b)'s particularity requirement and emphasizing that analysis may vary based on facts of case).  Indeed, the Seventh Circuit has found that a complaint may support a plausible inference of fraud without identifying the specific requests for payment the defendant submitted to the government.  United States ex rel. Lusby v. Rolls-Royce Corp., 570 F.3d 849, 854 (7th Cir. 2009) (concluding that relator's complaint supported a plausible inference of fraud when

the complaint specified the parts Rolls-Royce shipped to the government, the dates the parts were shipped, and the details of payment but did not include specific requests for payment that were in exclusive possession of defendant). If the Amended Complaint supports a plausible inference of fraud, Relator has complied with Rule 9(b).

The CRNA and Cost Report Counts allege false claims resulting from violations of federal and state anti-kickback statutes. Both the CRNA and Cost Report Counts allege that Defendants Associated, Medical Memorial Center, and Medical Health System engaged in a kick-back scheme in which Medical Memorial paid for Associated's supplies, equipment, and CRNA costs and Associated in turn referred Medicare and Medicaid patients to Memorial Medical for surgical procedures. According to Relator, this scheme violated anti-kickback laws. Relator alleges that Defendants Associated, Medical Memorial, and Medical Health System submitted false claims to the government by certifying that they had complied with the anti-kickback laws when filing reimbursement requests and cost reports to the government.

The CRNA Counts additionally allege that although Memorial Medical paid for the salaries and benefits of CRNAs, Associated submitted claims for compensation to Medicare for these expenses. The Cost Report Counts also include allegations that the agreement between these defendants regarding CRNAs allowed Memorial Medical and Memorial Health System to include the wages and benefits of CRNAs in their annual cost reports to Medicare, which "potentially" led to additional reimbursements for Memorial Medical and Memorial Health Systems.

As a threshold matter, Relator sufficiently alleges in the CRNA and Cost Report Counts that the entity submitting the requests for payment and cost reports had to certify that it had complied with the applicable regulations, like the anti-kickback laws. See Gross, 415 F.3d at 605 ("[W]here an FCA claim is based upon an alleged false certification of regulatory compliance, the certification must be a condition of the government payment in order to be actionable."). These Counts contain the certifications Associated and Memorial Medical had to sign when submitting claims and cost reports to the government and demonstrate that these certificates were conditions of payment.

Although Relator's Amended Complaint may not have to include or identify specific requests for payments or specific cost reports, the CRNA and Cost Report Counts fail to comply with even Lusby's somewhat mitigated Rule 9(b) analysis of "plausibly inferring" that Defendants engaged in fraud. See Lusby, 570 F.3d at 854. The CRNA and Cost Reports Counts are completely void of any detail about the underlying kick-back scheme Relator claims violated the certifications the defendants submitted. A scarcity of information exists about the alleged agreement to engage in this scheme—such as when the agreement to engage in this scheme occurred and how the scheme was enacted—and the scheme itself. Relator does not identify one instance in which he or anyone else at Associated was pressured to refer patients to Memorial Medical for surgery; nor does he name one patient who was referred.

Additionally, Relator does not include any details that plausibly infer his allegations in the CRNA and Cost Report Counts are true. He does not identify any patient who was billed by Associated for CRNA services or reference a conversation he had or overhead that would support this allegation of double-billing. Even the Lusby complaint, which alleged that Rolls-Royce defrauded the

United States about the quality of its turbine blades, named the "specific parts shipped on specific dates," and "relate[d] details of payment." 570 F.3d at 854.

Lack of detail in a complaint may not always be a fatal blow under Rule 9(b). Fraud can be pleaded "based on information and belief" when the facts constituting the fraud are only accessible to the defendants and the complaint otherwise provides "grounds for its suspicions" that make the allegations plausible. <u>Pirelli</u>, 631 F.3d at 443 (stating that when someone alleges fraud "based on information and belief, not just any grounds will do" and rejecting grounds that relied on allegations in other complaints against defendant). But the CRNA and Cost Report Counts do not provide any grounds or bases that suggest the allegations are plausible. Although Relator was employed as an anesthesiologist at Associated for nearly 20 years, he does not supply even secondhand information about this alleged referral scheme that directly involved anesthesiologists at Associated.

Because neither the CRNA nor Cost Report Counts particularly allege or plausibly infer that Associated, Memorial Medical, and Memorial Health engaged in a kick-back scheme, the

counts fail to sufficiently allege that these defendants violated the False Claims Act and Illinois FCA.  Accordingly, the CRNA Counts (Counts IV-VI, XV-XVII) and the Cost Report Counts (Counts VII-IX, XVIII-XX) are DISMISSED WITHOUT PREJUDICE.

## D. STANDING TO PURSUE CLAIMS UNDER ILLINOIS FALSE CLAIMS ACT AND ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT

In Counts XI-XX, Relator alleges violations of the Illinois FCA, 740 ILCS 175/3(a)(1), and in Count XXI-B, a violation of the Illinois ICFPA, 740 ILCS 92/1, et seq.  Counts XI-XIV and XXI-B involve allegations that Associated submitted false claims to Medicare that Associated anesthesiologists provided continuous monitoring of epidural patients and that Associated, CBIZ Medical, and ABC created false records to support those false claims.  Counts XV-XX allege that Associated and Memorial Medical Center were involved in a kickback scheme in which Associate would refer patients to Memorial Medical Center in exchange for assistance from CRNAs, leading to both defendants submitting false claims to Illinois Medicaid.

Defendants' challenge to these claims center on the notice procedures required under the Illinois FCA, 740 ILCS

175/3(a)(1)(B), and Illinois ICFPA, 740 ILCS 92/1, et seq. Like the federal FCA, these two state statutes require a relator to serve a copy of the complaint and "written disclosure of substantially all material evidence and information the person possesses . . . on the State." 740 ILCS 175/4(b)(2); 740 ILCS 92/15(b); <u>see also</u> FCA, 31 U.S.C. § 3730(b)(2). Under all of these statutes, the complaint is to be filed under seal. Defendants argue that because the docket fails to indicate that Defendants complied with the statutory notice and disclosure requirement of the Illinois FCA and ICFPA, Relator lacks standing to pursue Counts XI-XX and XXI-B.

Relator, however, did comply with the notice and disclosure requirements of these two state statutes. On March 4, 2011, Relator electronically filed proof of serving the Illinois Attorney General with the Complaint and requisite material disclosures (d/e 4). On February 13, 2012, Relator filed proof of serving the Illinois Attorney General with a copy of the Amended Complaint (d/e 14). Because these proofs of service remain under seal, Defendants would not have known their contents. However, to respond to Defendants' standing argument, Relator filed the proofs of service and accompanying cover letters to the Illinois Attorney General as

part of his Response to the Motion to Dismiss, and declined to request that the Court seal these documents. All parties are now aware of the dates Relator served the documents, and can plainly see that Relator complied with the notice and statutory requirements of the Illinois FCA and ICFPA. The fact that the Illinois Attorney General, in contravention of 740 ILCS 175/4(b)(4)(B) and 740 ILCS 92/15(d)(2), failed to timely notify the Court about her intention to either intervene in this case or decline to intervene does not undermine Relator's efforts to provide her with proper service.

Because Relator properly served the Illinois Attorney General under the Illinois FCA and ICFPA, Defendants' Consolidated Motion to Dismiss Counts XI-XX and XXI-B is DENIED in part.

### D. STATUTE OF LIMITATIONS UNDER FALSE CLAIMS ACT, ILLINOIS FALSE CLAIMS ACT, AND ILLINOIS INSURANCE CLAIM FRAUD PREVENTION ACT

Defendants also challenge Relator's claims brought under the FCA, Illinois FCA, and Illinois ICFPA as time-barred. The statute of limitations is an affirmative defense that complaints are not required to anticipate and address. See, e.g., Indep. Trust Corp. v. Stewart Info. Servs. Corp., 665 F.3d 930, 935 (7th Cir. 2012).

However, dismissal under Rule 12(b)(6) is warranted when allegations in a complaint satisfy this affirmative defense. <u>Id.</u>

Relator's Complaint alleges that Defendants engaged in a scheme to submit false claims to Medicare and Medicaid to receive payments from the government from 1997 to the present day. Relator concedes that the claims alleging violations of the FCA and Illinois FCA before March 30, 2000 are time-barred. The parties dispute which statute of limitations in the FCA, 31 U.S.C. § 3731(b)(2), applies, and what claims, if any are barred under the Illinois ICFPA, 740 ILCS 92-45.

## 1. Relator May Pursue FCA and Illinois FCA Claims Alleged to Have Occurred As Early As March 30, 2010.

Section 31 U.S.C. § 3731 of the FCA states:

(b) A civil action under section 3730 may not be brought—

    (1)  more than 6 years after the date on which the violation is committed, or

    (2)  more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,

whichever occurs last.

The Illinois FCA echoes the statutes of limitations cited above, substituting the appropriate state references for the federal ones contained in the FCA.  See 740 ILCS 175/5(b).

The parties dispute whether the six-year statute of limitations in § 3731(b)(1) or the three-year statute of limitations in § 3731(b)(2) applies to a relator's FCA claims.  Federal courts of appeals disagree on this issue as well.  A split exists among the courts of appeal whether § 3731(b)(2) applies to qui tam plaintiffs as well as to the government.  The Fourth, Fifth, and Eleventh Circuit have found that § 3731(b)(2) contains a "tolling provision" available only to the government.  See, e.g.,  United States ex rel. Sanders v. N. Am. Bus Indus., Inc., 546 F.3d 288, 293 (4th Cir. 2008) ("Congress intended Section 3731(b)(2) to extend the FCA's default six-year period only in cases in which the government is a party, rather than to produce the bizarre scenario in which the limitations period in a relator's action depends on the knowledge of a nonparty to the action."); United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 725-26 (10th Cir. 2006) (same); Foster v. Savannah Commc'n, 140 F. App'x 905, 907 (11th Cir. 2005)

(applying only the six-year statute of limitations to the relator's claim without discussing § 3731(b)(2)); <u>U.S. ex rel Erskine v. Baker</u>, 213 F.3d 638 (5th Cir. 2000) (unpublished) (per curiam) ("[Section] 3731(b)(2) is only available to relators if they are in direct identity with the government. . . . [Relators] are thus bound by § 3731(b)(1), which governs relator actions.").

The Third and Ninth Circuits have come to the opposite conclusion, finding that § 3731(b)(2) applies to qui tam plaintiffs. The courts have found that the three-year period in § 3731(b)(2) begins when the plaintiff, rather than the government, discovers the alleged fraud. <u>See, e.g.</u>, <u>United States ex rel. Malloy v. Telephonics Corp.</u>, 68 F. App'x 270, 273 (3d Cir. 2003) (holding that 31 U.S.C. § 3731(b)(2) may apply to qui tam plaintiffs and that the three-year extension begins when plaintiffs learn of the alleged fraud); <u>United States ex rel. Hyatt v. Northrup Corp.</u>, 91 F.3d 1211, 1218 (9th Cir. 1996) (same).

The Seventh Circuit has yet to decide the issue, but the majority of district courts in this circuit have agreed with the Third and Ninth Circuits that both subsections may apply to relators. <u>See, e.g.</u>, <u>United States ex rel. Bidani v. Lewis</u>, No. 97 C 6502, 1999

WL 163053, at *9 (N.D. Ill. Mar.12, 1999) (Hart, J.) (thoroughly discussing the legislative history of § 3731(b) and concluding that "the three-year knowledge rule is measured by the knowledge of the qui tam plaintiff"); United States ex rel. King v. F.E. Moran, Inc., No. 00 C 3877, 2002 WL 2003219, at *13 (N.D. Ill. Aug. 29, 2002)(Kennelly, J.) (relying on Bidani and the Ninth Circuit's decision in Hyatt to find that relator's three-year statute of limitations began when relator knew of alleged fraud); United States ex rel. Hudalla v. Walsh Const. Co., 834 F. Supp. 2d 816, 824 (N.D. Ill. 2011) (Kennelly, J.) (citing King for finding that three-year statute of limitations begins when relator knew of fraud); see also Goldberg v. Rush Univ. Med. Ctr., 929 F. Supp. 2d 807, 826 (N.D. Ill. 2013) (Castillo, C.J.) (declining to rule on whether § 3731(b)(2) applies to qui tam plaintiffs because plaintiffs conceded that six-year statute of limitations applied either way). But see United States ex rel. Hill v. City of Chi., 08 C 4540, 2014 WL 123833, at *1 n.1 (N.D. Ill. Jan. 14, 2014) (Pallmeyer, J.) (briefly noting that § 3731(b)(1)'s six-year statute of limitations applied to case filed by qui tam plaintiff without discussing whether § 3731(b)(2) would apply).

This Court agrees with the Third and Ninth Circuits and the district courts that have followed their lead, that § 3731(b)(2) applies to relators as well as the government.  Rather than delve into the morass of legislative history to support this conclusion, as the above-cited cases do, the Court finds the answer in the plain language of the statute.  See Milner v. Dep't of Navy, 131 S. Ct. 1259, 1266 (2011) (warning that although legislative history may be useful to illuminate ambiguous test, "ambiguous legislative history" should not be used to "muddy clear statutory language").

Senior Judge Milton I. Shadur of the Northern District of Illinois and Judge Lamberth of the District of Columbia have done the same.  See United States ex rel. Salmeron v. Enter. Recovery Sys., Inc., 464 F. Supp. 2d 766, 767 (N.D. Ill. 2006); United States ex rel. Pogue v. Diabetes Treatment Centers of Am., 474 F. Supp. 2d 75, 84-85 (D.D.C. 2007).  Pogue emphasized that the opening clause of § 3731(b), "A civil action under § 3730 may not be brought," does not distinguish between actions brought by the government and qui tam plaintiffs.  474 F. Supp. 2d at 84-85.  Similarly, neither subsection of § 3731(b) explicitly excludes relators after the opening clause envelopes them.  Id. at 85.  Therefore, the

court concluded, the two subsections of § 3731(b) refer to relators and the government.

The structure of § 3731(b) also supports the finding that relators are included in subsection (b)(2). The closing clause of § 3731(b)—"whichever occurs last" —is not bunched with the text of either subsection. Rather, "whichever occurs last" stands alone and clearly refers to both subsection (b)(1) and (b)(2). See Pogue, 474 F.Supp. 2d at 85. The final phrase indicates that the two subsections are to be read in the alternative: either the six-year or the three-year statute applies to claims brought under § 3730. See Salmeron, 464 F. Supp. 2d at 769 (noting that the time bar is established by the "later" of two alternatives proposed in § 3731(b)(1) and § 3731(b)(2)).

Among the courts that have applied the three-year statute of limitations, a further split exists. The Third and Ninth Circuits and the Northern District of Illinois courts in the above-cited cases substitute the "official in the United States" in § 3731(b)(2) with "qui tam plaintiff" or "relator," so that the three-year limitations period starts to run when the relator, rather than the relevant government official, knows or should have known about the alleged fraud. In

Salmeron, Judge Shadur referred to this "transmut[ation]" as "with all respect . . . a conjurer's trick."  464 F. Supp. 2d at 767. Likewise, Judge Lamberth criticized courts that had interpreted "official" to be "relator" in § 3731(b)(2).  Rather than read the statute of limitations in subsection (b)(2), "which makes good sense as written," Judge Lamberth accused these courts of "declar[ing] [§ 3731(b)] ambiguous, put[ting] their own gloss on innocuous parts of the legislative history, and ultimately justify[ing] their interpretation on the grounds that it and it alone best serves the overall legislative purpose."  Pogue, 474 F. Supp. 2d at 87.

The Court need not decide whether the three-year extension in § 3731(b)(2) is triggered when the government official—rather than the relator—learns of the material facts of the alleged fraud.  Either way, Relator filed a timely complaint under § 3731(b)(2).  Nothing in the record indicates that the relevant government official knew of the alleged fraud before Relator filed his Complaint in March 30, 2010, and Relator's first "inklings" of fraud occurred less than a year before, in April of 2009.  Therefore, when Relator filed his Complaint on March 30, 2010, he was well within the three-year

statute of limitations, regardless of whose knowledge may have started the clock.

Under § 3731(b)(2), the 10-year statute of repose applies to "the date on which the violation [was] committed." The parties implicitly stipulate that March 30, 2010 is the date "on which the last violation was committed," though March 30, 2010 was the date Relator filed his Complaint. On this point, the Court will not dispute what the parties do not. Accordingly, if Relator successfully pleads violations of the FCA in a second amended complaint, Relator may pursue claims paid by the federal government and the Illinois government from March 30, 2000 to the present day. Relator's allegations of Defendants' violations of the FCA and Illinois FCA before March 30, 2000 are DISMISSED WITH PREJUDICE.

## 2. Relator May Pursue Claims Under Illinois Insurance Claim Fraud Prevention Act From March 30, 2002 Onward.

Count XXI of Relator's Amended Complaint alleges that Associated violated the Illinois ICFPA, 740 ILCS 92/1, by submitting false claims to private insurance carriers. The ICFPA's time limitations mirror § 3731(b)(2) by including a statute of limitations (subsection (a)) and a statute of repose (subsection (b)):

(a) Except as provided in subsection (b), an action pursuant to this Act may not be filed more than 3 years after the discovery of the facts constituting the grounds for commencing the action.

(b) Notwithstanding subsection (a), an action may be filed pursuant to this Act within not more than 8 years after the commission of an act constituting a violation of this Act, Section 17-8.5 or Section 17-10.5 of the Criminal Code of 1961 or the Criminal Code of 2012, or a violation of Article 46 of the Criminal Code of 1961.

740 ILCS 92-45

Although Relator may have been "intimately familiar with Associated's billing procedures," as Defendants contend, the Amended Complaint indicates that Relator only began to suspect Associated was submitting fraudulent claims in April of 2009. The trigger event under subsection (a) is therefore April of 2009 at the earliest. Because Relator filed the Amended Complaint well within three years of this date, Relator has complied with subsection (a) and may pursue the ICFPA claims.

Which potential ICFPA claims Relator can pursue is found in subsection (b) of the ICFPA. Like the 10-year limitation in 31 U.S.C. § 3731(b), the eight-year limitation in subsection (b) of the ICFPA refers to the date the actual violation of the statute occurred, "notwithstanding" the statute of limitations that begins to run when

someone "discovers" the alleged fraud.  <u>Compare</u> 31 U.S.C. § 3731(b)(2) ("A civil action may not be brought . . . more than three years after the date when facts material to the right of action are known . . . .") <u>with</u> 740 ILCS 92-45 ("(a) Except as provided in subsection (b), an action pursuant to this Act may not be filed more than 3 years after the discovery of the facts constituting the grounds for commencing the action . . . . (b) Notwithstanding subsection (a), an action may be filed pursuant to this Act within not more than 8 years after the commission of an act constituting a violation of this Act . . . .").  Just as § 3731(b)(2) will allow Relator to recover for FCA violations as early as March 30, 2000, subsection (b) of the ICFPA will permit Relator to recover for violations beginning on March 30, 2002.

## V.    CONCLUSION

**Defendant Associated's Motion to Dismiss (d/e 50) is DENIED because Counts X and XXI-A of the Amended Complaint sufficiently allege that Associated violated the False Claims Act and the Illinois FCA for terminating him in July of 2009.**

**The Consolidated Motion to Dismiss (d/e 56) is GRANTED in part and DENIED in part. Counts I-III, XI-XIV, XXI-B (Billing Counts), Counts IV-VI, XV-XVII (CRNA Counts) and Counts VII-IX, XVIII-XX (Cost Report Counts) are DISMISSED WITHOUT PREJUDICE for failing to comply with Rule 9(b) and because the Court declines to exercise subject-matter jurisdiction over the state law claims. Additionally, Relator's allegations of violations of the FCA and Illinois FCA before March 30, 2000, and allegations of violations of the Illinois ICFPA before March 30, 2002 are DISMISSED WITH PREJUDICE. Relator has until September 26, 2014 to file a Second Amended Complaint.**

ENTERED: August 25, 2014

FOR THE COURT:

s/Sue E. Myerscough
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE