**E-FILED**
Thursday, 14 January, 2016  03:50:49 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **DONALD HELFER, M.D.** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-3076** |
| | ) | |
| **ASSOCIATED** | ) | |
| **ANESTHESIOLOGISTS OF** | ) | |
| **SPRINGFIELD, LTD.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

Before the Court is Defendant Associated Anesthesiologists of Springfield, LTD's Motion for Summary Judgment (d/e 146), pursuant to Federal Rules of Civil Procedure Rule 56.  The Motion is DENIED.  Because of a lack of evidence that Associated was going to terminate Dr. Helfer prior to his contact with Medicare, the creation of a motion to terminate Dr. Helfer just days after Associated discovered that Dr. Helfer contacted Medicare, documentary evidence, including an email from Dr. Booton stating that Dr. Helfer should be terminated for contacting Medicare, and

credibility judgments that remain for the jury, a reasonable jury could find that Dr. Helfer's contact with Medicare was a but-for cause of his termination by Associated. Therefore, a genuine issue of material fact remains and the Defendant is not entitled to judgment as a matter of law.

## I. BACKGROUND[1]

From August 1990 to July 2009, Plaintiff Donald Helfer, M.D. ("Dr. Helfer") was an anesthesiologist and shareholder at Associated Anesthesiologists of Springfield, LTD ("Associated") in Springfield, Illinois. Associated provides anesthesia services to patients at Memorial Medical Center ("Memorial"). Dr. Helfer signed an employment agreement with Associated at the commencement of his employment. The employment agreement gave Associated the right to terminate Dr. Helfer without cause with 90-days' notice.

During Dr. Helfer's employment, Associated contracted with Anesthesia Billing Consultants ("Anesthesia Billing") to provide billing, accounts receivable, and management services to Associated. Anesthesia Billing was providing billing, accounts

---

[1] Unless otherwise noted, the factual information in this section is taken from the undisputed facts set forth in the parties' summary judgment briefs. *See* Def. Mem. in Support of Mot. Summ. J. (d/e 147); Pla. Resp. to Def. Mot. Summ. J. (d/e 148).

receivable, and management services for Associated in 2009.

Associated held monthly shareholder meetings to discuss corporate

business.  At the meetings, Partners, including Dr. Helfer, could

attend and could bring matters to the attention of Associated's

corporate officers.  ("Partner" is the term shareholders of Associated

use to refer to fellow shareholders.)  A representative of Anesthesia

Billing attended the monthly board meetings.

Beginning, at the latest, in 2008, significant tension arose

between Dr. Helfer and the rest of the group for a number of

reasons.  Partners described Dr. Helfer as isolated from the group

and difficult to work with.  Partners were also unhappy with the

amount of narcotics that Dr. Helfer was using for certain surgeries

because it was more than the rest of the anesthesiologists were

using.[2]  Foremost among the reasons for this tension was

Associated's displeasure with Dr. Helfer for allegedly contacting

third parties with concerns he had about Associated's business

---

[2] Partners testified in their depositions that in total knee, total hip, and other similar procedures, the anesthesiologists at Associated would typically administer 0.2 mg of a narcotic called Duramorph.  Dr. Helfer, however, would administer as much as 0.5 mg of Duramorph.  Although no Partner testified that 0.5 mg was outside the acceptable range of narcotic, so as to constitute malpractice, Partners testified that Dr. Helfer's patients frequently took longer to wake up after anesthesia and had an increased tendency to suffer respiratory issues in post-op.

practices on two separate occasions: one instance where he allegedly contacted the IRS about Associated's employees' health savings accounts and another instance where he allegedly contacted the President of Memorial about Associated's billing of epidurals.

In May 2008, at Associated's monthly shareholder meeting, the Partners discussed an IRS issue regarding Associated's employee health savings accounts. Dale Becker, an accounting consultant hired by Associated, advised the shareholders that Associated's health savings account plan did not comply with the law. Associated adopted the plan under Section 125, which applies to "S" corporations, when the group should have adopted the plan under Section 105, which applies to corporations. Although, the error had no impact on Associated's tax return, full compliance with the law would have required Associated's employees to file amended tax returns. However, Mr. Becker advised the shareholders that, despite the plan's noncompliance, there was no actual harm done, therefore the Partners did not need to file amended tax returns. *See* Becker Dep. at 17-28 (d/e 148-1 at 3-5). After the meeting, Dr. Helfer contacted the IRS directly. The record does not clearly reflect

the reason that Dr. Helfer contacted the IRS.  Dr. Helfer testified

that he contacted the IRS about the health savings account plan's

noncompliance in regard to his personal income taxes.  *See* Helfer

Dep. (d/e 147-1) at 55.  Other Partners testified that Dr. Helfer

contacted the IRS specifically about Associated's noncompliance.

*See, e.g.*, Booton Dep. (d/e 147-3) at 66-72.  The IRS later audited

Associated, although the record does not reflect whether the audit

was directly in response to Dr. Helfer's inquiry.

Later, in December 2008, Dr. Helfer, without authorization

from Associated, contacted Ed Curtis, the President of Memorial,

and asked him about Associated's billing.  Dr. Helfer testified that

he asked Mr. Curtis about how the CRNAs'[3] time was billed to

insurers.  *See* Helfer Dep. (d/e 147-1) at 78.  Mr. Curtis testified

that Dr. Helfer told Mr. Curtis he was "worried about whether

[Associated was] billing properly" in some Medicare cases.  Curtis

Dep. (d/e 147-4) at 13.   As a result of Dr. Helfer's contact with Mr.

Curtis, Memorial conducted an internal audit, including an inquiry

---

[3] CRNA stands for Certified Register Nurse Anesthetist.  CRNAs work
exclusively with the anesthesiologists, as opposed to CRNs, or Certified
Registered Nurses, who work with other doctors in the hospital.  In 2008,
Associated did not employ any CRNAs.  All of the CRNAs were employed by
Memorial.

into Associated's billing.  The audit revealed no improper billing by

Memorial or Associated.  On January 15, 2009, Dr. Helfer was

reappointed to the active staff of the Department of Anesthesiology.

However, the letter informing Dr. Helfer of his reappointment was

issued by Memorial and the record does not provide any evidence

that Associated has input on reappointment of the hospital's active

anesthesiology staff.  *See* Pla. Resp. to Def. Mot. Summ. J. (d/e

148-1) at 48.

On February 11, 2009, Associated's Executive Committee[4]

held a meeting with Dr. Helfer to discuss his future with Associated.

The Executive Committee was upset with Dr. Helfer for discussing

corporate business with the IRS and Ed Curtis without

authorization or consent from Associated.  At the meeting, the

Executive Committee told Dr. Helfer that, if he was concerned about

something, he should bring it to the group rather than talk to third

parties, unless he had authorization from Associated.  The

Executive Committee also asked Dr. Helfer whether or not he

---

[4] The Executive Committee is comprised of the President, Vice President,
Secretary, and Treasurer.  Partners serve short terms of office in the executive
positions, so many Partners, including Dr. Helfer, have served in one or more of
the positions in the past.  In 2009, the Executive Committee was Dr. Peter
Martin, Dr. Derek Booton, Dr. Joseph Ducaji, and Dr. Reginald Bulkley.

wanted to remain with Associated.  Dr. Helfer responded only that

he wanted to continue to provide anesthesia services at Memorial.[5]

On February 25, 2009, at the monthly shareholder meeting, the

Partners, as a whole, again instructed Dr. Helfer to bring any

concerns he had to Associated and not to contact outside

individuals without first talking to the group.

In May of 2009, Dr. Helfer was concerned about Associated's

billing of labor epidurals to Medicare.  Dr. Helfer thought that

Associated was billing labor epidurals as though the

anesthesiologist was present in the delivery room through the point

of the birth, even though the anesthesiologist left the delivery room

after administering the epidural drugs.  He brought his concerns

directly to, then President, Dr. Peter Martin.  On May 25, 2009, in

response to Dr. Helfer's questions, Dr. Martin contacted Anesthesia

Billing representative Rita Astani and asked her to give an opinion

on the epidural billing issue at the next shareholder meeting.  *See*

Def. Mem. in Supp. of Mot. Summ. J. (d/e 147-6).  In her response

to Dr. Martin's email, Rita Astani attached a Medicare publication

---

[5] Associated has an exclusive contract to provide anesthesia services for
Memorial.  Therefore, as it stood in 2009 and apparently still stands today, the
only way for a doctor to provide anesthesia services at Memorial is as a
member of Associated.

for Dr. Martin to send to Dr. Helfer.  *See* Def. Mem. in Supp. of Mot. Summ. J. (d/e 147-7).  Further, Rita Astani wrote that she could not find the publication Dr. Helfer had cited in his inquiry and asked Dr. Martin to have Dr. Helfer send her the publication.  *Id.* On May 29, 2009, Dr. Martin forwarded Rita Astani's response to Dr. Helfer.  *Id.*  On May 31, 2009, Dr. Helfer emailed Dr. Martin stating that his questions were still not answered, providing a link to an online manual, and advising Dr. Martin that it would be easy to call Medicare to get the answer.  *See* Pla. Resp. to Def. Mot. Summ. J. (d/e 148-1) at 37.

On June 3, 2009, Associated held its monthly shareholder meeting.  Dr. Helfer testified that the epidural billing issue was discussed at the meeting but not at length.  *See* Helfer Deposition (d/e 147-1) at 128.  The minutes from the meeting cite that "billing of labor epidurals" was discussed during Rita Astani's review of the billing reports.  *See* Pla. Resp. to Def. Mot. Summ. J. (d/e 148-1) at 39.  Dr. Helfer further testified that, although he assumed Dr. Martin was working to resolve Dr. Helfer's concerns, those concerns were not resolved by the end of the June 3, 2009 meeting.  *See* Helfer Deposition (d/e 147-1) at 128-29.

On June 4, 2009, Dr. Helfer emailed the Center for Medicare & Medicaid Services[6] ("Medicare") directly about his concerns. Dr. Helfer's contact with Medicare was not authorized by Associated. Dr. Helfer received a response from Medicare and notified Dr. Martin. *See* Pla. Resp. to Def. Mot. Summ. J. (d/e 148-1) at 40. After receiving Medicare's response, Dr. Martin continued his inquiry with Rita Astani via email. *Id.* at 43. During the course of this inquiry, several other Partners were cc'd on the emails, including Dr. Derek Booton and Dr. Joe Ducaji, making those Partners aware that Dr. Helfer had contacted Medicare about billing. *Id.* at 42.

On June 22, 2009, after discovering that Dr. Helfer had contacted Medicare, Dr. Ducaji sent an email to the Executive Committee members and Dr. Matthew Peecher. *See* Def. Mem. in Supp. of Mot. Summ. J. (d/e 147-9). In his email, Dr. Ducaji questioned whether Associated had authorized Dr. Helfer to contact Medicare and stated that Dr. Helfer was "undermining the process" once again. *Id.* Later that day, Dr. Booton sent an email response

---

[6] The Center for Medicare & Medicaid Services is a federal agency, within the United States Department of Health and Human Services, which administers the Medicare program.

to the same Partners.  *See* Def. Mem. in Supp. of Mot. Summ. J.

(d/e 147-10).  In his email, Dr. Booton stated:

> This is Insane.  Did our meeting with Helfer at Illini Country Club[7] a few
> months ago mean ANYTHING to him???  Who authorized him to contact
> ANYONE with his "questions"???
>
> Once again, [Dr. Helfer] is undermining the leadership of the group, and
> undermining every single other shareholder as well.  I will guarantee that
> Medicare will, in the next few months, initiate a full audit of our prior
> bills to them.  And, once again, I'm sure Helfer will chalk this up to
> another "coincidence".  Just like the IRS audit.  Just like the hospital
> audit.
>
> The entire group deserves an immediate explanation from Helfer
> concerning his actions.  If his "questions" to [Medicare] were not pre-
> authorized from the group, he should be terminated immediately.

At some point between June 22, 2009 and July 2, 2009, Dr.

Booton drafted a written motion to terminate Dr. Helfer.  *See*

Booton Deposition (d/e 147-3) at 12 ("Q: And when did you first

become aware that this document was being prepared?  Booton:

When I created it.").  The motion was then circulated by Dr. Booton,

Dr. Martin, and Dr. Ducaji and signed by all Partners other than

Dr. Helfer.  The motion was dated July 2, 2009.  The only Partners

that were aware that the motion was being created were the

members of the Executive Committee and Dr. Peecher.  It is unclear

from the testimony of the Partners to what extent the Executive

---

[7] Dr. Booton's reference to Illini Country Club refers to the February 11, 2009
meeting between the Executive Committee and Dr. Helfer, which was held at
Illini Country Club.

Committee gave reasons for the circulation of the motion.  The only

Partner no longer affiliated with Associated, Dr. Ranga Reddy,

stated that before he was presented the motion, there was a lot of

"unofficial talk" about how "Dr. Helfer approached

[Medicare]…without permission of the corporation."  Reddy

Deposition (d/e 147-22) at 11-13.

On July 2, 2009, after the signatures had been obtained, and

after Dr. Helfer had gone home for the day, Dr. Martin called Dr.

Helfer and requested that he return to Memorial.  Exactly what was

said during that phone call is not clear from the record.  A short

time later, Dr. Ducaji also called Dr. Helfer and asked him to return

to Memorial.  Dr. Helfer told Dr. Ducaji that he could not return to

Memorial due to a prior commitment.  Dr. Ducaji then informed Dr.

Helfer that he had been terminated and could not return to

Memorial.  Eight days after this phone conversation, on July 10,

2009, Associated held a special meeting, wherein the Partners

unanimously decided to adopt the motion to terminate.

Dr. Helfer was not given written notice by Associated of any

complaints, prior to his termination.  Further, Dr. Helfer was not

given a 90-day written notice of his termination.[8]  However, Dr. Helfer did receive salary and benefits for 90 days after being informed of his termination.

During depositions, each Partner who signed the motion for termination offered testimony about why he or she signed the motion.  No Partner testified that Dr. Helfer was terminated *exclusively* because he contacted Medicare.[9]  *Id.*  Further, some Partners who included Dr. Helfer's contact with Medicare among the reasons for signing off on his termination discussed the incident as part of a continued problem with Dr. Helfer undermining the group by repeatedly ignoring Associated's policy of bringing concerns to the group rather than contacting third parties.  Some Partners even testified that they believed Dr. Helfer wanted to dissolve the group so he could continue to provide services for Memorial without working for Associated.  As evidence, these Partners cited Dr. Helfer's contacts with third parties wherein he

---

[8] Dr. Helfer's employment agreement required that Associated provide written notice of any complaint that may lead to termination for cause.  The agreement further required 90-day notice of any termination not-for-cause.

[9] Partners cited a number of other reasons for signing the motion, including the general tension and displeasure with Dr. Helfer in the workplace, the instances where Dr. Helfer gave more narcotics to patients than the other Partners, and Dr. Helfer's previous contacts with the IRS and Ed Curtis.

questioned the legitimacy of Associated's business practices and Dr. Helfer's answer to the Executive Committee's question about wanting to continue to work at Associated.  Partners inferred that Dr. Helfer did not want to work with Associated from his answer that he wanted to continue to provide anesthesia services "at Memorial."

On March 30, 2010, Dr. Helfer filed a qui tam action against Associated, Anesthesia Billing, and CBIZ Medical Management Professionals, Inc.[10], alleging violations of the False Claims Act ("FCA"), the Illinois False Claims Act ("IFCA"), common-law retaliatory discharge, and the Illinois Insurance Claims Fraud Prevention Act.  *See* Complaint (d/e 1).  After the United States declined to intervene on December 13, 2011, Dr. Helfer filed an Amended Complaint[11], adding Memorial Medical Center and Memorial Health System as Defendants and asserting additional violations of the FCA and the IFCA related to Associated allegedly billing for CRNAs who are already billed for by their employer,

---

[10] CBIZ Medical Management Professionals, Inc. is a company that provided billing, accounts receivable, and management services to Associated prior to Associated's contract with Anesthesia Billing.

[11] Dr. Helfer at no point, in his initial complaint or any subsequently filed amended complaint, made any allegations regarding the 2008 issue with Associated's health savings accounts or Dr. Helfer's contact with the IRS.

Memorial.[12]  *See* Amended Complaint (d/e 13).  Dr. Helfer then

served the new Defendants and two Motions to Dismiss followed

(d/e 50, 56).

On August 25, 2014, this Court issued an Opinion denying

Associated's Motion to Dismiss and granting the other Defendants'

Consolidated Motion to Dismiss in part.  *See* Opinion (d/e 63).  The

Court dismissed all of Dr. Helfer's claims, except for Dr. Helfer's

retaliation claim against Associated.  *Id.*  As a result, the Court

dismissed all defendants other than Associated.  *Id.*  On February

9, 2015, Dr. Helfer filed his present complaint against Associated,

claiming only that he was illegally terminated in retaliation for

contacting Medicare, in violation of the FCA.  *See* Third Amended

Complaint (d/e 80).  On August 31, 2015, Associated filed a Motion

for Summary Judgment (d/e 146).  Associated's Motion for

Summary Judgment is hereby DENIED because a genuine issue of

material fact remains as to the reason why Associated terminated

Dr. Helfer.

## II.   LEGAL STANDARD

---

[12] The issue of billing for CRNAs is the same issue that Dr. Helfer brought to Ed Curtis' attention in December 2008.

The Court shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P
56(a).  "[T]he plain language of Rule 56(c)" requires that the Court
enter summary judgment against any party who, after adequate
time for discovery, "fails to make a showing sufficient to establish
the existence of [an] element essential to that party's case, and on
which that party will bear the burden of proof at trial."  *Lujan v.
Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990).  At the time of
summary judgment, a party is no longer permitted to rely only on
its pleadings, but must make a showing that "if reduced to
admissible evidence, would be sufficient to carry respondent's
burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317,
325-28 (1986).  To avoid summary judgment on an issue of fact, a
party must "present sufficient evidence from which a jury could
find" the issue of fact in the party's favor.  *Simpson v. Beaver Dam
Community Hospitals, Inc.*, 780 F.3d 784, 790 (7th Cir. 2015).
When weighing summary judgment, the Court "view[s] the record
and draw[s] all reasonable inferences" in favor of the non-moving

party.  *Warsco v. Preferred Technical Group*, 258 F.3d 557, 563 (7th Cir. 2001).

## III.  ANALYSIS

Associated argues that this Court should grant summary judgment for the singular reason that Dr. Helfer has not presented sufficient evidence to prove causation, *i.e.*, for a reasonable jury to find that he was terminated *because of* his contact with Medicare, an act that is protected by the FCA.  The FCA states that an employee is entitled to relief if he is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against…*because of* lawful acts done…in furtherance of an action" under the FCA.  18 U.S.C. § 3730(h) (emphasis added). To succeed on his retaliation claim, Dr. Helfer must prove that he contacted Medicare "in furtherance of an action" under the FCA and that his conduct was "connected to" Associated's decision to terminate him.  *Halasa v. ITT Educ. Serv., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012).  Associated's motion for summary judgment does not challenge that Dr. Helfer's contact with Medicare was an act that is protected by the FCA, but asserts only that Dr. Helfer was not terminated "because of" that action.

### a. The FCA Retaliation Provision Requires that Dr. Helfer Proves But-for Causation.

The parties rely on different authority for the meaning of "because of" in the FCA statute. Associated argues that, although the Seventh Circuit initially only required proof that the termination was "motivated, at least in part," by the FCA-protected conduct, the Seventh Circuit has since changed the standard because of the Supreme Court's decision in *Gross v. FBL Financial Serv., Inc.*, 557 U.S. 167 (2009) to instead require that the FCA-protected conduct is the "but-for" cause of the termination. *See Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 485 (7th Cir. 2004) (The plaintiff "must demonstrate that his discharge was motivated, at least in part, by the protected conduct."); *compare*, *Serafinn v. Local 722 Int'l Bhd. Of Teamsters*, 597 F.3d 908, 915 (7th Cir. 2010) (holding that, under *Gross*, "[m]ixed motive theories of liability are always improper in suits brought under statutes without language comparable to the Civil Rights Act's authorization of claims that an improper consideration was '*a motivating factor*' for the contested action"); *United States ex rel. Marchall v. Woodward, Inc.*, 85 F.Supp. 3d 973, 985 (N.D.Ill. 2015) (citing *Gross* and *Serafinn* in holding that the

"because of" language in the FCA mandates that the plaintiff in an FCA retaliation claim prove "but-for" causation).

Dr. Helfer, on the other hand, cites *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, wherein the Seventh Circuit refers to the causation standard applied in *Fanslow*.  764 F.3d 699, 715 (7th Cir. 2014) (Plaintiffs "must offer evidence from which the jury could find that…their discharge was motivated, at least in part, by the protected conduct.").  Dr. Helfer also cites *Green v. Doruff*, 660 F.3d 975 (7th Cir. 2011), a First Amendment case, wherein the Seventh Circuit provides an extensive philosophical analysis of causation when discussing the meaning of the "motivating factor" standard used in the case.  Dr. Helfer suggests that, under *Green*, Associated must show that its argued alternative reason for terminating Dr. Helfer was not simply sufficient to terminate him, but was a necessary cause of his termination.  *See* 764 F.3d at 715-16.

This Court agrees with Associated that Dr. Helfer is required to prove that his protected conduct was a "but-for" cause of his termination.  The latter authority Dr. Helfer provides, *Green*, is a case about the First Amendment claim of a prisoner who was fired

from his job as a prison library clerk.  660 F.3d 975.  Accordingly,
the case does not set forth the standard for causation in an FCA
case.  Further, Dr. Helfer's claim that Associated must show that its
alternative reason for firing Dr. Helfer was a necessary cause
improperly places the burden of proof on Associated.  *See Halasa*,
690 F.3d at 848 ("[I]n order to avoid summary judgment [*the
plaintiff*] *must have evidence* that would support a finding that he
was fired 'because of' his protected conduct.")(emphasis added).  Dr.
Helfer's other authority, *Absher*, is an FCA case, wherein the court
restates the causation standard used in *Fanslow*, *i.e.* "motivated, at
least in part."  However, the opinion in *Absher* did not include a
causation analysis.  Instead, the Seventh Circuit disposed of the
plaintiff's claim on the grounds that the plaintiff neither engaged in
conduct protected by the FCA nor was the victim of an adverse
employment action prohibited by the FCA.

Conversely, in *Serafinn*, the Seventh Circuit explicitly analyzed
the causation element in retaliation claims.  In *Serafinn*, the
Seventh Circuit held that, under *Gross*,  unless the statute clearly
states that the plaintiff only has to prove that the protected conduct
was a "motivating factor," the statute requires proof of "but-for"

causation.  *See Serafinn*, 597 F.3d at 914-15.  Then, in *Marchall*,
the Northern District specifically applied the holding in *Serafinn* to
the FCA, holding that the plaintiff must prove "but-for" causation in
FCA retaliation cases.  85 F.Supp. 3d. at 985.

Further, in *Univ. of Texas Southwestern Med. Ctr. v. Nassar*,
133 S.Ct. 2517, 2528 (2013), the Supreme Court again held that
plaintiffs must prove "but-for" causation in any claim under a
statute that does not explicitly authorize another standard.  In
*Nassar*, the Court specifically held that even a Title VII retaliation
claim requires the plaintiff to prove that the protected conduct is a
"but-for" cause of the plaintiff's termination.  *Id.*  The Court stated
that, although Title VII does contain language specifically
authorizing use of a "motivating factor" standard of causation, the
authorization only appears in the "status-based discrimination"
provision.  *Id.*

The status-based discrimination provision provides that a
plaintiff need only prove that race, color, religion, sex, or national
origin "was a motivating factor" of the adverse employment action.
42 U.S.C. § 2000e-2(m).  However, the Supreme Court noted that
the Title VII retaliation provision uses the same "because of"

language that the Court interpreted in *Gross*, and therefore, the Title VII retaliation provision similarly mandates that the plaintiff prove "but-for" causation.  Based on this precedent, this Court finds that because the FCA retaliation provision uses "because of" and not language specific to a standard of causation, the statute requires that Dr. Helfer shows that his protected conduct was a "but-for" cause of his termination.

### b. The Record Contains Sufficient Evidence for a Reasonable Jury to Find that Dr. Helfer's Contact with Medicare was a But-for Cause of his Termination.

Associated's motion for summary judgment argues that Dr. Helfer has not produced evidence sufficient for a jury to find that his FCA-protected conduct was a "but-for" cause of his termination. Associated first argues that Dr. Helfer does not meet his burden because none of the Partners that were deposed stated that Dr. Helfer's contact with Medicare was the exclusive reason that they signed the motion for termination.  Partners cite other reasons, such as the tension between Dr. Helfer and the group and Dr. Helfer's previous unauthorized contacts with the IRS and Ed Curtis.

Associated next argues that Dr. Helfer does not present sufficient evidence to prove "but-for" causation because the

Partners that were aware of Dr. Helfer's conduct were upset, not because Dr. Helfer was investigating possible fraud, but because his actions violated Associated's confidentiality agreement.  Finally, Associated argues that Dr. Helfer does not present sufficient evidence to prove "but-for" causation because Dr. Helfer admitted that, months prior to his termination, there was tension between him and the group and he was aware that members of Associated were not happy with him.  However, Associated's proffered evidence does not foreclose the possibility that Dr. Helfer's contact with Medicare was a "but-for" cause of his termination.

This Court finds that enough evidence exists for a reasonable jury to find that Dr. Helfer would not have been terminated *but for* his contact with Medicare because: (1) the salient act to analyze is not the individual signatures of the Partners but the decision to create and circulate the motion for termination; (2) a confidentiality agreement cannot trump the FCA; and (3) the requirement that an act is a "but-for" cause does not necessitate that it is the only cause.

Associated's first argument is founded upon the numerous reasons cited by various Partners for why they signed the motion to

terminate.  However, Partners who were not on the Executive
Committee, aside from Dr. Peecher, consistently testified that they
were not aware that the motion to terminate was being prepared.
Further, the same Partners consistently testified that they would
have signed a motion for termination at various points in the
months and even years leading up to Dr. Helfer's termination.
Although the above evidence shows that issues existed between Dr.
Helfer and Associated long before he contacted Medicare, the same
evidence also shows that none of the plethora of reasons why the
Partners signed the motion to terminate were the "but-for" cause of
Dr. Helfer's actual termination.  While the Partners *would have
signed* a motion for termination months prior to Dr. Helfer
contacting Medicare, no Partner *brought* a motion for termination
prior to June of 2009.  Therefore, the action taken by Associated
that a fact-finder must analyze is actually Dr. Booton's creation of
the motion for termination and Dr. Booton, Dr. Martin, and Dr.
Ducaji's circulation of the motion to the other Partners.

Associated next argues that Dr. Helfer cannot prove that his
investigation of a potential FCA claim was a "but-for" cause of his
termination because the only reason Associated was unhappy about

Dr. Helfer contacting Medicare was that he violated Associated's confidentiality agreement. However, the record does contain a confidentiality agreement between Dr. Helfer and Associated at the time he contacted Medicare. Further, even an enforceable confidentiality agreement cannot prohibit an employee from investigating a potential FCA claim. *See U.S. v. Cancer Treatment Centers of America*, 350 F.Supp.2d 765, 773 (N.D.Ill. 2004) (holding that a "confidentiality agreement cannot trump the FCA's strong policy of protecting whistleblowers who report fraud against the government").

Associated last argues that Dr. Helfer cannot prove that his contact with Medicare was a "but-for" cause of his termination because there is evidence of other causes for termination. The deposition testimony of the Partners does provide evidence that Associated had more than one reason for terminating Dr. Helfer. However, this evidence does not foreclose the possibility that a jury could reasonably find for Dr. Helfer because "but-for" cause does not mean "only cause" or "exclusive cause."

In 2014, the Supreme Court elaborated on its holdings from *Gross* and *Nassar* when the Court extensively discussed the

meaning of "but-for" cause, in *Burrage v. United States*, 134 S.Ct. 881 (2014) (Part III).  *Burrage* was an appeal of a criminal case regarding a conviction for distribution of heroin resulting in death. However, in the Court's discussion of "but-for" cause, it repeatedly refers to *Gross* and *Nassar*, demonstrating that "but-for" cause has the same meaning in both criminal law and employment law.  *See id.*  Therefore, the meaning of "but-for" cause set forth in *Burrage* also applies to Dr. Helfer's retaliation claim.

In the Supreme Court's discussion of "but-for" cause in *Burrage*, the Court begins with a simple example of A shooting B, where B is hit and dies.  Clearly, in such a case, "A [actually] caused B's death, since but for A's conduct B would not have died." *Id.* at 888.  The Court explained that the same logic applies even if the "predicate act combines with other factors to produce the result," as long as the other factors would not have produced the result on their own.  *Id.* ("if, so to speak, it was the straw that broke the camel's back").  The Court then clarified the concept through the example of poisoning a diseased person.  *Id.*  If poison is given to a man who is "debilitated by multiple diseases," the poison is the "but-for" cause, "even if those diseases played a part" in the man's

death, as long as the man would have continued to live had he not been poisoned.  *Id.*

Finally, the Court contrasted the poison example with a baseball example.  *Id.*  The Court pointed out that if a lead-off batter hit a home run in the first inning and the team won 1-0, it would be clear to all that the home run was a "but-for" cause of the win, as the win would not have come to pass without the home run.  *Id.*  Even though there were other "necessary" causes, such as good pitching and the fact that the game was scheduled at all, those other necessary causes did not prevent the home run from being a "but-for" cause.  *Id.*  However, if the team went on to win the game 5-2 rather than 1-0, the lead-off home run would not be considered a "but-for" cause, as the win would presumably have occurred with or without it.  *Id.*  Therefore, the focal point of the decision as to whether *X* is a but-for cause in a case is whether the result would have been the same if *X* did not happen.

In light of the Supreme Court's discussion of "but-for" cause in *Burrage*, it is clear that the proper consideration in the present case is whether the Partners would have created and circulated a motion to terminate Dr. Helfer if he had not contacted Medicare.  This

Court finds that sufficient evidence exists for a reasonable jury to find that Dr. Helfer would not have been terminated if he had not contacted Medicare.

First, despite evidence that Associated was not happy with various aspects of Dr. Helfer's employment and even questioned Dr. Helfer on whether he wanted to continue working for Associated in February 2009, no evidence in the record suggests that Associated was considering terminating Dr. Helfer in June 2009, when he first contacted Medicare.  Using one of the Supreme Court's examples, even though Dr. Helfer's relationship with Associated was already diseased, if Dr. Helfer contacting Medicare was the poison, without which the diseased relationship would have continued to live, the contact with Medicare is still the but-for cause.

Second, the timing of the creation and circulation of the motion for termination is highly conspicuous.[13]  The evidence does

---

[13] Associated's reply addressed an argument from Dr. Helfer's response that the "temporal sequence of events," put forth by Dr. Helfer should alone be enough to avoid summary judgment.  Pla. Resp. to Def. Mot. Summ. J. (d/e 148) at 15.  Associated noted that reliance on "suspicious timing alone" goes against Seventh Circuit precedent from *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (2005) (stating that temporal proximity will "rarely be sufficient in and of itself to create a triable issue.")(internal citation omitted).  However, the *Culver* court maintained that temporal proximity could still be persuasive as part of the plaintiff's evidence.  *See id.*

not show precisely when the motion was created; however, the motion was clearly created after members of the Executive Committee discovered that Dr. Helfer contacted Medicare, which occurred on June 22, 2009.  Further, the latest the motion could have been created was July 2, 2009, the date Dr. Helfer was informed of his termination.  Therefore, the motion was created anywhere from a matter of hours to eleven days after Dr. Booton and Dr. Ducaji found out that Dr. Helfer contacted Medicare.

Third, the record contains an email from Dr. Booton, in response to discovering that Dr. Helfer contacted Medicare.  Dr. Booton's email expresses, (1) that Dr. Booton was extremely displeased with Dr. Helfer's contact with Medicare; (2) that his displeasure with Dr. Helfer's actions was due, at least in part, to possible consequences of contacting Medicare, such as an audit; and (3) that Dr. Helfer should be terminated immediately if his contact with Medicare was not authorized by Associated.  Then, sometime in the eleven days after Dr. Booton sent this email, he created the motion for termination.

The foregoing evidence does not stand alone in support of the premise that Dr. Helfer would not have been terminated "but for"

his contact with Medicare.  The record also contains deposition testimony stating that Partners discussed Dr. Helfer contacting Medicare while the motion for termination was being circulated. Further, a jury could reasonably doubt the credibility of the Partners.  The Partners consistently recalled specific details about the negative actions of Dr. Helfer.  However, the same Partners consistently struggled to remember any details at all surrounding Dr. Helfer's termination, even though Associated has only terminated two Partners since its inception in 1982.  Therefore, a jury could reasonably infer that the Partners are withholding the details of Dr. Helfer's termination.

Further, the record shows stark differences between the testimony of the Partners who still work for Associated and Dr. Ranga Reddy, the only doctor no longer affiliated with the corporation.  For instance, Dr. Reddy remembered that, during the time the motion was being circulated, he was shown documents regarding Dr. Helfer's contact with Medicare by the members of the Executive Committee.  Such testimony directly counters Dr. Martin, Dr. Ducaji, and Dr. Booton, who testified that they did not provide information to the Partners along with the motion to terminate.  The

Page 29 of 30

above evidence is sufficient for a reasonable jury to find in favor of
Dr. Helfer on the issue of causation.

Therefore, a genuine issue of material fact still exists and the
case cannot be decided on summary judgment.

## CONCLUSION

For the foregoing reasons, Defendant Associated's Motion for
Summary Judgment (d/e 146) is DENIED.

ENTERED: January 14, 2016

FOR THE COURT:

                              s/Sue E. Myerscough
                              SUE E. MYERSCOUGH
                              UNITED STATES DISTRICT JUDGE